1  VINCENT M. COSCINO (BAR NO. 122086)
   JEFFREY R. PATTERSON (BAR NO. 126148)
2  CHARLES L. PERNICKA (BAR NO. 224134)
   ALLEN MATKINS LECK GAMBLE
3    MALLORY & NATSIS LLP
   501 West Broadway, 15th Floor
4  San Diego, California 92101-3541
   Phone: (619) 233-1155
5  Fax: (619) 233-1158
   E-Mail: vcoscino@allenmatkins.com
6          jpatterson@allenmatkins.com
           cpernicka@allenmatkins.com
7
   Special Counsel for Chapter 7 Trustee
8  James L. Kennedy

9              UNITED STATES BANKRUPTCY COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

| 12 | In re | Case No. 14-02607-CL7 |
| 13 | BURLINGAME CAPITAL PARTNERS II, L.P., a Delaware Limited Partnership, | Chapter 7 |
| 14 | Debtor. | **DECLARATION OF CHARLES L. PERNICKA IN SUPPORT OF TRUSTEE'S SUPPLEMENTAL BRIEF RE APPLICATION FOR SECOND ORDER REQUIRING PRODUCTION OF DOCUMENTS AND APPEARANCE FOR EXAMINATION BY BURLINGAME CAPITAL PARTNERS II, L.P.** |
| 19 | | Date: April 22, 2015<br>Time: 11:00 a.m.<br>Dept: 5<br>Judge: Hon. Christopher B. Latham |

23     I, Charles L. Pernicka, declare as follows:

24        1.    I am an attorney at the law firm of Allen Matkins Leck Gamble Mallory & Natsis

25  LLP ("Allen Matkins"), special counsel for Chapter 7 Trustee James L. Kennedy ("Trustee") in the

26  above-captioned proceeding. I am the attorney at Allen Matkins primarily responsible for the day-

27  to-day handling of this engagement on behalf of Trustee. I am a member in good standing of the

28  State Bar of California, duly authorized to practice in the above-captioned court.

1      2.     I attended the continued Section 341(a) meeting of creditors held in this proceeding

2 on August 12, 2014. Attached to this declaration as Exhibit 1 is a true and correct copy of a

3 portion of the Reporter's Transcript of Proceedings recording what was said at the continued

4 Section 341(a) meeting held on August 12, 2014.

5      3.     On February 13, 2015, I drafted a letter to attorneys James Beshears, John Howard,

6 and Jeffrey Cawdrey, providing notice of the duty to preserve documents and records. A true and

7 correct copy of this letter is attached to this declaration as Exhibit 2, along with facsimile delivery

8 confirmation and cover email.

9      4.     On April 2, 2015, I conducted the examination of Robert D. Judson, Jr., person

10 most knowledgeable for debtor Burlingame Capital Partners II, L.P. ("Debtor"). The examination

11 was conducted by videoconference. Attached to this declaration as Exhibit 3 is a true and correct

12 copy of the transcript of that examination, excluding Exhibit 1 to the examination (which is

13 separately attached to this declaration). I am informed that Mr. Judson signed the transcript, at

14 page 157, and provided corrections, at page 158.

15      5.     On April 3, 2015, I drafted a letter to attorneys James Beshears and Jeffrey

16 Cawdrey, demanding that the destruction of Debtor's records be immediately halted. A true and

17 correct copy of this letter is attached to this declaration as Exhibit 4, along with facsimile delivery

18 confirmation and cover email.

19      6.     Attached to this declaration as Exhibit 5 are true and correct copies of three

20 photographs, which were provided to me by Mr. Cawdrey at the commencement of the April 2,

21 2015 examination of Mr. Judson, and which were attached as Exhibit 1 to the transcript of the

22 April 2, 2015 examination.

23      7.     Attached to this declaration as Exhibit 6 is a true and correct copy of a document

24 entitled "Purchase Agreement" that was previously produced by Debtor to Trustee.

25     I declare under penalty of perjury that the foregoing is true and correct. Executed on

26 April 20, 2015, at San Diego, California.

27

28

Charles L. Pernicka

*EXHIBIT 1*

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

OFFICE OF THE UNITED STATES TRUSTEE

IN RE:

BURLINGAME CAPITAL PARTNERS II,
L.P., A DELAWARE LIMITED
PARTNERSHIP,

        DEBTOR.

CASE NO. 14-02607-CL7

341 (A) FIRST MEETING OF CREDITORS

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SAN DIEGO, CALIFORNIA

TUESDAY, AUGUST 12, 2014

OFFICE OF THE U.S. TRUSTEE
402 WEST BROADWAY, SUITE 600
SAN DIEGO, CALIFORNIA 92101

FEDERAL COURT REPORTERS
BY:  DIANE BERGER
POST OFFICE BOX 60583
SAN DIEGO, CALIFORNIA 92166
TELEPHONE:  (619) 223-6082

SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 12, 2014, 1:30 P.M.

2                          --- oOo ---

3

4          (AUDIO FILE STARTS WITH MATTER OF BURLINGAME CAPITAL

5     PARTNERS II, L.P., APPARENTLY HAVING BEEN CALLED.)

6

7          .  .  .

8

9          THE TRUSTEE:  (UNDISCERNIBLE) - AND MR. BESHEARS CAN

10    SIT WHEREVER HE WANTS.

11          MR. RUDOLPH.

12          UNIDENTIFIED SPEAKER:  AND THAT'S OFF.

13          THE TRUSTEE:  AND I'LL JUST NEED TO SEE A DRIVER'S

14    LICENSE JUST SO I CAN SEE -

15          MR. JUDSON:  MAKE SURE THAT I'M NOT SOME IMPOSTER

16    HERE.  I GET IT.  NOBODY WANTS TO LOOK AS UGLY AS ME.

17          THE TRUSTEE:  GO AHEAD AND HAVE A SEAT.

18          MR. JUDSON:  OH, YES, SIR.

19          THE TRUSTEE:  OKAY.  I'LL RETURN YOUR DRIVER'S

20    LICENSE.

21          MR. JUDSON:  THANK YOU.

22          THE TRUSTEE:  OKAY.  WE'RE ON THE RECORD HERE, SO WHAT

23    I'LL DO IS GET YOU TO RAISE YOUR RIGHT HAND.

24          (WITNESS SWORN.)

25    / / /

2

```
 1                    ROBERT DRAKE JUDSON, JUNIOR,

 2              DEBTOR REPRESENTATIVE HEREIN, HAVING BEEN

 3                FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

 4                              EXAMINATION

 5  BY THE TRUSTEE:

 6          Q    AND I'LL NEED YOU JUST TO STATE YOUR NAME AND

 7  YOUR POSITION WITH THE PARTNERSHIP.

 8          A    ROBERT DRAKE JUDSON, JUNIOR, AND I'M A PRINCIPAL

 9  OF THE GENERAL PARTNER.

10          Q    OKAY.

11          THE TRUSTEE:  AND I'LL DEFER MY QUESTIONS TO

12  MR. RUDOLPH.

13          UNIDENTIFIED SPEAKER:  JUST LET ME -

14          MR. RUDOLPH:  GOOD AFTERNOON, MR. JUDSON, AND THANK

15  YOU FOR TAKING TIME TO COME - TRAVEL HERE FROM FLORIDA.  I

16  UNDERSTAND THAT YOU HAD TO MAKE THAT JOURNEY, AND THANK YOU FOR

17  THAT.

18          AND, MR. BESHEARS, THANK YOU FOR SENDING ME

19  DOCUMENTATION THAT YOU SENT ME TODAY.  I HAVEN'T HAD A CHANCE TO

20  REVIEW IT ALL, BUT I DO HAVE SOME QUESTIONS, MR. JUDSON.

21          WE DID RECEIVE RECENTLY DOCUMENTATION FROM

22  JUDGE CHIANTELLI (PHONETIC) -

23          THE WITNESS:  - CHIANTELLI -

24          MR. RUDOLPH:  - CHIANTELLI, THAT WAS -

25  / / /
```

3

1     THE WITNESS:  - YEAH, IT'S A HARD "C."  I GOT IT WRONG
 2   FOR A LONG TIME MYSELF.
 3     MR. RUDOLPH:  I'M SURE THE FIRST TIME I PRONOUNCED IT
 4   WRONG IN FRONT OF HIM, HE WOULD HAVE CORRECTED ME, SO —
 5     THE WITNESS:  - (LAUGHTER) —
 6     MR. RUDOLPH:  - AND I THINK MY QUESTIONS ARE REALLY
 7   JUST GOING TO FOCUS TODAY ON PYTHON (PHONETIC) INJECTION.
 8     THE WITNESS:  UH-HUH.
 9   BY MR. RUDOLPH:
10     Q    WOULD YOU MIND TAKING A MOMENT AND EXPLAINING TO
11   ME THE RELATIONSHIP BETWEEN BURLINGAME CAPITAL PARTNERS II,
12   L.P., THE DEBTOR HERE, AND PYTHON INJECTION?
13     A    PYTHON IS A COMPANY UP IN — OR WAS UP IN ORANGE
14   COUNTY THAT BURLINGAME MADE A LOAN TO SOME NUMBER OF YEARS BACK,
15   AND AS PART OF COMPENSATION FOR THE LOAN, BESIDES AN INTEREST
16   RATE, WE GOT WARRANTS FOR STOCK.
17     SUBSEQUENT TO THE ORIGINAL LOAN, WE HAD TO LEND MONEY
18   AND TO THE POINT THAT OUR WARRANTS INCREASED TO ABOUT FIFTY-FIVE
19   PERCENT OF THE STOCK OF THE COMPANY.
20     AT SOME POINT THEREAFTER, WE EXERCISED OUR RIGHTS TO
21   NOT ONLY HAVE A LENDING RELATIONSHIP BUT NOW TO ACTUALLY OWN
22   FIFTY-FIVE PERCENT OF THE STOCK OF THE COMPANY.
23     Q    AND WHEN WAS THAT, THAT YOU EXERCISED THE RIGHTS?
24     A    I — I DON'T KNOW EXACTLY.
25     Q    OKAY.

                                                              4

. . .

1

2

3    MR. RUDOLPH:  IDENTIFY THAT LIST OF DOCUMENTS AS PART

4  OF A 2004 EXAMINATION STIPULATION, WHERE THE DOCUMENTS WOULD BE

5  PRODUCED AT LEAST TWO WEEKS IN ADVANCE –

6    MR. BESHEARS:  YES.

7    MR. RUDOLPH:  – OF THE DATE FOR THE 2004 EXAMINATION,

8  WHICH WE ARE TRYING TO SET FOR THE END OF OCTOBER OF 2014.

9    THAT PART OF OUR DISCUSSION, IS EVERYONE IN AGREEMENT

10  WITH WHAT WE WERE TALKING ABOUT?

11    THE WITNESS:  SURE.

12    MR. BESHEARS:  SO AGREED.

13    MR. RUDOLPH:  OKAY.

14    AND THEN, AS IT RELATES TO THE GENERAL PARTNER OF THE

15  DEBTOR, MR. JUDSON WAS INDICATING HIS DESIRE TO DISSOLVE THE

16  GENERAL PARTNER, AND THE DISCUSSION WE HAD OFF THE RECORD WAS

17  THAT HE WOULD, THROUGH MR. BESHEARS, PROVIDE TO MYSELF AND

18  MR. KENNEDY THE FINAL TAX RETURN FOR THE GENERAL PARTNER.  IF

19  THE TRUSTEE IS SATISFIED THAT THE GENERAL PARTNER HAS NO ASSETS

20  AND IS NOT WORTH PURSUING, WE WILL FILE AND SERVE A NOTICE OF

21  INTENDED ACTION NOT TO PURSUE THE GENERAL PARTNER FOR DEFICIENCY

22  CLAIMS OF THE DEBTOR.

23    UNTIL THAT HAPPENS, WE ASK MR. JUDSON NOT TO DISSOLVE

24  THE GENERAL PARTNER UNTIL YOU HEAR FURTHER FROM MR. BESHEARS.

25    THE WITNESS:  OKAY.

37

1          MR. BESHEARS:  AGREED.

2          THE TRUSTEE:  THAT'S FINE.

3          MR. RUDOLPH:  SO I THINK, WITH THAT, MR. KENNEDY, I'M

4    COMFORTABLE, UNLESS THERE'S ANY OTHER QUESTIONS, ABOUT

5    CONCLUDING.

6          MR. BESHEARS:  OH, AND THEN ON RECORDS, THE RECORDS

7    THAT ARE HELD AT - AT HIS EXPENSE AT $170 A MONTH, YOU KNOW, AT

8    SOME POINT, IF WE REACH A CONCLUSION WE DON'T NEED THEM AND WE

9    COULD AUTHORIZE THEM TO BE DISPOSED OF -

10         MR. RUDOLPH:  WE WOULD -

11         MR. BESHEARS:  - YOU KNOW -

12         MR. RUDOLPH:  - AGAIN, FILE A NOTICE OF ABANDONMENT.

13         THE TRUSTEE:  UH-HUH.

14         MR. BESHEARS:  OKAY.  YOU GUYS, IN THE MEANTIME, YOU

15   KNOW, HE CAN HAVE AN ADMINISTRATIVE CLAIM HERE FOR THE $170 A

16   MONTH -

17         THE TRUSTEE:  SURE HE CAN.

18         MR. BESHEARS:  - HE'S PAYING OUT.

19         MR. RUDOLPH:  YEAH.

20         MR. BESHEARS:  SO - OKAY.

21         UNIDENTIFIED SPEAKER:  AND ALLEN, MATKINS IS GOING TO

22   RESERVE RIGHTS TO OBJECT TO THAT.

23         MR. BESHEARS:  SURE.

24         UNIDENTIFIED SPEAKER:  WE MAY HAVE EX- -

25   / / /

38

```
 1          THE TRUSTEE:  TO THE ABANDONMENT, YOU MEAN?  OR JUST
 2   TO THE —

 3          UNIDENTIFIED SPEAKER:  TO EITHER ABANDONMENT OR
 4   DESTRUCTION.

 5          THE TRUSTEE:  OH, YEAH.  WELL, THEY CAN'T BE DESTROYED
 6   UNTIL THEY'RE ABANDONED, BUT, I MEAN, I JUST — BUT I — IF ALLEN,
 7   MATKINS WANTS TO PAY THE $170 A MONTH TOO, THAT COULD SOLVE THE
 8   PROBLEM.

 9          UNIDENTIFIED SPEAKER:  OH, I THINK WE HAD A LOT OF
10   FIGHTING ABOUT BURLINGAME HAVING A VERY STRONG DESIRE ABOUT
11   MAINTAINING THEM ITSELF.

12          THE TRUSTEE:  YEAH.  WELL, BUT NOW BURLINGAME IS —
13          MR. JUDSON:  WELL, THERE WERE —
14          THE TRUSTEE:  — BROKE, SO —
15          THE WITNESS:  — WELL, THERE WAS A — THERE WAS A FIGHT
16   ABOUT (A) GETTING THEM, AND THEN THERE WAS A FIGHT ABOUT WHERE
17   THEY WERE GOING TO BE MAINTAINED, AND THEN THERE WAS A FIGHT
18   ABOUT WHETHER BURLINGAME HAD THE RIGHTS —
19          MR. RUDOLPH:  WELL —
20          THE TRUSTEE:  — SO, WELL — .
21          MULTIPLE SPEAKERS:  — (UNDISCERNIBLE) —
22          THE WITNESS:  — WHAT IT WANTED —
23          THE TRUSTEE:  — THAT'S ALL — THAT'S ALL HISTORY.
24          MR. RUDOLPH:  THE REALITY IS — THE REALITY IS THE
25   TRUSTEE —
```

39

```
 1              THE WITNESS:  YEAH, I AGREE.

 2              MR. RUDOLPH:  - NOW IS IN -

 3              THE TRUSTEE:  RIGHT, SO I -

 4              MULTIPLE SPEAKERS:  - (UNDISCERNIBLE) -

 5              THE WITNESS:  - IT'S YOUR DECISION.

 6              THE TRUSTEE:  WELL, AND THAT'S - THAT'S A CASE - I

 7    MEAN, EVEN IF THE ESTATE TAKES A POSITION TO FILE A NOTICE OF

 8    ABANDONMENT, OBVIOUSLY THEN ALLEN, MATKINS COULD OBJECT AND -

 9              THE WITNESS:  UH-HUH.

10              THE TRUSTEE:  - THEN WHATEVER, AND THEN AT SOME POINT,

11    THE COURT WILL DECIDE WHERE THE - WHERE THE RECORDS GO.  I MEAN,

12    IT'S - IT'S PRETTY SIMPLE.

13              MR. RUDOLPH:  YEAH, THAT'S - THAT'S THE PROCESS.

14              THE TRUSTEE:  SO ANYWAY - BUT RIGHT NOW, IF YOU - YOU

15    KNOW, IT'S TRUE, MR. BESHEARS SAID, THAT IF YOU PAY THAT, I

16    MEAN, YOU COULD HAVE A CLAIM IN THE BANKRUPTCY ESTATE, AN

17    ADMINISTRATIVE CLAIM FOR REIMBURSEMENT FOR THE STORAGE FEES.  I

18    DON'T HAVE A PROBLEM WITH THAT.

19              THE WITNESS:  YUP.

20              THE TRUSTEE:  I MEAN, OBVIOUSLY, THAT - WHEN WE WENT -

21    IF WE EVER GOT TO THAT POINT, IT WOULD BE NOTICED OUT THAT WE

22    WERE GOING TO PAY IT AS ADMINISTRATIVE, AND SOMEBODY COULD

23    OBJECT TO THAT TOO.  I MEAN, THAT'S -

24              UNIDENTIFIED SPEAKER:  SURE.

25    / / /

                                                              40
```

```
 1            THE TRUSTEE:  - THAT'S THE WAY THIS WHOLE PROCESS
 2   WORKS.
 3            MR. BESHEARS:  OKAY.
 4            THE TRUSTEE:  SO - BUT FOR RIGHT NOW, I THINK, UNLESS
 5   THERE'S ANY OPPOSITION, I'M - MY INTENTION IS TO CONCLUDE THE
 6   341 MEETING OF THIS -
 7            MR. SCHOENFELD:  MAY I ASK A COUPLE OF QUESTIONS?
 8            THE TRUSTEE:  YEAH, SURE.  COME UP HERE AND MAKE AN
 9   APPEARANCE AND -
10            MR. SCHOENFELD:  THANK YOU.
11            UNIDENTIFIED SPEAKER:  DO YOU KNOW THIS GUY?  YEAH, HE
12   WAS THE FELLOW THAT - (UNDISCERNIBLE) - PYTHON.
13            THE WITNESS:  I AM SO EMBARRASSED THAT I HAVE -
14            MR. RUDOLPH:  PLEASE STATE YOUR NAME - PLEASE STATE
15   YOUR NAME.
16            MR. SCHOENFELD:  YEAH.  MY NAME IS RICHARD SCHOENFELD
17   (PHONETIC).
18            THE WITNESS:  RICHARD WAS THE C.E.O. FOR -
19            THE TRUSTEE:  - THAT YOU COULDN'T REMEMBER THE NAME?
20            THE WITNESS:  - TWO OR THREE YEARS THAT I COULDN'T
21   REMEMBER THE NAME OF.
22            MR. SCHOENFELD:  YEAH, I WAS THE C.E.O. AT PYTHON FROM
23   LATE 2008 UNTIL THE - THE END OF 2012.
24            THE TRUSTEE:  OKAY.
25            MR. SCHOENFELD:  OKAY.  JUST A COUPLE OF QUESTIONS.

                                                            41
```

```
1              THE TRUSTEE:  UH-HUH.

2              MR. RUDOLPH:  AND THE TRUSTEE IS NOT GOING TO BE

3    LOOKING AT IT NOW BECAUSE WE HAVE NO MONEY.  BUT WHEN WE GET TO

4    THAT POINT, IT'LL BE AN ANALYSIS, BUT IF YOU BELIEVE THERE'S A

5    CLAIM AGAINST BURLINGAME, IT'S MY RECOMMENDATION THAT, ONE, YOU

6    CONSULT A LAWYER -

7              MR. SCHOENFELD:  OF COURSE.

8              MR. RUDOLPH:  - AND DISCUSS WITH THE LAWYER THE FILING

9    OF A - TIMELY FILING OF A PROOF OF CLAIM.

10             THE TRUSTEE:  RIGHT.

11             DO YOU HAVE ANY OTHER QUESTIONS?

12             MR. SCHOENFELD:  YEAH, DO YOU KNOW WHAT THE BAR DATE

13   IS AS OF RIGHT NOW FOR CLAIMS?

14             MR. BESHEARS:  YEAH, IT'S - ITEMS NOVEMBER 3RD, 2014.

15             MR. SCHOENFELD:  OKAY.  THANK YOU.

16             THE TRUSTEE:  OKAY?

17             MR. SCHOENFELD:  GOT THAT.  THAT'S ALL I HAVE.  THANK

18   YOU VERY MUCH.

19             THE TRUSTEE:  OKAY.  SO IF THAT'S IT, THEN I'M GOING

20   TO CONCLUDE THE MEETING, AND YOU'LL BE EXCUSED, AND APPRECIATE

21   YOUR EXPLANATION OF EVERYTHING.

22             MR. RUDOLPH:  THANK YOU.

23             THE WITNESS:  YEAH, WELL -

24             MR. RUDOLPH:  GOOD LUCK WITH YOUR SURGERY.

25   / / /

                                                              46
```

```
 1          THE WITNESS:  I HOPE IT –

 2     (END OF AUDIO FILE.)

 3                    (MATTER CONCLUDED.)

 4                    --- oOo ---

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF CALIFORNIA

 2   COUNTY OF SAN DIEGO

 3

 4            I, DIANE BERGER, OFFICIAL REPORTER, DO HEREBY CERTIFY:

 5            THAT THE OFFICE OF THE U.S. TRUSTEE SUPERVISED THE

 6   RECORDING OF PROCEEDINGS HELD IN THE FOREGOING CAUSE ON THE

 7   12TH DAY OF AUGUST, 2014;

 8            THAT THE RECORDING WAS LATER TRANSCRIBED INTO

 9   TYPEWRITING UNDER MY DIRECTION;

10            AND THAT THE FOREGOING TRANSCRIPT CONTAINS A CORRECT

11   STATEMENT OF THE PROCEEDINGS.

12            DATED THIS 18TH DAY OF AUGUST, 2014.

13
                             S/ DIANE BERGER
14                           DIANE BERGER
                             OFFICIAL REPORTER
15

16

17

18

19

20

21

22

23

24

25

                                                               48
```

*EXHIBIT 2*

# Allen Matkins

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law
501 West Broadway, 15th Floor | San Diego, CA 92101-3541
Telephone: 619.233.1155 | Facsimile: 619.233.1158
www.allenmatkins.com

Charles L. Pernicka
E-mail: cpernicka@allenmatkins.com
Direct Dial: 619.235.1531  File Number: 374533-00001/SD827462.01

**Via Facsimile and Email**

February 13, 2015

James W. Beshears, Esq.
110 West C Street, Suite 1300
San Diego, CA 92101
Facsimile (619-233-1018)
jwblaw@sbcglobal.net

John W. Howard, Esq.
JW Howard Attorneys
225 Broadway, Suite 2220
San Diego, California 92101
Facsimile (619-234-1716)
johnh@jwhowardattorneys.com

Jeffrey D. Cawdrey, Esq.
Gordon & Rees LLP
101 W. Broadway, Suite 2000
San Diego, CA  92101
Facsimile (619-696-7124)
jcawdrey@gordonrees.com

Re: **Burlingame Capital Partners II, L.P.**
**Burlingame Capital, LLC**
**KC Funding, LLC**
**Robert Judson**
**Janice Judson**

## NOTICE OF DUTY TO PRESERVE DOCUMENTS

Dear Mr. Beshears, Mr. Howard, and Mr. Cawdrey:

This law firm is special counsel for Chapter 7 Trustee James L. Kennedy in In re Burlingame Capital Partners II, L.P., Southern District of California Bankruptcy Court Case No. 14-02607-CL7.  This letter is sent to you in your capacities as attorneys for Burlingame Capital Partners II, L.P. ("Burlingame"), and Burlingame Capital, LLC, KC Funding, LLC, Robert Judson, and Janice Judson (collectively, the "Affiliates and Insiders").  Please advise us if you do not represent the Affiliates and Insiders, or if there is someone additional to whom this letter should be sent.

This letter serves as notice to the Affiliates and Insiders of their duty to preserve documents, records, and any other evidence in relation to the assets and liabilities of Burlingame, the

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law

James W. Beshears, Esq.
John W. Howard, Esq.
Jeffrey D. Cawdrey, Esq.
February 13, 2015
Page 2

organization and capitalization of Burlingame, and any transactions or transfers to which Burlingame was a party, including without limitation as it regards the Affiliates and Insiders and any other individuals or entities which held or hold an interest in Burlingame or in which Burlingame held or holds an interest. In addition to any other pertinent materials which the Affiliates and Insiders, and/or any of their principals, agents, and/or attorneys may possess, the materials which must be maintained and preserved include all documents, records, and other evidence described in the attached Exhibit A.

Sanctions may be imposed for the destruction of documents or other evidence, where a person is on notice that the documents or other evidence are relevant to litigation or to potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence. A duty to preserve such documents or other evidence exists where a person knows, or reasonably should know, that the documents are relevant, reasonably likely to lead to the discovery of admissible evidence, reasonably likely to be requested during discovery, and/or are the subject of a pending discovery request. See, e.g., *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984); *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001).

Further, counsel bear responsibility for ensuring that documents are maintained. "[I]t is not sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).

The documents, records, and other evidence that must be preserved include documents in the possession of Burlingame's, and the Affiliates and Insiders', attorneys (past or current), and any other affiliated entities. See, e.g., *Johnson v. Akin Capital Management, L..P.*, 202 F.R.D. 112, 114 (S.D.N.Y. 2001) ("Pursuant to 'Fed. R. Civ. P. 34, which governs the production of documents during discovery, the clear rule is that documents in the possession of a party's *current or former* counsel are deemed to be within that party's 'possession, custody and control.' ' " [Emphasis in original]); *United States v. Faltico*, 586 F.2d 1267, 1270 (8th Cir. 1978) (affirming order requiring production of documents under responding party's "effective control" even though they were "in the hands of corporations which are not parties to this action.")

The documents, records, and evidence described above are relevant to litigation or to potential litigation, are reasonably calculated to lead to the discovery of admissible evidence, are reasonably likely to be requested during discovery, are the subject of a pending discovery request, and/or have been ordered produced.

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law

James W. Beshears, Esq.
John W. Howard, Esq.
Jeffrey D. Cawdrey, Esq.
February 13, 2015
Page 3

Please contact me if you have any questions.

Sincerely,

Charles L. Pernicka

Attachment - Exhibit A

cc:     Gary Rudolph, Esq. (via email)

1
2
3
4

# EXHIBIT A

## In re BURLINGAME CAPITAL PARTNERS II, L.P. ("Debtor")

## USBC SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 14-02607-CL7

## TRUSTEE'S REQUEST FOR DOCUMENTS

5  **I.      DEFINITIONS**

6        "CORPORATE GOVERNANCE RECORDS" includes all DOCUMENTS referring,

7  RELATING and/or pertaining to or evidencing corporate filings with any Secretary of State for

8  each entity, including any articles of incorporation, LLC Agreements, Statements of Information,

9  and any other corporate filings, including bylaws or operating agreements, minutes of board

10  meetings, board resolutions, and owner information, and any amendments to any of the foregoing

11  DOCUMENTS.

12        "DOCUMENT" or "DOCUMENTS" has the same meaning as in Rule 34 of the Federal

13  Rules of Civil Procedure, including electronically stored information, and Rule 1001 of the

14  Federal Rules of Evidence, and includes any kind of written, typewritten, or printed material

15  whatsoever, any kind of graphic material, and any computer readable media including, but without

16  limitation, papers, agreements, contracts, notes, memoranda, correspondence, e-mails, studies,

17  working papers, letters, telegrams, invoices, personal diaries, journal entries, reports, records,

18  books, forms, indexes, transcriptions and recordings, magnetic tapes, disks and printed cards, data

19  sheets, data processing cards, personal calendars, interoffice memoranda, minutes and records of

20  any meetings, financial statements, financial calculations, estimates, reports of telephone or other

21  oral conversations, appointment books, maps, drawings, charts, graphs, photographs, and all other

22  writings and recordings of every kind, however produced or reproduced, whether signed or

23  unsigned, and whether in computerized databases or other electronic format or whether hard

24  copies thereof. The term "DOCUMENT" further includes, without limitation, the original and all

25  file copies and other copies that are not identical to the original no matter how or by whom

26  prepared, and all drafts prepared in connection with any documents, whether used or not. If the

27  original of any document is not in your possession, custody or control, a copy of that document

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

1 should be produced.  The term "DOCUMENT" also includes audio files, video files, and web
2 pages, both current and historical.

3      "FINANCIAL RECORDS" refers to all financial information, including financial
4 statements, balance sheets, income statements, bank statements, brokerage statements and
5 statements of line of credit available, statements of cash flow, tax returns, and all documents
6 evidencing, referring, or RELATING TO financial resources and liquidity, capital contributions
7 and financial support.

8      "RELATING TO" or "RELATED TO" means pertaining to, mentioning, commenting on,
9 connected with, discussing, describing, analyzing, explaining, showing, reflecting, referring to,
10 dealing with, comprising, consisting of, containing, resulting from, or recording a particular
11 subject in whole or in part either directly or indirectly or being in any way logically or factually
12 connected with the matter discussed or identified.

13 **II.**     **DOCUMENTS AND RECORDS TO BE PRODUCED**

14     1.     Any and all agreements between Debtor and any other individual or entity
15 RELATING TO that certain promissory note dated June 25, 2008 in favor of Lawrence Foley,
16 including without limitation any Pledge Agreement or guarantee.

17     2.     That certain promissory note from Alturdyne Power Systems with a value of
18 $300,000 as listed on Attachment to Schedule B(16) of the Amendment filed on April 9, 2014, any
19 and all amendments to or modifications of that promissory note, and any and all DOCUMENTS
20 RELATED TO payments made under that promissory note.

21     3.     Any and all DOCUMENTS RELATED TO correspondence or communications
22 between Debtor and any other individual or entity, including without limitation the borrower
23 under the subject promissory note, concerning that certain promissory note from Alturdyne Power
24 Systems with a value of $300,000 as listed on Attachment to Schedule B(16) of the Amendment
25 filed on April 9, 2014.

26     4.     Any and all DOCUMENTS RELATED TO the basis for and calculation of the
27 "gross up" of $346,588 paid to Robert and Janice Judson by Debtor in connection with that certain
28

1  promissory note dated March 11, 2010 from Debtor in favor of Robert D. Judson, Jr. and Janice H.
2  Judson.

3       5.     Any and all DOCUMENTS demonstrating the basis of the payment of $247,705.27
4  made by Debtor to Burlingame Capital, LLC in or about March 2013.

5       6.     Any and all DOCUMENTS RELATED TO any and all loans made by Debtor to
6  Python Injection and any and all payments received by Debtor from Python Injection.

7       7.     Any and all DOCUMENTS RELATED TO any and every acquisition by Debtor of
8  an interest in Python Injection.

9       8.     Any and all DOCUMENTS RELATED TO any request, call, or need for additional
10  capital or an additional monetary investment in Python Injection, at any time from January 1, 2009
11  through the present.

12       9.     Any and all DOCUMENTS RELATED TO  the dissolution of Python Injection,
13  and/or the disbursement of Python Injection's assets upon its dissolution.

14       10.     Any and all DOCUMENTS RELATED TO the current status of Debtor's
15  investment in Python Injection and any loan made by Debtor to Python Injection.

16       11.     Any and all DOCUMENTS RELATED TO the CORPORATE GOVERNANCE
17  RECORDS of Python Injection from January 1, 2007 through the present.

18       12.     Any and all DOCUMENTS RELATED TO the FINANCIAL RECORDS of
19  Python Injection from January 1, 2009 through the present.

20       13.     Any and all DOCUMENTS RELATED TO correspondence or communications
21  between Debtor, Robert and/or Janice Judson, and/or any partner (limited or general) in Debtor
22  RELATED TO the acquisition of the property and assets of Kids Connection, Inc.

23       14.     Any and all DOCUMENTS RELATED TO correspondence or communications
24  between Debtor, Robert and/or Janice Judson, and/or any partner (limited or general) in Debtor
25  RELATED TO investment in KC Funding, LLC and/or the acquisition of an interest in KC
26  Funding, LLC.

27       15.     Any and all DOCUMENTS RELATED TO correspondence or communications
28  between Debtor, Robert and/or Janice Judson, and/or any partner (limited or general) in Debtor

1  RELATED TO the judgment in favor of Debtor against Kids Connection, Inc., from January 1,

2  2007 through the present.

3        16.    Any and all DOCUMENTS RELATED TO correspondence or communications

4  between Debtor, Robert and/or Janice Judson, and/or the holder(s) of any interest in KC Funding,

5  LLC RELATED TO the acquisition of the property and assets of Kids Connection, Inc.

6        17.    Any and all DOCUMENTS RELATED TO correspondence or communications

7  between Debtor, Robert and/or Janice Judson, and/or the holder(s) of any interest in KC Funding,

8  LLC RELATED TO investment in KC Funding, LLC and/or the acquisition of an interest in KC

9  Funding, LLC.

10        18.    Any and all DOCUMENTS RELATED TO correspondence or communications

11  between Debtor, Robert and/or Janice Judson, and/or the holder(s) of any interest in KC Funding,

12  LLC RELATED TO the judgment in favor of Debtor against Kids Connection, Inc., from January

13  1, 2007 through the present.

14        19.    Any and all DOCUMENTS not otherwise requested RELATED TO

15  correspondence or communications between Debtor, Robert and/or Janice Judson, and/or any

16  partner (limited or general) in Debtor RELATED TO KC Funding, LLC, and/or Kids Connection,

17  Inc.

18        20.    Any and all DOCUMENTS RELATED TO the CORPORATE GOVERNANCE

19  RECORDS of KC Funding, LLC, without limitation as to time.

20        21.    Any and all DOCUMENTS RELATED TO the FINANCIAL RECORDS of KC

21  Funding, LLC, without limitation as to time.

22        22.    Any and all DOCUMENTS RELATED TO the sale of the assets and/or property

23  owned by KC Funding, LLC to Robert and/or Janice Judson, Turtle Grove Properties, LLC, and/or

24  any other individual or entity, including without limitation RELATED TO the sources and

25  amounts of the payments made for the purchase and the amounts and recipients of all distributions

26  of sale proceeds.

27        23.    Any and all DOCUMENTS RELATED TO correspondence or communications

28  between Debtor, Robert and/or Janice Judson, and/or the holder(s) of any interest in KC Funding,

1  LLC RELATED TO the sale of the assets and/or property owned by KC Funding, LLC to Robert
2  and/or Janice Judson, Turtle Grove Properties, LLC, and/or any other individual or entity.

3      24.    Any and all DOCUMENTS RELATED TO the monetary value of any and all
4  assets and/or property sold by KC Funding, LLC to Robert and/or Janice Judson, Turtle Grove
5  Properties, LLC, and/or any other individual or entity, without limitation as to time, including
6  without limitation any and all appraisals.

7      25.    Any and all agreements between Debtor and any other individual or entity
8  RELATED TO investment in and/or the capitalization of KC Funding, LLC, without limitation as
9  to time, including any amendment or modification of any such agreement.

10      26.    Any and all DOCUMENTS RELATED TO the disbursement of the $2,510,000
11  paid by Alturdyne to Debtor in or about March 2013, and any and all DOCUMENTS
12  demonstrating Debtor's payment to others of the proceeds of that $2,510,000.

13      27.    Any and all DOCUMENTS RELATED TO the amounts and recipients of any and
14  all payments made by Debtor to any other individual or entity from January 1, 2009 to the present.

15      28.    Any and all DOCUMENTS RELATED TO the amounts and recipients of any and
16  all payments made by Burlingame Capital, LLC to any other individual or entity from January 1,
17  2009 to the present.

18      29.    Any and all DOCUMENTS RELATED TO the FINANCIAL RECORDS of
19  Debtor, from January 1, 2009 through the present.

20      30.    Any and all DOCUMENTS RELATED TO the FINANCIAL RECORDS of
21  Burlingame Capital, LLC, from January 1, 2009 through the present.

22      31.    Any and all DOCUMENTS RELATED TO the CORPORATE GOVERNANCE
23  RECORDS of Debtor, from January 1, 2009 through the present.

24      32.    Any and all DOCUMENTS RELATED TO the CORPORATE GOVERNANCE
25  RECORDS of Burlingame Capital, LLC, from January 1, 2009 through the present.

26      33.    Any and all fee agreements, engagement agreements, or other agreements between
27  Debtor and any attorney(s) hired by Debtor to represent it in connection with any matter from
28  January 1, 2007 through the present.

34.     Any and all DOCUMENTS RELATED TO correspondence or communications between Debtor, or any individual on behalf of Debtor, and any attorney(s) hired by Debtor, RELATED TO Debtor's acquisition of an interest in KC Funding, LLC.

35.     Any and all DOCUMENTS RELATED TO correspondence or communications between Debtor, or any individual on behalf of Debtor, and any attorney(s) hired by Debtor, RELATED TO the purchase of the assets and/or property of Kids Connection, Inc. by KC Funding, LLC.

36.     Any and all DOCUMENTS RELATED TO correspondence or communications between Debtor, or any individual on behalf of Debtor, and any attorney(s) hired by Debtor, RELATED TO the sale of the assets and/or property owned by KC Funding, LLC to Robert and/or Janice Judson, Turtle Grove Properties, LLC, and/or any other individual or entity.

37.     Any and all DOCUMENTS RELATED TO correspondence or communications between Debtor, or any individual on behalf of Debtor, and any attorney(s) hired by Debtor, RELATED TO any asset or liability of Debtor, from January 1, 2007 through the present.

38.     Any and all DOCUMENTS RELATED TO any and all payments made by or on behalf of Debtor from April 1, 2013 through the present to any and all attorneys retained to represent Debtor in any matter, including without limitation attorney John Howard and/or JW Howard Attorneys, Ltd.

* * * COMMUNICATION RESULT REPORT ( FEB. 13. 2015 11:24AM ) * * *

FAX HEADER 1: ALLEN MATKINS SD
FAX HEADER 2:

TRANSMITTED/STORED : FEB. 13. 2015 11:07AM
FILE MODE        OPTION              ADDRESS                        RESULT      PAGE

6050 MEMORY TX                          6192331018                  OK          10/10
                                          unknown                   OK          10/10
                       1*6967124                                    OK          10/10
                                        6192314372                  OK          10/10

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION

# Allen Matkins

**Facsimile**

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law
www.allenmatkins.com

**To:** James W. Beshears, Esq.
Fax: 619.233.1018

**John W. Howard, Esq.**
JW Howard Attorneys
Fax: 619.234.1716

**Jeffrey D. Cawdrey, Esq.**
Gordon & Rees LLP
Fax: 619.696.7124

cc: Gary Rudolph, Esq.
Sullivan Hill
Fax: 619.231.4372

**From: Charles L. Pernicka**

Date: February 13, 2015

Telephone: 619.235.1531
E-mail: cpernicka@allenmatkins.com
File Number: 374533-00001/SD827574.01

Total pages including cover sheet: 10

**Subject: Burlingame Capital Partners II, L.P.**

**Comments:**

Please see attached letter from Charles Pernicka.

Original will: ☐ be sent via mail   ☐ be sent via messenger   ☐ be sent via fedex/courier   ☑ be sent via email   ☐ not be sent

*Note: The information contained in this facsimile document is confidential and is intended only for the use of the individual named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original document to us at the above address via U.S. Mail. We will reimburse you for the postage. Thank you.*

Los Angeles | Orange County | San Diego | Century City | San Francisco
501 West Broadway, 15th Floor | San Diego, CA 92101-3541 | Telephone: 619.233.1155 | Facsimile: 619.233.1158

| | |
|---|---|
| **From:** | Trickey, Glenda |
| **Sent:** | Friday, February 13, 2015 10:44 AM |
| **To:** | 'jwblaw@sbcglobal.net'; 'johnh@jwhowardattorneys.com'; 'jcawdrey@gordonrees.com' |
| **Cc:** | 'rudolph@sullivanhill.com'; Pernicka, Charles |
| **Subject:** | Burlingame Capital Partners, et al. |
| **Attachments:** | Notice of Duty to Preserve Documents.pdf |

Please see attached letter from Charles Pernicka regarding the above matter.

*Glenda S. Trickey*

Legal Secretary to Valentine S. Hoy and Charles L. Pernicka
Allen Matkins Leck Gamble Mallory & Natsis LLP
501 West Broadway, 15th Floor, San Diego, CA 92101-3541
(619) 233-1155 (main)
(619) 233-1158 (fax)



Allen Matkins
CHALLENGE. OPPORTUNITY. SUCCESS.

*EXHIBIT 3*

# In re Burlingame Capital Business Partners II

Deposition of
**ROBERT D. JUDSON, JR.**
April 02, 2015



*Fivecoat & With*

1                  UNITED STATES BANKRUPTCY COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4    _____

5    In re                         )
                                    )
6    BURLINGAME CAPITAL             )
     PARTNERS II, L.P., a Delaware  )  Case No. 14-02607-CL7
7    Limited Partnership,           )
                                    )
8                      Debtor.      )
                                    )
9    _____)

10

11

12

13

14           VIDEOCONFERENCE RULE 2004 EXAMINATION OF

15                    ROBERT D. JUDSON, JR.

16                    SAN DIEGO, CALIFORNIA

17                       APRIL 2, 2015

18

19

20

21

22

23   REPORTED BY:
     KATRINA F. BURLASON
24   RPR, CSR NO. 5898

25   JOB NO.:  10015832

1              UNITED STATES BANKRUPTCY COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

4    _____

5    In re                          )
                                    )
6    BURLINGAME CAPITAL             )
     PARTNERS II, L.P., a Delaware  )   Case No. 14-02607-CL7
7    Limited Partnership,           )
                                    )
8                   Debtor.         )
                                    )
9    _____)

10

11

12

13

14

15        VIDEOCONFERENCE RULE 2004 EXAMINATION OF

16              ROBERT D. JUDSON, JR.,

17   taken on behalf of Bankruptcy Trustee, at 501 West

18   Broadway, Suite 1500, San Diego, California, on

19   Thursday, April 2, 2015, beginning at 9:36 a.m., and

20   ending at 2:07 p.m., before Katrina F. Burlason, RPR,

21   Certified Shorthand Reporter No. 5898, pursuant to

22   Court Order.

23

24

25

```
1                     I N D E X

2  WITNESS:                                    PAGE

3  ROBERT D. JUDSON, JR.                          5

4           Examination by Mr. Pernicka

5           Examination by Mr. Cawdrey        153

6

7

8              INDEX OF EXHIBITS

9  TRUSTEE'S                                   PAGE

10 Exhibit 1    Copies of Three Photographs     76

11

12

13

14     QUESTIONS WITNESS INSTRUCTED TO NOT ANSWER

15  PAGE      LINE      PAGE      LINE      PAGE      LINE

16   59         3        64        21       103        9

17   59        12        65         2       104        5

18   59        22        65        19       130        7

19   61         7        67        19

20   61        17       100         2

21   62         5       101         1

22   62        16       101        11

23   62        24       101        25

24   63        11       102         8

25   64        13       102        19
```

```
1    APPEARANCES:

2    For the Bankruptcy Trustee:

3            ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
             BY:   CHARLES L. PERNICKA, ESQ.
4            501 West Broadway
             Fifteenth Floor
5            San Diego, California  92101-3541
             619.233.1155
6            cpernicka@allenmatkins.com

7    For the Examinee:

8            GORDON & REES
             BY:   JEFFREY D. CAWDREY, ESQ.
9            101 West Broadway
             Suite 2000
10           San Diego, California  92101
             619.696.6700
11           jcawdrey@gordonrees.com

12   PERSONS PRESENT:

13           Janice Judson (Present via Teleconference)

14

15

16

17

18

19

20

21

22

23

24

25
```

1      SAN DIEGO, CALIFORNIA - THURSDAY, APRIL 2, 2015

2                          9:36 A.M.

3

4            ROBERT D. JUDSON, JR.,

5      having been first administered an oath, was examined and

6      testified as follows:

7

8                        EXAMINATION

9      BY MR. PERNICKA:

10         Q.   Sir, can you state your name and spell your

11     last name so that we've got it correctly on the record.

12         A.   (Present via videoconference.)  Robert Drake

13     Judson, J-u-d-s-o-n, Jr.

14         Q.   And we are conducting this examination by

15     video conference.  Where are you located right now,

16     Mr. Judson?

17         A.   In Del Ray Beach, Florida.

18         Q.   And sitting in a conference room in my office

19     we have with me Mr. Cawdrey as well as our court

20     reporter.

21              Mr. Judson, we can see you just fine, and I

22     think that this should proceed without any trouble.  Are

23     you able to see all three of the folks at the conference

24     room table in my office?

25         A.   I can see you and I can see Mr. Cawdrey.  I

 1   can't see the court reporter, other than her right

 2   elbow.

 3        Q.    Got it.

 4              Please speak up if there's any technical

 5   problem, if you lose video, if you can't hear us or if

 6   somehow I move out of the frame and you can't see me

 7   anymore.

 8        A.    Okay.

 9        Q.    Mr. Judson, have you sat through an

10   examination in the bankruptcy context before?

11              MR. CAWDREY:  Vague and ambiguous as to

12   "examination."

13   BY MR. PERNICKA:

14        Q.    Similar to what we're doing today.

15        A.    Um, I don't remember if I was ever in a 2004

16   exam.

17        Q.    Have you ever been in a deposition?

18        A.    Yes.

19        Q.    About how many times have you been deposed in

20   whatever capacity -- individually or as a representative

21   of a company or whatever else it might have been?

22        A.    More than I care to.  But I would give you a

23   guess:  Somewhere plus or minus 10.

24        Q.    Have you ever testified in a trial?

25        A.    Yes.

1       Q.   About how many times have you done that?

2       A.   Um, I don't know, four or five, maybe more.

3       Q.   When was the last time you were in a

4   deposition?

5       A.   Geez, I can't recall.  It's going to be six,

6   seven years ago, maybe more.

7       Q.   So that would be --

8       A.   I can't recall --

9       Q.   Sometime around 2009 or 2010?

10      A.   I just can't recall whether I was deposed in

11  the state court litigation that your firm brought.  But

12  if not, then it would be certainly prior to that.

13      Q.   And when's the last time you were in a trial,

14  as best you recall, as a witness?

15      A.   I'm going to -- My best recollection would be

16  about 2007.  No, I take that back.  I was in Judge

17  Munter's court.  I gave some testimony in a two-day

18  trial.  And so I'm going to say that was a couple years

19  ago maybe.

20      Q.   Did you testify in the trial of Allen Matkins

21  vs. Burlingame matter?

22      A.   I believe that was what Judge Munter's case

23  what was about.

24      Q.   Okay.  Let me quickly run through some of the

25  rules.  You've done a great job so far.  This one is

1    particularly important because we're on video:  To make

2    sure we're not talking over each other.  I will

3    certainly do my best to let you finish your answers

4    before talking and would ask that you let me finish my

5    questions before you answer.

6              Does that make sense to you?

7       A.    I'll do my best.

8       Q.    You've said once or twice that you would make

9    guesses as to dates.  I certainly don't want you to make

10   guesses about anything out of the blue.  But I am

11   entitled to your best recollection or your best

12   estimate.  And if you're able to give me an estimate,

13   whether it's as to numbers or amounts or time, I'd like

14   you to do that.

15             Do you understand that?

16      A.    There's a fine line between all of that.  I'll

17   do my best.

18      Q.    Do you have any questions about that?

19      A.    No.

20             MR. CAWDREY:  Would you make sure that you can

21   hear us okay?  And because I know you're speaking

22   loudly.  I want to make sure he can hear.

23   BY MR. PERNICKA:

24      Q.    Mr. Judson, we've had a couple minutes, now,

25   where we're talking.  Has everything been okay for you

1    to be able to hear what I'm asking?

2        A.    Seems so, yes.

3        Q.    Volume's all fine for you to be able to hear

4    the questions?

5        A.    So far, yes.

6        Q.    Please do let us know if that changes.  Okay?

7        A.    Will do.

8        Q.    I do want to remind you that the court

9    reporter swore you in.  That is an oath under penalty of

10   perjury.  It's the same oath as you would take if you

11   were sitting next to a judge in a courtroom, and it does

12   require that you give truthful responses, complete

13   responses, and accurate responses to each of my

14   questions.

15             Do you understand that?

16       A.    The best I can, I will do that.

17       Q.    Do you have any questions about that oath or

18   your obligations to give responses as a witness in this

19   examination?

20       A.    I'm not a lawyer, but I think I understand

21   what you're after.

22       Q.    Have you, either earlier today or yesterday

23   evening, taken any medications, had any alcohol to

24   drink, or had any treatments or consumed any substances

25   that could affect your ability to give your best

1   responses, your most complete responses, and your best
2   recollections here today?
3       A.    I did not consume any alcohol last night.  I
4   do take a variety of medications, which I took when I
5   normally take them.  To the best of my knowledge, I
6   should be able to make coherent responses to your
7   questions.
8       Q.    Have any of the medications that you took had
9   any effect on your memory in the past, as far as you
10  know?
11      A.    Not as far as I know.  My wife might have a
12  different view of that.
13      Q.    Is there any reason that you're aware of that
14  you cannot give your best recollections and your best
15  responses to my questions today as opposed to some other
16  day?
17      A.    No.  I think I can be as responsive as I can
18  be.
19      Q.    Mr. Judson, we are here today chiefly to talk
20  about the documents of the debtor in this bankruptcy
21  proceeding.  The debtor is Burlingame Capital Partners
22  II, L.P.  I do understand that there are some other
23  entities that you are connected with that use the name
24  Burlingame.  If I use the word "Burlingame," I'm going
25  to be talking about the debtor in this bankruptcy, and

1    that's Burlingame Capital Partners II, L.P.

2         Does that work for you?

3    A.    Yes.

4    Q.    Who is the person responsible for maintaining

5    Burlingame's records?

6    A.    At this point in time?

7    Q.    Yes.

8    A.    I have no idea.

9    Q.    Who would know that information?

10   A.    You'd have to ask the trustee.

11   Q.    Who possesses Burlingame's documents as we sit

12   here today?

13   A.    I suppose my wife and I do only because we're

14   paying for the storage locker and I guess if you pay,

15   that gives you the right to the locker.  But neither of

16   us are part of the general partner, which has gone out

17   of business with the trustee's full knowledge and

18   approval.  So I don't know who's responsible, other than

19   the trustee.

20   Q.    Is there any other person, aside from you or

21   your wife, who currently has access to Burlingame's

22   documents and records?

23   A.    I don't think so.

24         MR. CAWDREY:  Other than what's been produced

25   to the trustee by Mr. Beshears and other than presumably

1   what's in the possession of others; right?

2           MR. PERNICKA:  No, not other than that.

3   That's all included in the question.  I want to know who

4   has the records.

5           MR. CAWDREY:  That's right.

6           Well, the reason I say that, Mr. Pernicka, is

7   because Mr. Beshears, in connection with the bankruptcy,

8   produced a host of records, Burlingame records, to the

9   trustee.

10          MR. PERNICKA:  Okay.  I'm sure you'll have a

11  chance to make whatever your views are clear.  At this

12  point I'm asking Mr. Judson questions about who has

13  documents and looking for his answers.

14          MR. CAWDREY:  Um-hmm.  Okay.  Fair enough.

15          THE WITNESS:  Is there a question?

16  BY MR. PERNICKA:

17      Q.    **Mr. Judson -- No.  I believe you responded to**

18  **the last question.**

19      A.    I mean we have what's in the storage locker,

20  other than a few boxes that we've taken out to try and

21  find items that were responsive to your exhibit request.

22  But other than that, everything that we have is in the

23  storage locker.

24      Q.    **And when you say --**

25      A.    Not to the extent that Mr. Beshears or Counsel

1  or the trustee or entities that are not part of

2  Burlingame that have documents.  I could only refer to

3  the ones that we're directly involved with.  We don't

4  have anything more than what's at -- in the storage

5  locker or that we've taken to try and go through to try

6  and be as responsive as we can, reasonably, to that

7  exhibit list.

8      Q.    You've used the word "we."  Whom are you

9  referring to when you say, "we"?

10     A.    My wife and I.

11     Q.    And what's your wife's name?

12     A.    Janice.

13     Q.    Same last name:  Judson?

14     A.    Yes.  Yes.

15     Q.    Are you doing anything to make sure that the

16  documents that you and Ms. Judson possess are being

17  maintained and protected; that is to say, they're not

18  being destroyed or lost?

19     A.    Yes.

20     Q.    And what are you doing in that regard?

21     A.    We're making sure that we don't lose or

22  destroy anything that we took out of the storage locker.

23     Q.    How do you and Ms. Judson apportion

24  responsibility for that maintenance and preventing

25  destruction?

1        A.    Um, there's only two of us.  And I go through

2    this box, she goes through that box.  When we're done,

3    we make sure everything goes back in the box and then

4    the box goes back to storage.

5        Q.    **Does that mean that you and Ms. Judson have**

6    **generally equal responsibility as far as reviewing**

7    **documents goes and making sure documents are organized?**

8              MR. CAWDREY:  Um -- Go ahead.

9        A.    I don't know whether equal.  I mean that's a

10   math project.  But we go through the stuff together.  I

11   mean she does what she does; I do what I do.  I don't

12   know whether it's equal, 60/40.  You know, we're kind of

13   doing it together, as your firm well knows.

14   BY MR. PERNICKA:

15       Q.    **Sitting here today, would you say that you**

16   **take greater responsibility for reviewing the documents**

17   **and organizing the documents or that your wife takes**

18   **greater responsibility or that you both share that about**

19   **the same?**

20       A.    I would say my wife probably does more of it.

21   But, you know, what is that, 51/49?  I don't know.

22       Q.    **Do you have an understanding as to why it is**

23   **that you are appearing for this examination today?**

24       A.    Because I was ordered to.

25       Q.    **Do you have an understanding as to what that**

1    order required?

2        A.    Required that I show up and give answers that

3    are truthful.

4        Q.    **Is it your understanding that the order**

5    **required that you personally show up or that it required**

6    **that the Person Most Knowledgeable about Burlingame's**

7    **documents show up?**

8        A.    It's my understanding that I personally show

9    up.

10       Q.    **Is there any person other than you who has**

11   **more knowledge about Burlingame's documents and records?**

12       A.    Well, it depends on which documents and

13   records you're referring to.

14       Q.    **Who knows more about Burlingame's records than**

15   **you, any of them?**

16       A.    Well, I know more about some records than

17   anyone else.  And my wife would know about some records

18   than I would.

19       Q.    **Which records do you know the most about?**

20       A.    Uh, I would know more about the individual

21   transaction records and maybe more about the financial

22   records.

23       Q.    **And which records would you say your wife**

24   **knows more about than you do?**

25       A.    All of the records that Allen Matkins had over

1   the many years and that we received in the 370 bankers

2   boxes that came from Allen Matkins.

3       **Q.    Why does your wife know more about those**

4   **records than you do?**

5       A.    Well, she spent untold hours in your San

6   Francisco office's conference room, to the point at one

7   point she actually had one of your passes to be able to

8   just come and go from your offices.  And she did the

9   vast majority of the leg work in the various cases that

10  was very beneficial to your partners.

11      **Q.    This was work during cases that Allen Matkins**

12  **was representing Burlingame on?**

13      A.    Yes.

14      **Q.    Has your wife reviewed these boxes of**

15  **documents that were provided by Allen Matkins to**

16  **Burlingame since those documents were provided?**

17          MR. CAWDREY:  Objection --

18      A.    Are you asking --

19          MR. CAWDREY:  Hang on, Bob.

20          Objection to the extent it calls for

21  speculation.

22  BY MR. PERNICKA:

23      **Q.    So --**

24      A.    Are you asking:  Has she reviewed every single

25  box?

1      Q.      You said that she had reviewed these

2   documents.  I'm trying to find out if she did that after

3   the documents were provided to Burlingame.  With that

4   clarification, so far as you know, has she reviewed the

5   documents in these boxes from Allen Matkins?

6      A.      Well, she reviewed the documents, many of the

7   documents.  Whether she reviewed every single one, I

8   don't know the answer to that.  But she reviewed most of

9   these documents -- or a big -- probably "most" means

10  over 50 percent -- in Allen Matkins' offices.  So

11  subsequent to receiving those documents, I know she's

12  gone through a whole lot of boxes.  You know, a lot of

13  that is more of a refresher than to review it for the

14  first time.

15     Q.      So is it correct that she did most of the work

16  reviewing them during the time that Allen Matkins was

17  representing Burlingame and then she has reviewed at

18  least some number of them after they were provided by

19  Allen Matkins to Burlingame?

20     A.      Yeah, I -- I think that's a fair summation.

21     Q.      I want to talk a bit about, in a general

22  sense, where Burlingame's documents are located.  We've

23  talked about a storage unit that houses some volume of

24  Burlingame documents.  Where is this storage unit

25  located?

1      A.    I believe it's Boynton, Florida.

2      Q.    And is that a unit that is owned by Burlingame

3   or is it rented?

4      A.    Rented.

5      Q.    From whom is it rented?

6      A.    Used to be United Storage.  They may have

7   changed their name.  The charge on the credit card says,

8   "Cube Smart."  But I couldn't tell you who the legal

9   owner is.

10      Q.    Do you know the address for the facility where

11   the storage unit is located?

12      A.    Uh, I don't.

13      Q.    What is the monthly rent for the facility?

14      A.    Uh, I believe it's 170 dollars and some cents.

15      Q.    How big is the unit that has the Burlingame

16   documents in it?

17      A.    I don't know the dimensions.

18      Q.    Give me your best estimate.  Is it 10 by 10?

19   Is it a hundred by ten?  Two by two?

20      A.    Well, it's not two by two and it's not a

21   hundred by ten either.  You've got a picture there.  I'm

22   not good at this.  I don't know, maybe 12-, 14 by 14.  I

23   don't know.  That's just a wild guess.

24      Q.    Does this storage unit have a garage door that

25   opens directly onto an alleyway or a street or somewhere

1    that vehicles can access it?

2        A.    No.

3        Q.    How's the storage unit accessed?

4        A.    Um, there's -- You go through a door where you

5    have to put your combination in or code.  Code in, and

6    then you go in and you have to go through another,

7    inside door, where you have to put your code in again.

8    And then you're inside a building that has sprinklers

9    and is relatively air conditioned, and you go down the

10   hallway and to a certain -- I don't know, two or three

11   halls and then you hang a right, and it's down -- down a

12   ways on the left.

13       Q.    Which floor of the building is this storage

14   unit that has Burlingame's documents in it located in?

15       A.    First floor.

16       Q.    Who is the tenant for the rental of that unit?

17   Whose name is it that's renting it?  Burlingame?  You

18   personally?  Somebody else?

19       A.    Uh, I suspect it's us personally.  But that's

20   a guess.  I haven't looked at the documents in a while.

21   I do know that it's -- the charge is on our personal

22   credit card.

23       Q.    So when you say "us" and "our," who are you

24   referring to there?

25       A.    My wife and I.

1      Q.    Who has access to this storage unit currently?

2      A.    My wife or I.

3      Q.    Is there anyone else with access to it, so far

4  as you know?

5      A.    Not as far as I know.

6      Q.    Are there keys required to access the unit?

7      A.    No.   There's a combination lock.

8      Q.    When was this storage unit first rented?

9      A.    I don't know.   Several years ago.

10      Q.    Was it first rented before or after Allen

11  Matkins stopped representing Burlingame?

12      A.    I don't know.   I'd be speculating.

13      Q.    Was it first rented before or after Allen

14  Matkins and Burlingame became involved in a lawsuit

15  against one another?

16      A.    Well, if I didn't know the first question, I

17  wouldn't know the second.

18      Q.    Why was the storage unit first rented?

19      A.    There were more -- more supplies at the time

20  than our small condo could reasonably hold, and so we

21  rented one.

22      Q.    You said there were more supplies than the

23  condo could hold.  What kind of supplies did you rent

24  the storage unit for?

25      A.    I misspoke.   I should have said documents.

1    Paper.   Things in boxes.

2        Q.    When this storage unit was first rented, how

3    many boxes were moved into it?

4        A.    I don't recall.

5        Q.    More than five?

6        A.    I don't recall.

7        Q.    More than a hundred?

8        A.    Less than a hundred to start with.

9        Q.    When this storage unit was first rented, was

10   it rented to hold documents provided to Burlingame by

11   Allen Matkins or was it rented to hold other sorts of

12   documents?

13       A.    Uh, originally it was rented to, uh, hold the

14   document -- the overflow of boxes of documents that were

15   not the 370 boxes that Allen Matkins ultimately turned

16   over to the debtor.

17       Q.    So it was rented before those box -- those 300

18   boxes were provided to Burlingame by Allen Matkins?

19       A.    Yes.

20       Q.    What sorts of documents were put into the

21   storage unit when it was first rented?

22       A.    I don't know.  That was a long time ago.

23       Q.    How did you decide which boxes or files of

24   documents would be put in the storage unit and which

25   would not?

1       A.    I don't remember.  I don't remember what went

2   through our minds, why this document verse that

3   document.  My guess is it was documents that we weren't

4   using.  But it's a guess.

5       Q.    Were all of the documents that were put in the

6   storage unit when it was first rented related to

7   Burlingame?

8       A.    I'm not sure I understand the question.

9       Q.    Did the documents that went in the storage

10   unit when it was first rented have to do with Burlingame

11   or did they have to do with your -- your kids' college,

12   for example, or various other things -- the condo you

13   own in Florida?

14       A.    Uh, well, if you're referring to the

15   Burlingame documents, which is what my other questions

16   were and answers were about, that's what went into the

17   storage locker.

18       Q.    I'm referring to all -- all of the documents

19   that you or Ms. Judson or whomever else was involved in

20   moving documents into the storage unit when it was first

21   opened had.  And what I'm trying to find out is:  Are

22   all of the documents that were put in the storage unit

23   Burlingame documents or are there other sorts of records

24   in there as well that have nothing do with Burlingame or

25   its ventures or business operations?

1    A.    Um, the storage locker that you see all these

2  documents in, those only had Burlingame -- are boxes

3  full of things, documents, that were related to

4  Burlingame.  We actually rented other units that we put

5  non-Burlingame-related things in there, in the other

6  locker, so that we wouldn't commingle.

7    Q.    How many storage units with documents in them

8  do you and Ms. Judson currently have access to or

9  currently rent?

10    A.    Right now we only rent the one.

11    Q.    And that's the one that has Burlingame

12  documents in it?

13    A.    That is correct.

14    Q.    At the time when you rented the unit that now

15  has Burlingame documents in it, did you rent other

16  storage units as well?

17    A.    I believe I just answered that.

18    Q.    Indulge me, please.  Did you rent other units

19  at the same time?

20    A.    Yeah.  We had more than one.  And we put

21  non-Burlingame -- At one point we even had three.  But

22  we had one that had only Burlingame stuff, and we took

23  great care to make sure that only Burlingame stuff was

24  in that one locker.  Our personal stuff, whether it was

25  furniture or documents for other entities that had

1    nothing to -- that were not Burlingame, whether it was

2    our kids' college transcripts or whatever the heck it

3    was, those went in the other two.  And so there was no

4    commingling of documents.  You didn't find Burlingame

5    documents in a variety of them and you didn't find

6    non-Burlingame documents in the -- what we might call

7    the Burlingame storage locker.

8        Q.    **Why is it that you set it up that way, with**

9    **the different storage lockers with -- Well, let me ask a**

10   **different question.  I apologize.**

11           **At the time when you had these multiple units,**

12   **was the Burlingame unit full?**

13       A.    Well, once the Allen Matkins documents

14   arrived, you know, pretty much.  I mean you see the

15   pictures.  We put other boxes in there, but the majority

16   of those boxes came from Allen Matkins.  So --

17       Q.    **This is what I'm getting at.  If you had three**

18   **units, why didn't you just get the one unit and say:**

19   **This corner will be Burlingame, that corner will be my**

20   **kids' transcripts?  Why did you feel a need to get three**

21   **separate units for the separate documents?**

22       A.    Because we'd been dealing with Allen Matkins

23   since 2000 and we knew how your firm worked and we knew

24   that it would just be cleaner to keep it separate so you

25   guys wouldn't say, oh, see, this is an example of alter

1    ego or some other concocted theory.  We kept the

2    Burlingame stuff separate that's different than all the

3    other stuff.

4       **Q.    So did you rent this storage unit after Allen**

5    **Matkins stopped representing Burlingame?**

6       A.    I told you before:  I don't know this -- It

7    would be such a wild guess as to exact date.  You told

8    me not to make those kinds of guesses, so I'm following

9    your instructions.

10      **Q.    Let me try it this way, Mr. Judson.  If Allen**

11   **Matkins was still representing Burlingame at the time**

12   **when these storage units were rented, what would the**

13   **reason be for segregating documents to avoid Allen**

14   **Matkins' accusing someone of alter ego?**

15             MR. CAWDREY:  Incomplete hypothetical.  Lacks

16   foundation.  Calls for speculation.

17      A.    I used the term "alter ego" as just as

18   example, just to start with.

19             But second of all, we would have acquired the

20   locker most likely sometime from 2009 forward --

21   sometime in that time frame.  Exactly when and whether

22   it was 2009, 2010, 2011, I can't tell you -- 2012,

23   whatever.  You asked the question as to when Allen

24   Matkins stopped representing us, which was in July of

25   2009.  So it's conceivable that if we rented it in

1    February of 2009, that would be before you stopped.  If

2    we rented it in October of 2009, it would be after.  I

3    don't know the answer to it, so I can't -- unless you

4    want me to guess -- I mean make a wild guess, then --

5    which you told me you didn't want me to do, I don't know

6    what to tell you.

7    BY MR. PERNICKA:

8        Q.    Do you have any records anywhere that indicate

9    when this storage unit that contains Burlingame

10   documents was first rented?

11       A.    I might.  I don't know if we got -- kept them

12   from that far back.  I just don't know the answer.

13       Q.    Do you know where you would look to see if you

14   have those records?

15       A.    Well, if it's the storage for that locker, it

16   would be amongst those boxes somewhere.

17       Q.    As I understand it, the locker was rented

18   before Allen Matkins documents were delivered to

19   Burlingame and there was some volume of boxes that were

20   put into this locker when it was first rented.  Do I

21   have all that correct?

22       A.    Your question was garbled.

23       Q.    I want to make sure I understand correctly.

24   The storage unit that currently has Burlingame records

25   in it was rented before Allen Matkins records were

1    delivered to Burlingame and at the time when it was

2    first rented there was some volume of Burlingame

3    documents that you and Ms. Judson put in that locker.

4           Do I have all that correct?

5    A.    The locker was rented before the Allen Matkins

6    documents arrived, correct.  And that there were some

7    documents already in there before the Allen Matkins

8    documents arrived, that's also correct.

9    Q.    Were the documents that were already in the

10   storage locker when the Allen Matkins records arrived in

11   boxes?  Were they in file folders?  Were they loose on

12   the floor?  How were those documents kept?

13   A.    Well, they weren't loose on the floor.  We

14   weren't playing 52-card pickup.  But were they in file

15   folders or were they in boxes?  I suspect -- you know,

16   it's a while ago.  I suspect they were in boxes.  There

17   may have been file folders in the boxes.  I don't

18   remember exactly how it was all held in the storage

19   locker at that time.

20   Q.    What is your general practice for keeping

21   records?  And this is in a general sense.  Do you have

22   files that are separated by topic, that are separated by

23   year?  Do you just have loose piles in corners?  How do

24   you keep records, as a general practice?

25   A.    Well, I mean everybody aspires to have some

1   sort of organization that is relatively organized.  But

2   I would guess that most of us fail at that at least to

3   some extent.

4          As it related to this storage locker --

5   **Q.    Well, hold on.  I want to stop you there.  And**

6   **I apologize for interrupting.  I'm not asking as related**

7   **to the storage locker.  I'm asking:  As your general**

8   **practice, how do you keep files that you maintain, for**

9   **whatever purpose?**

10  A.     Today, or when?

11  **Q.    Through the course of the last 10 years.  And**

12  **if your practice has changed, tell me about that.**

13  A.     Uh, 10 years ago we were paper-based.  Today

14  we strive to be, um, paperless.  I would say we probably

15  fail to some extent on that.  Maybe it's better

16  described as paper-light.  You try and keep it so you

17  can find it.  Sometimes you're better at that than

18  others.  I'm not so anal about it that it has to be in a

19  specific way, and it's not the Dewey Decimal System in

20  terms of being able to look it up.  I guess as a broad

21  statement that's kind of the way we are.

22  **Q.    What is the system?  Let me put it this way:**

23  **What is the system you use for your paper files?**

24  A.     Well, we put them in boxes and we try and have

25  some idea as to what's in the boxes.  But quite often

1    it's more of, okay, we've got some documents and we've

2    got some space in a box, so we put it in there.

3        Q.    Do you just put loose documents in any box or

4    are these documents files and the files then go in a

5    box, as a general practice, again?

6        A.    Both.

7        Q.    At what point did you begin making a

8    transition from paper files to paperless?

9        A.    Or paper light.

10       Q.    Or paper light.  (Nodded.)

11       A.    I would say sometime in the 2010-to-2011 time

12   frame.

13       Q.    Can you describe what you did to make that

14   transition?

15       A.    Well, instead of keeping as much paper,

16   anything that we felt that we needed to keep -- because

17   we would scan it in.

18       Q.    Do you have a scanner at home or did you go to

19   a Kinko's or do you have one at an office?  Where did

20   you get a scanner?

21       A.    Uh, well, we've done all of the above.

22       Q.    How would you make a determination as to what

23   would be scanned?

24       A.    Well, the volume of whatever it was would be

25   one indicator as to whether we'd scan it.  If it was a

1   big set of closing documents or loan documents, we might

2   not -- we might or we might not scan it in.  You know,

3   we'd look at the documents:  Is there any importance in

4   keeping it.  And if we thought we needed to keep it for

5   whatever reason, we did.  Then we'd scan it in and we'd

6   have it under the particular year.

7        Q.    Did you have electronic files that were

8   organized by year, then, once you began the process of

9   scanning records?

10       A.    Yeah.  We had those, yes.

11       Q.    Within each year did you then have subfiles to

12  somehow categorize the documents?

13       A.    To some extent.  (Witness nodded.)

14       Q.    Has this electronic file system grown since

15  you began developing it in 2010 or 2011?

16       A.    Not really as it relates to Burlingame.

17       Q.    As it relates to other records, you've

18  expanded the practice of scanning?

19       A.    Um, we do different things for different

20  entities and for ourselves.

21       Q.    You say the electronic file system has not

22  expanded as it regards Burlingame since it began.  Are

23  there Burlingame records that are scanned into this

24  electronic file system?

25       A.    Well, as of this moment?

1    Q.    Yes.

2    A.    Um, we have, over the last approximate year,

3    printed out most of those and we should be done with

4    that shortly.  And we've put all of those documents in

5    the storage locker.

6    Q.    **You're currently in the process of printing**

7    **the electronic files you had at Burlingame?**

8    A.    There are some that are left, but the vast

9    majority have already been printed out and put in

10   storage.  We're in the final stretch of getting all that

11   done.

12   Q.    **What is the reason that Burlingame records are**

13   **being printed out?**

14   A.    The reason is so that there is a -- all the

15   Burlingame stuff is in one place, and that way -- once

16   we -- So the trustee or anybody else, if they want to

17   see it, it's there.  The hardware and software that

18   the electronic file's on are not the property of

19   Burlingame or its former G.P.  And as a result, we felt

20   it was appropriate that Burlingame stuff be put in a

21   storage locker with everything else and that there be a

22   complete -- where all the files would be complete over

23   there so that we weren't -- we didn't have to start

24   looking in a whole bunch of different places.  If we

25   needed to go find something or if the trustee or you or

1  anybody else wanted to find something, you could go to

2  the storage locker and you'd know that it was all there.

3      **Q.   When the electronic files of Burlingame**

4  **documents are being printed, how are those printed**

5  **documents organized?**

6      A.   Um, we -- To the best we can, we print them

7  out.  I guess they'd be in chronological order.  We --

8  If they happen to be e-mails, you'd have an e-mail

9  stream and you'd try and keep those together.  We don't

10 have -- I mean the I.T. department, you're looking at.

11 And I'm not sure I've gotten to the point where I'm not

12 dangerous yet.  But the -- We're not trying to just sort

13 of throw things in so it's a big mess, because we may

14 have to go get something out of there as well.  But can

15 I promise you that everything's in true chronological

16 order or whatever?  No, I can't make that promise, given

17 the oath I had to take.  But what we're trying to do is

18 put this stuff in there so that anybody who wants it can

19 go get it.

20     **Q.   Are the documents that are being printed being**

21 **put in specific files or are they just being put in**

22 **loose piles and boxes?**

23     A.   Well, I think if you'll look at the picture

24 you'll see that most of everything in there is in boxes.

25 To the extent we can, we try and put the same type of

1    documents in the same box.  But are we perfect at that?
2    I would say probably not.  Because there's a limited
3    amount of space.  So if we find a box that's half full,
4    well, we may put some more stuff in there because we got
5    to take advantage of whatever space is because we're
6    space constrained, as you can see in the pictures.

7        Q.    When you put documents into boxes, are they
8    put into files first and then the files are put in
9    boxes?  Or is there just a stack of loose documents in a
10   box?

11       A.    Sometimes it's just loose paper that came out
12   of the printer, sometimes there are files.  We're not
13   putting a file for every e-mail.  But some of the boxes
14   have files and loose paper.  Some of the boxes have
15   files.  Some of the boxes have just -- which I guess
16   you'd describe as loose paper, even if the whole stack
17   is in chronological order.

18       Q.    Are the different documents each stapled
19   together in each box or are they just straight off the
20   printer into the box?  That is to say, if there's a --
21   If there's a 10-page document, would that document then
22   be stapled so that it's a single document or are the 10
23   pages of that document just run continuously with the
24   next thing to come off the printer?

25       A.    There's probably a little bit of both.  But I

1    would say there's probably less that's stapled than not

2    stapled.  But that could be 51/49.  I would probably

3    hazard a guess it's -- Yeah, it's hard to say because

4    you've got files where things are put together, and so

5    that would be a hundred percent and zero.  And then

6    you've got other stuff that might be 80 or 90 percent

7    loose paper.  Pulling it all together to give you a

8    percentage is -- it would be too much of a guess.

9        Q.    Who is conducting the printing project of

10   Burlingame's files?  Who is the person doing it?

11       A.    My wife and I.  We both do it.

12       Q.    And what's your general practice for the

13   procedure for going through and doing this?  Can you

14   explain how you're doing it?

15       A.    We go and we look -- We're looking at what did

16   we have on the computer that was Burlingame's, that we

17   are making sure that nothing gets lost.  So we print it

18   out by file or folder on the computer.  So we've got

19   everything on there and we know now that when we've got

20   that in the box and goes into storage, nothing's gotten

21   lost.  Because we don't want anybody to suggest that we

22   did something nefarious, because that's just not who we

23   are.

24       Q.    When did you begin the printing project?  Last

25   week?  Last month?  A year ago?

1    A.    No.  I would say 14 to 18 months ago, although
2   we had been doing some of that before.  But really
3   saying this stuff needs to come off these computers and
4   we've got the storage locker with all the stuff and we
5   need to put it in one place.  So I would say that would
6   be certainly 12 to 18 months ago and probably 14 to 18
7   months ago.

8        Q.    How often are you or Ms. Judson working on
9   this?  I assume you're not doing it all day, every day?
10   A.    That would be correct:  We are not doing it
11  all day, every day.

12       Q.    How often are you working on the printing
13  project?
14   A.    Certainly every week, unless we're out of
15  town.  How many days in a given week?  It varies.

16       Q.    About what --
17   A.    We're getting -- We're almost -- We're getting
18  to the end.

19       Q.    About what percentage of the way through it
20  are you?
21   A.    85 to 90, maybe even a little bit more.  We're
22  getting there.

23       Q.    What volume of hard-copy documents have been
24  printed so far?  These are the Burlingame --
25   A.    I'm not --

1    Q.    -- electronic records that you're printing to

2    hard copy.

3    A.    I would say 85 to 90 percent of those have

4    been printed out now in hard copy.

5    Q.    Sure.

6          And does that make a stack an inch high?  Is

7    it one box?  Is it 20 boxes?  What volume have you

8    produced?

9    A.    Well, if you look -- and you have access to

10   it.  Just as one example, all of the e-mails that we had

11   with Allen Matkins, that's a lot of boxes -- It's been,

12   I don't know, a number of boxes to print all those out.

13   But we've gone through that, and those are done.  How

14   many boxes?  I don't know, 30, 40?  Could be wrong.

15   Q.    About 30 to 40 boxes is your best estimate?

16   A.    That's a guess.

17   Q.    Do you have a better estimate?

18   A.    No.  I'm not trying to be flip.  You know,

19   some of this stuff, when we go over there and we take it

20   over -- And, again, we're space constrained.  You can

21   see the storage locker that -- I mean when we go through

22   it, we work.  We actually sit out in the hall on these

23   chairs and go through boxes because there's not enough

24   room to do it in the locker.  But if there are some

25   boxes that, for example, came from Allen Matkins and

1   stuff was just thrown in these boxes and there was some

2   room in those boxes, we might put some other stuff in

3   there because we needed the space.

4       Q.    What sorts of files are there in the

5   electronic records that you're printing?  I understand

6   there are e-mails.  And we'll start with those.  What

7   else is there?

8       A.    Oh, there were loan documents.  As I say, we

9   tried to go paper light.  So to the extent that we could

10  scan in loan documents and transactional documents like

11  that, we would do it.

12      Q.    Do the --

13      A.    Most of the -- Most of the paper are e-mails.

14      Q.    When you scan documents in, do they end up as

15  PDFs?

16      A.    I don't know.  I assume so.  I don't -- Again,

17  you're looking at the I.T. department.  I would assume

18  they're PDF.  I think that's correct, but sometimes I

19  get a document and it comes in a different format and I

20  would save it that way.  So when I -- I don't want to be

21  inaccurate.

22      Q.    When the documents are printed, do you have to

23  open each document separately?  That is, is each

24  document its own separate document in your filing

25  system?  Or are they scanned in as:  Here's 15

1    documents, we'll put them together in one stack, hit

2    Scan, and end up with one PDF file or whatever-format

3    file?

4        A.    Well, unfortunately the answer to your

5    question is yes.  Some are individual.  I don't know, at

6    the time the sun and the moon and the stars were aligned

7    that one of us decided that they'd take the time to do

8    them individually.  And then other times, if you were in

9    a rush, you'd scan it in all as one.  Some of that would

10   be a function of just how thick the list of documents

11   is.  There's -- Unfortunately there isn't a particular

12   hard-and-fast rule.

13       Q.    Mr. Judson, slightly off topic, can you tell

14   me who all the people are that are in the room with you

15   right now?

16       A.    My wife and I.

17       Q.    Is there anyone else in the room?

18       A.    No.  I gave her my phone because it started --

19   somebody was trying to call.  You might have heard the

20   buzz.  We have it on red dot.

21       Q.    I want to go back to the documents that are

22   kept electronically.  How are the electronic files of

23   each document or the electronic copies of each document

24   named?

25       A.    Depends on what I named it.

1      Q.      Do you --

2      A.      Again, I'm not -- I'm not trying to be flip,

3   but you have a document and you scan it in and you give

4   it a name.  You know, and -- there's different names,

5   different stuff.

6      Q.      Is it your practice, then, to name each

7   document that's scanned in as it's being scanned?

8      A.      No.  Well, it has to have a name or it's a

9   number that is, I guess, randomly determined by the

10  computer.  I try to give it some sort of name.  Sometime

11  it's a date.  And it's whatever I thought at the time

12  would help me find it sometime down the road if I ever

13  had to find it.

14     Q.      So you do try to name each document, then, as

15  opposed to just let it sit with the randomly generated

16  number?

17     A.      Yes.  But, you know, as we print this stuff

18  out, we're not keeping it on the computer.  We're

19  printing it out, putting it in a box, it goes over

20  there, and once we're convinced -- sure that every

21  document that was in that file has in fact been

22  reproduced and it's going to be in the storage locker,

23  we don't keep the electronic copy, because we don't

24  think it's appropriate for us to keep that because we

25  shouldn't have Burlingame's documents.  We're not part

1    of the G.P.  We don't have any ownership in the debtor.

2    Our job is to make sure that no documents of

3    Burlingame's get, to the best we can, lost or stolen.

4         Q.    Let's talk about where the electronic -- Well,

5    let me ask about the e-mails.  What format are the

6    e-mails in that are being printed?

7         A.    What do you mean by "format"?

8         Q.    Are those things that are scanned?  Do they

9    come -- just hit Print off the e-mail server?  How are

10   those scored electronically?

11        A.    Well, we don't have -- Well, I guess we have a

12   server.  But it's off somewhere else.  We don't have our

13   own server.  So whoever, I guess, serves our -- is our

14   server in theory, I guess, would have it.  But we have

15   it on the computer.  So what we've done is when you go

16   to your list of e-mails, you take one, you print it out.

17   If it's got an attachment, you print that out.  Okay, so

18   that's done.  Then you go to the next one.  Sometimes

19   they come off as streams and you check to make sure that

20   you get every one and you get every attachment.  Then

21   you go to the next one, et cetera.  It's a long,

22   laborious process.  But we wanted to make sure that

23   nothing got lost and that, the best we could, everything

24   was going to -- was being retained so that it was all

25   there for whoever wanted to go through it or find out

1  what they thought they were looking for.  To the extent

2  that Burlingame had it, it would be there.

3      Q.    Whose e-mail addresses are being printed?

4      A.    Uh, geez.  I guess I would assume it would be

5  mine and Jan.

6      Q.    Is there anyone else who communicated by

7  e-mail in connection with Burlingame whose e-mail

8  addresses you have access to other than you and your

9  wife?

10     A.    I'm not sure I know what you mean by "access

11  to."

12     Q.    I mean are there other people whose e-mails

13  you can open up and print?

14     A.    Well, if you sent me an e-mail or I sent you

15  an e-mail, I would be able to print that.  I don't have

16  access to, nor does Jan have access to, anybody else's

17  account where we own -- we know the log-in and the

18  password and that kind of stuff.  I don't -- I'm not

19  aware of anybody else that we would have that kind of

20  access to.

21     Q.    You and Ms. Judson, then, have communicated by

22  e-mail concerning Burlingame and its affairs?

23     A.    To some extent, sure.

24     Q.    I want to talk about --

25     A.    ' Look at all the e-mails that went back and

1    forth with Allen Matkins.  I mean you already knew the

2    answer to that question.

3        Q.    During the time that you, as opposed to your

4    wife, have communicated by e-mail in connection with

5    Burlingame's affairs, how many different e-mail

6    addresses have you used?

7        A.    I think only one.

8        Q.    What is that e-mail address?

9        A.    Rjudson@burlcap, b-u-r-l-c-a-p, .com.

10       Q.    And --

11       A.    Now -- Go ahead.

12       Q.    What sort of program handles those e-mails?

13   Is it Outlook?  It a G-mail program?  Is it something

14   else?

15       A.    Today we use -- I use Apple mail.

16       Q.    Did you use something else in the past?

17       A.    Uh, I've used Outlook.  We used to be PC

18   based, and now we're Apple based.  But we used to -- or

19   I used to use Outlook, probably five, six, seven, eight

20   years ago, and then going back.

21       Q.    And at some point five, six, seven, eight

22   years ago you switched to Apple Mail as the program?

23       A.    Uh, I'm going to say sometime in 2010 we

24   switched to Apple hardware and subsequently to that.  I

25   switched to Apple Mail.  I think I may have used

1  Entourage, which was the Outlook for Mac, before they

2  went to calling it Outlook for Mac.  But I switched over

3  to Apple Mail at some point in this process.

4      Q.    Have you deleted any of your e-mails in

5  connection with Burlingame?

6      A.    As to when?

7      Q.    Anytime.

8      A.    I'm sure that from 2000 forward I would not be

9  surprised if I'd deleted some e-mails, probably because

10 they didn't have any value.  Maybe I e-mailed Bob Moore

11 and asked him about a Raiders game.

12     Q.    As -- Was your general practice to keep

13 e-mails related to Burlingame if you felt that they had

14 any significance?

15     A.    Um, our practice changed over time just due to

16 the sheer volume and being involved in litigation and

17 having to provide all the e-mail correspondence and

18 going through the process of finding it all, getting it

19 all on a CD, prior to the advent of thumb drives and

20 stuff, that we became cognizant that that was just going

21 to create a lot of work potentially down the road.  So

22 we stopped -- or I shouldn't say stopped -- we shrunk

23 the amount of e-mail that we would use from the volume

24 that we had previously.

25     Q.    You say you shrunk the amount of e-mail you

1   would use.  Do you mean the amount of e-mail you saved,

2   or you stopped communicating by e-mail to some degree?

3       A.   Uh, I would say that we communicated less by

4   e-mail than we used to and that obviously reduced the

5   volume of e-mail.  And the -- Once the litigation with

6   Allen Matkins started, we made sure that we didn't get

7   rid of anything that had any value.  I mean if there was

8   an e-mail that talked about an article somebody wrote

9   that had nothing to do with Burlingame, we might have

10  deleted that.  But we understood that what the judge had

11  said:  You got to keep it all.  So you keep it all.

12  It's not -- not terribly difficult to figure that out.

13  You just keep it.

14      Q.   So since roughly 2009 or 2010 you have kept

15  all e-mails that relate to Burlingame?

16      A.   Yeah, I would guess so, other than maybe some

17  with Counsel.  But, again, you know, that was, at least

18  we thought, covered under, at the time, attorney-client

19  privilege.  We've obviously kept everything since the

20  bankruptcy.

21      Q.   How many e-mails with Counsel did you delete,

22  percentage-wise?

23      A.   I have no idea.  We did most -- We did most of

24  it by telephone.  So it wasn't like it was a huge

25  volume.  And I don't think that there's -- I can't

1    imagine that we deleted anything that had any incredible

2    value anyway.

3        Q.    Are all of these e-mails still located in the

4    Apple Mail account, your e-mails, at least to the extent

5    they've not been deleted?

6            MR. CAWDREY:  Vague and ambiguous as to "all

7    of these e-mails."

8        A.    All of the e-mails I have, they're either

9    printed out or they're still on my account, about to be

10   printed out, the vast majority of which have already

11   been printed out.  And if they've been printed out, then

12   I delete them off the system.

13   BY MR. PERNICKA:

14       Q.    I understand that you've completed about 85 to

15   90 percent of the printing job, based on what you've

16   said already.

17           Isn't that correct?

18       A.    Yeah.  Yeah, that's my -- that's my estimate.

19       Q.    Do you have a similar estimate regarding the

20   volume of e-mails that have now been deleted from the

21   electronic system:  That 85 to 90 percent of the e-mails

22   have now been deleted?

23       A.    Well, I would say that if I have printed out

24   85 to 90 percent of the e-mails, that those that had

25   been printed out have been deleted.  It isn't that

 1    Burlingame doesn't have them.  We have them.  We just

 2    have them in paper form rather than in electronic form.

 3    But the same percentage of e-mails that I've printed out

 4    would be the same percentage of e-mails that have been

 5    deleted from the system.

 6        Q.    So that's 85 --

 7        A.    But I want to be clear, though:  No e-mail is

 8    lost.  Just because it's not in electronic form doesn't

 9    mean that we don't have it.  We have it in paper form.

10        Q.    But 85 to 90 percent of the e-mails have now

11    been deleted electronically.

12        A.    If -- I said of all the documents, 85 to 90.

13    If 85 to 90 percent of the e-mails have been printed

14    out, then yes, I would say 85 to 90 percent of the

15    e-mails have been deleted.

16        Q.    What e-mail address does your wife use?

17        A.    Jjudson@burlcap.com.

18        Q.    And during the time that she has corresponded

19    by e-mail in connection with Burlingame's affairs, has

20    she ever used a different e-mail address, so far as you

21    know?

22        A.    For Burlingame affairs?

23        Q.    Correct.

24        A.    Not that I'm aware of.  We have other e-mail

25    addresses.  Whether by mistake, you know, you have an

1   outlier, I don't know.  But I -- We've gone through
2   everything we've got, to make sure that we're putting in
3   storage everything that relates to Burlingame.  And
4   we're searching those others just to make sure.  But I
5   don't -- I don't believe that there's anything out there
6   that is being missed.  We're being very diligent in
7   making sure that we've got everything there.
8          Q.     What other e-mail addresses have you used,
9   other than rjudson@burlcap, in the last seven years?
10         A.     Let's see.  Rjudson@kc4us.com.
11  Bob@judson-family.com.  Bob@turtlegroveadvisors.com.
12  Info@family -- or, judson-family.com.  I think that's
13  it.
14         Q.     Generally what have you used the e-mail
15  rjudson@kc4us.com for?
16         A.     For KC Funding work.
17         Q.     What do you mean by "KC Funding work"?
18         A.     Work done on behalf of KC Funding.
19         Q.     Is that work done in connection with the kids
20  ' school --
21         A.     KC Funding operates the school, yes.
22         Q.     Is there anything else that KC Funding is
23  involved in other than the school and the school
24  property?
25         A.     No.

1    Q.    And has there been anything else that KC

2    Funding was involved in other than the school and the

3    school property?

4         MR. CAWDREY:  The question exceeds the scope

5    of the examination, which concerns Burlingame's

6    documents and how they're preserved and maintained.  I'm

7    giving Mr. Judson some latitude.

8         Feel free to answer this question if you want.

9         But I don't want to get too far outside, Mr.

10   Pernicka.

11        THE WITNESS:  Can you repeat the question?

12   BY MR. PERNICKA:

13   Q.    Sure.  I first asked if there is anything that

14   KC Funding is involved in other than the Kids Connection

15   school and the property the school is on, and you had

16   said no.  So the next question was:  Has there been, in

17   the past, anything else KC Funding was involved in?

18   A.    Um, I want to talk to Counsel.

19        MR. CAWDREY:  All right.  That's fine.

20        I'll interpose an objection that it exceeds

21   the scope of this examination.

22        MR. PERNICKA:  It does not exceed the scope

23   because I'm trying to find out whether there are

24   documents related to Burlingame that may be in the KC

25   Funding records.  And that includes, in a general sense,

1    understanding what those records may have to do with.

2    If KC Funding is involved in an Antarctic outpost that

3    has nothing to do with Burlingame, then I'm not

4    particularly interested in it.  And that's what I'm

5    trying to find out, what else is KC Funding involved in,

6    so we can explore where the records are.

7    BY MR. PERNICKA:

8        Q.    And with that I think helpful explanation,

9    I'll ask again:  Was KC Funding involved in anything

10   other than the Kids Connection school and Kids

11   Connection property, in the context of your e-mails on

12   this e-mail address concerning KC Funding's affairs?

13            MR. CAWDREY:  And I'll object it exceeds the

14   scope of the examination.  Mr. Judson has responded

15   repeatedly as to where the Burlingame documents are

16   kept.  So your inquiry is outside the scope, doesn't

17   relate to the examination nor the Burlingame documents.

18   If you want to ask him whether Burlingame documents are

19   kept on the KC Funding e-mail, ask him that.  I think

20   he's answered it in a number of ways, but you can

21   answer -- ask it more directly if you prefer.

22            MR. PERNICKA:  I appreciate the help.  I'll

23   offer the same request as I did earlier, that you keep

24   your soliloquies and comments to yourself for a more

25   appropriate time.  You're certainly welcome to examine

1    Mr. Judson on the record, if you're so inclined, or to

2    present your argument to the Court.  But I'd appreciate

3    that your objections be kept to proper objections as to

4    the form of the question.

5            MR. CAWDREY:  Excellent.  It's a proper

6    objection, and I'll state my objections as I see fit.

7    And if we want to discuss it with Judge Latham, Mr.

8    Pernicka, we can.

9            MR. PERNICKA:  No doubt we will.

10            MR. CAWDREY:  All right.

11    BY MR. PERNICKA:

12    **Q.    Mr. Judson, can you explain the search that**

13    **you have done, if any, of the e-mails on your KC4us file**

14    **to evaluate whether any of those have to do with**

15    **Burlingame or its affairs?**

16    A.    We have gone through all of the various

17    e-mails that we have retained over the years, kept, and

18    anything that was for Burlingame has been printed out,

19    or will be printed out, of this last 10 to 15 percent.

20    We have already searched all of the KC Funding, CK4us

21    files, and we have gone through all of the KC Funding

22    hard-copy files to make sure that we had identified and

23    taken out of there and put it into the Burlingame

24    documents.  So we are quite confident at this stage that

25    there aren't any Burlingame documents in the possession

 1   of KC Funding.

 2        Q.    I want to talk about e-mails --

 3        A.    Does that answer your question?

 4        Q.    I want to talk about the e-mails first.  Can

 5   you explain how you searched your e-mails, what process

 6   you used to determine whether there was anything related

 7   to Burlingame in the KC Funding e-mails?

 8        A.    We looked at every single e-mail that we had

 9   to determine whether or not it was a -- had to do with

10   Burlingame's business, as compared to KC Funding's

11   business or our personal business or Turtle Grove

12   Advisors' business, so that we could be sure that

13   everything that related to Burlingame was going to be in

14   the storage locker.  I mean we literally looked at every

15   single e-mail:  Eyeball it, look at it, what's the

16   context, what's the subject, what does it say in the

17   body of the e-mail.  I mean we've been going at this for

18   14 to 18 months.  It's a long process.  But we've been

19   diligent about it.

20        Q.    How many e-mails, if you can estimate, are

21   there saved in your KC Funding e-mail address file?

22        A.    A lot.  I couldn't give you an estimate, other

23   than it's a lot.

24        Q.    Hundreds?

25        A.    There's -- But I can tell you there are

1    zero Burlingame e-mails in those files, as I sit here.

2    Zero.

3        Q.    And of the number of e-mails, total, in the KC

4    Funding e-mail address, are there hundreds?  I'm trying

5    to get --

6        A.    Not hundreds.

7        Q.    I'm trying to get an estimate.

8        A.    Well, 900 would be in the hundreds, but it's a

9    lot.

10        Q.    Is 900 --

11        A.    Let's just say this:  It's not a couple

12    hundred.  There are a lot.  I don't know what the number

13    is.  I don't know what the number is.

14        Q.    Is it 10,000?

15        A.    I don't know what the number is.  I don't want

16    to say no and it turns out it's 12,000 and you go:

17    Yeah, you misled me.  I'm just telling you there are a

18    lot.

19        Q.    About what percent of the KC Funding e-mails

20    in total did you determine have to do with Burlingame?

21        A.    Oh, there might have been a handful.

22        Q.    Is that 1 percent or less?

23        A.    Now you're asking a math question to a guy who

24    has dealt with numbers all his life.  If it's a

25    thousand, that's 10 -- I mean -- You're talking about,

1   you know, three, four, five out of a lot of e-mails were

2   misfiled.

3       Q.    So your belief is that there are three or four

4   or five total e-mails in your KC Funding e-mail address

5   that have to do with Burlingame?

6       A.    No.  I am saying those three to four or five,

7   whatever they were, were misfiled.  They were moved to

8   the Burlingame files and then have subsequently been

9   printed out.  As a result, there are no remaining

10  Burlingame-related e-mails in the KC Funding or in the

11  TurtleGroveAdvisors or in the Bob-Judsonfamily accounts.

12  We've gone through every single e-mail, and out of all

13  of that, there was less than a handful, and -- that had

14  been misfiled.  And so we found them, put them where

15  they were supposed to be.  And so what -- as -- And

16  they've been printed out, and they're now in storage.

17      Q.    So to make sure I understand the numbers, do

18  you believe that in the KC Funding e-mail address files

19  that you have there were a total of three or four or

20  five that had to do with Burlingame?

21      A.    No.  I said there were -- in the KC Funding

22  files there were three or four that had been misfiled or

23  for -- when you go to send an e-mail you had -- you

24  forget to send it from the right e-mail address.  And so

25  it had it there, and as a result, it would be in the KC

1   Funding files.  We took those files, moved them to the

2   Burlingame Capital files, and then from there printed

3   them out so that all e-mails relating to Burlingame were

4   printed out, were in the storage.  So as I sit here

5   today, in the KC Funding files that, you know, cover

6   payroll and supplies and vendors and stuff with parents

7   and teachers and yada, yada, yada, there are no

8   Burlingame-related e-mails.

9        Q.    **Did you ever communicate with any of the**

10  **investors in KC Funding by e-mail?**

11       A.    Well, you know the answer to that is yes

12  because you've got a bunch of the e-mails.

13       Q.    **And where -- In which of your e-mail files are**

14  **those e-mails located?**

15       A.    Well, those are all printed out and they're in

16  storage.  But they were all in the Burlingame files.

17       Q.    **Did you ever communicate with anyone by e-mail**

18  **in connection with the sale of the KC Funding property,**

19  **the school and related assets, to Turtle Grove and to**

20  **yourself and your wife?**

21       A.    Um, I have a question regarding -- that I'd

22  like to talk to Counsel.

23            MR. CAWDREY:  Okay.

24            THE WITNESS:  As to --

25            MR. CAWDREY:  That's all right.  We can take a

1    break and talk about it.  In fact, do you want to take a

2    break now, Mr. Pernicka?  It's about an hour and a half

3    in.

4    BY MR. PERNICKA:

5        Q.    Let's take a break, but that's a simple

6    question:  Did you ever communicate by e-mail about

7    that -- with anyone about that sale transaction?  We can

8    answer that "Yes" or "No" and then take our break.

9              MR. CAWDREY:  You can choose not to answer it,

10   Mr. Judson, if you prefer to discuss it.  That's fine.

11             THE WITNESS:  I would prefer to discuss it.

12             MR. CAWDREY:  All right.

13             MR. PERNICKA:  I want the record to note that

14   Mr. Judson has now refused to respond to that question,

15   and we can go off the record and take a break.

16             MR. CAWDREY:  And the question is vague and

17   ambiguous and overbroad and exceeds the scope of the

18   examination.  And I'll speak with Mr. Judson about it.

19             All right?  Why don't we take a break?

20             MR. PERNICKA:  Off the record.

21             (Recess taken.)

22   BY MR. PERNICKA:

23       Q.    Okay.  Back on the record.

24             Mr. Judson, we are back on the record after

25   our break.  Who all is in the room with you currently?

1        A.    My wife.

2        Q.    Anyone else?

3        A.    Nope.

4        Q.    Are you still able to see me okay and to see

5   Mr. Cawdrey okay?

6        A.    Yes.

7        Q.    Still able to hear me okay?

8        A.    Yes.

9        Q.    I want to pick up where we left off.  Did you

10  ever communicate with anyone by e-mail concerning the

11  affairs of KC Funding?

12       A.    Yes.

13       Q.    And that's a broad question, intended to be

14  broad.

15       A.    Yes.

16       Q.    Which e-mail address did you primarily use for

17  that?

18       A.    I don't know.  Probably -- I would say for KC

19  Funding activities, probably the KC4us.com primarily.

20       Q.    Was it your practice to use the KC4us e-mail

21  for KC Funding's affairs?

22       A.    Yes.

23       Q.    Did you communicate with anyone by e-mail

24  concerning the sale of KC Funding's assets?  And when I

25  refer to "sale," I'm talking about the sale of the real

1   property to Turtle Grove and the sale of the other

2   assets to you and your wife.

3            MR. CAWDREY:  Vague and ambiguous.

4        A.   Uh, that's an incorrect statement, so I don't

5   know how to answer.

6   BY MR. PERNICKA:

7        Q.   Tell me how it's incorrect, please.

8            MR. CAWDREY:  Well -- Go ahead, Bob.  Yeah,

9   ask it -- Why don't you ask the question again.

10  BY MR. PERNICKA:

11       Q.   Sure.  What's incorrect about the question?

12           MR. CAWDREY:  If you don't understand the

13  question, you don't need to answer it.

14       A.   I'm not -- I think the issue here is the

15  previous question, not the current one.

16  BY MR. PERNICKA:

17       Q.   Right.

18           And the previous question was:  Did you ever

19  communicate by e-mail with anyone about the sale of KC

20  Funding's assets?

21           MR. CAWDREY:  And that was asked and answered.

22           MR. PERNICKA:  It was not asked or answered

23  either before the break or now.

24           MR. CAWDREY:  Oh, I thought --

25           MR. PERNICKA:  This is the question that

1    you --

2              MR. CAWDREY:  I thought you'd asked that

3    question again.

4              Go ahead.

5    BY MR. PERNICKA:

6      Q.    Let me ask it again so we have a clean record.

7             Have you ever communicated with anyone by

8    e-mail in connection with the sale of KC Funding's

9    assets?

10     A.    Yes.

11     Q.    And when I speak of "the sale," do you have an

12   understanding as to what I'm referring to?

13     A.    Why don't you enlighten me.

14     Q.    Is it correct that at some point KC Funding

15   owned a school and related assets?

16             MR. CAWDREY:  I'm going to --

17     A.    Yes.

18             MR. CAWDREY:  The question's been answered.

19   I'm going to object that this exceeds the scope of this

20   examination, which concerns the existence, location, and

21   general nature of documents responsive to the 2004

22   request.  That includes documents obtained in the

23   400-plus boxes of storage in Florida as well as other

24   documents that may exist elsewhere.  There's the first

25   part of potentially two examinations.  So exceeds the

1   scope.

2   BY MR. PERNICKA:

3       Q.    And KC Funding is no longer the owner of the

4   sale -- or no longer the owner of the school and related

5   assets; right?

6             MR. CAWDREY:  Same objection:  Exceeds the

7   scope.

8             Instruct the witness not to answer.

9   BY MR. PERNICKA:

10      Q.    Are you going to answer, Mr. Judson?

11      A.    No.

12      Q.    When I talk about the sale of KC Funding's

13  assets, what I'm talking about is the disposition of

14  those assets so that KC Funding no longer owns them.

15            Do you understand what I mean by that?

16            MR. CAWDREY:  Vague and ambiguous.  Exceeds

17  the scope.

18            Instruct the client not to answer.

19  BY MR. PERNICKA:

20      Q.    Are you going to follow that instruction?

21      A.    Yes.

22      Q.    How many times were the assets of KC Funding

23  sold by KC Funding?

24            MR. CAWDREY:  Same objection.

25            Same instruction.

1   BY MR. PERNICKA:

2       Q.    Mr. Judson, are you going to answer?

3       A.    No.

4       Q.    Do you have confusion as to what I mean when I

5   asked did you communicate by e-mail about the sale of

6   the KC Funding assets?

7            MR. CAWDREY:   Objection, argumentative.  He's

8   responded to your question.

9            (Interruption at the door.)

10  BY MR. PERNICKA:

11      Q.    Mr. Judson, are you confused by what I mean

12  when I say did you communicate by e-mail with anyone

13  about the sale of KC Funding's assets?

14      A.    I think I understand your question, and I

15  answered it.

16      Q.    And what e-mail address did you use when you

17  communicated by e-mail about that sale?

18      A.    I don't know as I sit here.

19      Q.    Have you reviewed all of the KC Funding

20  e-mails in your -- or, strike that.

21           Have you reviewed all of the e-mails in your

22  KC Funding e-mail address files within the last year?

23      A.    What do you mean by "reviewed"?

24      Q.    Well, you said before that you opened up every

25  single e-mail and looked at it to determine whether or

1   not it had to do with Burlingame. Did you do that for

2   every one -- Did you do that for every one of the

3   e-mails in the KC Funding e-mail address file?

4      A.   Yes.

5      Q.   And have you done that within the last year?

6      A.   For the last 14 to 18 months, yes.

7      Q.   And do you know whether any of those e-mails

8   had to do with the sale of the KC Funding property?

9           MR. CAWDREY: Exceeds the scope of the

10   examination relating to the nature and location and

11   extent of Burlingame documents. He's asked and answered

12   the question regarding the Burlingame documents.

13           Instruct the client not to respond.

14   BY MR. PERNICKA:

15      Q.   Are you going to respond, Mr. Judson?

16      A.   No.

17      Q.   Was there ever a time in KC Funding's history

18   that Burlingame did not hold at least some interest in

19   KC Funding?

20           MR. CAWDREY: Same objection, same

21   instruction. This is argumentative.

22           Instruct the witness not to answer.

23           There's a second go-round of examination in

24   which those types of questions, to the extent they're

25   going to be asked, are more appropriate. This is not

1   that examination.

2   BY MR. PERNICKA:

3        Q.    Are you going to answer the question?

4        A.    No.

5        Q.    Were communications with the entities and

6   individuals who had interests in KC Funding made by you

7   from your KC Funding e-mail address in connection with

8   the sale of the KC Funding assets?

9              MR. CAWDREY:  Vague and ambiguous.  Exceeds

10  the scope.

11             Instruct the witness not to answer.

12             Asked and answered.  Argumentative.

13  BY MR. PERNICKA:

14       Q.    Are you going to answer that question, sir?

15       A.    No.

16       Q.    Was there ever a time, in relation to the sale

17  of the KC Funding assets, in which Burlingame was not

18  the holder of some interest of KC Funding?

19             MR. CAWDREY:  Same objection.

20             Same instruction.

21  BY MR. PERNICKA:

22       Q.    Will you answer that question?

23       A.    No.

24       Q.    Was there ever a time, in connection with the

25  sale of the KC Funding assets, in which Burlingame, to

1   your belief, was not entitled to at least some proceeds

2   from the sale?

3           MR. CAWDREY:  Same instruction.

4           Same objections.  And if we don't get back on

5   the records, then I'm going to ask that this deposition

6   be suspended, we visit Judge Latham, and get back on

7   track.

8   BY MR. PERNICKA:

9       Q.   Are you going to answer that question, sir?

10      A.   No.

11      Q.   Were there communications -- excuse me.  Were

12  there communications that you were involved in with the

13  investors of KC Funding about the divisions of proceeds

14  of the sale of the KC Funding assets?

15          MR. CAWDREY:  Same objection.

16          Same instruction.

17  BY MR. PERNICKA:

18      Q.   Will you answer that question, sir?

19      A.   No.

20      Q.   Were there any communications with the

21  investors in KC Funding about the distribution of the

22  proceeds of that sale that were made from your KC

23  Funding e-mail address?

24          MR. CAWDREY:  Asked and answered.

25          THE WITNESS:  Could the court reporter read

1    that back to me, please.

2             (Last question read.)

3             MR. CAWDREY:  Same objections:  Vague and

4    ambiguous.

5             If you understand that, you can answer that,

6    Mr. Judson.

7             THE WITNESS:  Yes.

8    BY MR. PERNICKA:

9        Q.    **And have those e-mails been printed?**

10       A.    That -- Those are KC Funding property, not

11   Burlingame.  I'm here to talk about Burlingame's

12   documents, not somebody else's documents.

13       Q.    **Have those e-mails been printed, Mr. Judson?**

14            MR. CAWDREY:  Exceeds -- To the extent that

15   they're not Burlingame documents, it exceeds the scope

16   of this examination.

17            And I instruct the witness not to answer.

18   BY MR. PERNICKA:

19       Q.    **Are you going to respond?**

20       A.    No.

21       Q.    **Have those e-mails been deleted?**

22            MR. CAWDREY:  Same objection.

23            Same instruction.

24   BY MR. PERNICKA:

25       Q.    **Will you respond?**

1      A.    No.

2      Q.    Are those e-mails still located in the files

3    for your KC Funding e-mail address?

4            MR. CAWDREY:  Same instructions.

5            Same objections.

6    BY MR. PERNICKA:

7      Q.    Are those e-mails also located in your

8    Burlingame e-mail address files?

9            MR. CAWDREY:  Vague and ambiguous as to "those

10   e-mails."

11   BY MR. PERNICKA:

12     Q.    Well, let me ask it another way.  First of

13   all, Mr. Judson, are you going to respond to my question

14   as to whether e-mails concerning the distribution of

15   proceeds of the sale of the KC Funding assets are still

16   located in your electronic files for your KC Funding

17   e-mail address?

18     A.    Uh, no, as I sit here.

19     Q.    The question was:  Are you going to answer

20   that question as Mr. Cawdrey instructed you?

21           MR. CAWDREY:  Vague and ambiguous as to what

22   "that" means.  We've objected to it as exceeding the

23   scope.

24           And I've instructed the witness not to answer.

25

1   BY MR. PERNICKA:

2       Q.   And Mr. Judson, are you going to follow your

3   attorney's instruction?

4       A.   Absolutely.

5       Q.   Are the e-mails involving KC Funding and the

6   distribution of the proceeds of the sale of the KC

7   Funding property -- Are copies of those e-mails also

8   contained in the files for your Burlingame e-mail

9   address?

10      A.   I don't know the answer to that.

11      Q.   Do you recall ever having seen any of those

12  e-mails in your Burlingame e-mail folder or folders?

13      A.   I don't -- I don't recall.

14      Q.   Do you have any recollection, sitting here

15  today, as to whether you corresponded about the division

16  of the proceeds of the KC Funding properties and assets

17  from your Burlingame e-mail address or from your KC

18  Funding e-mail address or from some other e-mail

19  address?

20           MR. CAWDREY:  Objection, compound.  Vague and

21  ambiguous.

22           You can answer it if you understand it.

23      A.   Uh, I'm not sure I understand -- Could you say

24  it again.

25

1    BY MR. PERNICKA:

2        Q.    Which e-mail address did you use when you

3    corresponded with others about the sale of the KC

4    Funding assets and the distribution of the proceeds of

5    that sale?

6              MR. CAWDREY:  Asked and answered.

7        A.    Uh, I don't know.  There were a variety of

8    e-mails.  I don't know which one.

9    BY MR. PERNICKA:

10       Q.    What are the possibilities?

11       A.    The Burlcap one.  It could have been KC4us.

12   It could have been -- We may have had -- I seem to

13   recall that KC Funding had a separate e-mail address

14   that it doesn't have now.  I just -- I don't know the

15   answer to your question as I sit here.

16   BY MR. PERNICKA:

17       Q.    Have any of those files, those e-mail -- Start

18   over.

19             Any of the e-mails about the distributions of

20   the proceeds of the sale of the KC Funding asset been

21   printed?

22             MR. CAWDREY:  Asked and answered.  Exceeds the

23   scope of the examination.

24             I've instructed the witness not to answer.

25

1  BY MR. PERNICKA:

2      Q.    You mentioned that during the process of the

3  printing of records and e-mails, once those materials

4  are printed, the electronic copies have been deleted.

5            Do I have that correct?

6      A.    Yes.

7      Q.    When is it that the deletion of the electronic

8  files began?  And these are the Burlingame records that

9  I'm talking about.

10     A.    Um, related to the printing?

11     Q.    If that's --

12     A.    Is that your question?

13     Q.    If that's what the deletion was related to.

14  I'm not limiting it that way.  But whatever the deletion

15  was related to, when did you begin deleting electronic

16  files of Burlingame's?

17     A.    Well, I think I've answered that, you know, it

18  started way back when.  And there were some files, I'm

19  sure, that got deleted starting whenever we started

20  using e-mail, back in 2000, forward.

21     Q.    But then at some point you began a program of

22  printing records and deleting the electronic files;

23  right?

24            MR. CAWDREY:  Asked and answered.

25     A.    That's right.

1  BY MR. PERNICKA:

2      **Q.     And when did the deletion under that program**

3  **begin?**

4           MR. CAWDREY:  Asked and answered.

5      A.    The -- As we print one, we delete that same

6  e-mail.  So it kind of went together.

7  BY MR. PERNICKA:

8      **Q.     And when did you start that process?  Was that**

9  **the 12 to 14 months ago?**

10     A.    I think I've testified that it was 14 to 18

11  months ago.

12     **Q.     When did you last delete electronic files as**

13  **part of this program?**

14     A.    Yesterday.

15     **Q.     And what was deleted yesterday?**

16     A.    Whatever I printed out yesterday.

17     **Q.     Were there e-mails that you deleted yesterday?**

18     A.    Uh, as I have testified, we look at an e-mail,

19  if it's a Burlingame document, we print it out so that

20  we retain it and then we delete the e-mail.  As part of

21  the printing, we print out the attachments so the entire

22  e-mail is there and nothing's lost, and once we've done

23  that, then we delete it.  And we keep going back and

24  forth:  Find one, print it, then delete it.

25     **Q.     I understand that there are various categories**

1   of Burlingame documents that you have been printing and

2   deleting.  And that includes e-mail records, it also

3   includes your electronic files of other sorts of

4   documents.

5          Do I have that correct?

6   A.    Yes.

7   Q.    What was deleted yesterday?  Was it e-mails or

8   was it electronic files of other sorts of documents?

9   A.    Uh, yesterday I think it was just e-mails.

10  Q.    Over the course of the last month, can you

11  tell me about how many e-mails have been deleted,

12  Burlingame e-mails?

13  A.    Um, I -- it would be a wild guess.

14  Q.    More than a hundred?

15  A.    Probably.

16  Q.    More than a thousand?

17  A.    Probably not.

18  Q.    Over the course of the last month, about how

19  many other sorts of Burlingame records have been deleted

20  from their electronic folders?

21  A.    Less than e-mails.  Again, it would be a wild

22  guess.

23  Q.    More than a hundred?

24  A.    More than -- That might be at the outside,

25  because there were a lot less of those.

1    Q.    And these are things like agreements, to give

2    one example of the sorts of documents that we're talking

3    about?

4    A.    I don't know what kind of document -- I don't

5    want to specify that there were agreements because

6    agreement can relate to a particular document.  They

7    were documents that had been scanned in.

8    Q.    What sorts of documents?  Can you describe

9    them generally?

10   A.    Uh, a promissory note, a security interest.

11   I'm just thinking, generally speaking, things of those

12   nature.  Whether or not there was specifically a

13   security interest, I don't know.  But things like that,

14   we would print out, to make sure that we've got the

15   entire document that had been scanned in, and then that

16   particular document would be deleted from the electronic

17   file.  The whole purpose was to make sure that nothing

18   got lost.  It protects against a hard drive crash and

19   we'd lose everything.  Now we've got everything.

20   Q.    Are Burlingame's financial records maintained,

21   sitting here today?

22   A.    I don't know who's maintaining.

23   Q.    Has Burlingame ever had financial records --

24   profit/loss statements, ledgers, bank account

25   statements -- that sort of thing?

1      A.      Yes.

2      Q.      **And where, historically, have those been kept?**

3      A.      In a variety of places.

4      Q.      **Can you --**

5      A.      There's no one -- There's no one place.

6  They've been kept in Burlingame's offices as that moved

7  around, and then when we moved here, they went into

8  storage.

9      Q.      **Are they kept as hard-copy documents?**

10     A.      Pardon me?

11     Q.      **Are they hard copied?  These are the financial**

12 **records of Burlingame.**

13     A.      Other than the tax -- We have hard copy for

14 tax returns.  But other than for tax returns, they're

15 kept as hard copy.

16     Q.      **Was a computer system used, during the time**

17 **that Burlingame was operating, to run Burlingame's**

18 **finances?**

19     A.      Yes.

20     Q.      **And what system was that?**

21     A.      QuickBooks.

22     Q.      **Are the electronic versions of the QuickBooks**

23 **files for Burlingame's finances still saved?**

24     A.      They're in the storage locker.

25     Q.      **Are they saved electronically?**

1      A.    The -- What do you mean by "saved

2  electronically"?

3      Q.    We've been talking about computer files and

4  computer records.  Do you have computer records of the

5  QuickBooks files?

6      A.    Do I?

7      Q.    Does anyone?

8      A.    Uh, they're in the storage locker.  They were

9  backed up and put in the storage locker.

10      Q.    And what happened to the electronic versions

11  of those?

12      A.    They're in the storage locker.

13      Q.    Are you saying that a computer or a thumb

14  drive or a disk of some sort is in the storage locker?

15      A.    Yes.

16      Q.    What sort of medium is holding these

17  electronic files right now?

18      A.    A thumb drive.

19      Q.    Do you know where in the storage locker this

20  thumb drive is?

21      A.    It's in one of the boxes.

22      Q.    Do you know which one?

23      A.    As I sit here?  No.

24      Q.    When were the QuickBooks files for Burlingame

25  put on a thumb drive?

1    A.    Uh, I don't know exactly.

2    Q.    **Within the last year or longer ago than that?**

3    A.    Oh, within the last year.  It was after the

4    bankruptcy was filed.

5    Q.    **And who transferred those files to the thumb**

6    **drive?**

7    A.    I did.

8    Q.    **Why did you do that?**

9    A.    Because I'm not respon- -- I don't do anything

10   with it.  It was the trustee's stuff.  So I was trying

11   to maintain and protect those files in case the trustee

12   ever wanted them.

13   Q.    **How did you decide where to put the thumb**

14   **drive in the storage locker?**

15   A.    Uh, probably in the box that was there nearest

16   to me at the time.  And I put it in there in an envelope

17   that said that it had the thumb drive.

18   Q.    **Just threw it in the closest box?**

19         MR. CAWDREY:  Misstates his testimony.

20   BY MR. PERNICKA:

21   Q.    **Well, tell me if I'm wrong, please.**

22         MR. CAWDREY:  Asked and answered.

23   A.    I did --

24         THE WITNESS:  Do I still go ahead and answer?

25         MR. CAWDREY:  Go ahead.

1       A.      I did not throw it in the box.  I placed it in

2    the box.

3    BY MR. PERNICKA:

4       Q.      **And what was your selection criteria for which**

5    **box you picked?**

6       A.      I believe I answered that.  It was the one

7    that was there at my desk that we were putting stuff in,

8    and I put the thumb drive in there.

9       Q.      **Where is your desk located?**

10      A.      In my house.

11      Q.      **So you created a box in your house, you did**

12   **not carry the thumb drive to the storage locker and put**

13   **it in a box there?**

14      A.      I don't know if I created a box.  I had a box

15   that had some -- As I've told you, we were going through

16   a process of putting -- of printing this stuff out, and

17   in that box that I had there at the time seemed like the

18   most logical place to put the thumb drive is to come --

19   compared to going over to storage and using some sort of

20   mystical channeling to figure out which box it should go

21   into.  The box was there.  I put it in and envelope and

22   labeled what it was, put it in there.  When that box was

23   full, it went over to storage.

24      Q.      **Do you have any system for identifying what**

25   **records are in what box in the storage unit?**

1          MR. CAWDREY:  Asked and answered, on more than

2    one occasion.

3        A.    We do not have a table of contents, just like

4    we -- there was no table of contents from the Allen

5    Matkins boxes.

6    BY MR. PERNICKA:

7        Q.    Do you have any system at all for identifying

8    what's in what box at the storage unit?

9        A.    No.

10       Q.    Mr. Cawdrey has provided three photos to us.

11   I'm going to attach them collectively as Exhibit 1 to

12   this deposition transcript.

13             (Trustee's Exhibit 1 was marked for

14   identification.)

15   BY MR. PERNICKA:

16       Q.    Mr. Judson, are you familiar with the three

17   photos that I'm speaking of?  These are three photos of

18   boxes in a storage unit.  I'm holding them up for you to

19   see to the extent that is helpful over the video

20   conference.

21             Are you able to see what I'm holding up?

22       A.    Yeah, vaguely.

23       Q.    Did you provide these three photos to Mr.

24   Cawdrey?

25       A.    Um, no.

1      Q.     Do you know who provided them to Mr. Cawdrey?

2      A.     Yes.

3      Q.     Who was that?

4      A.     My wife.

5      Q.     Do you know who took these photos?

6      A.     Yes.

7      Q.     Who was that?

8      A.     My wife.

9      Q.     Do you know when she took the photos?

10     A.     Yes.

11     Q.     When were they taken?

12     A.     Uh, a couple days ago.

13     Q.     And what are these three photos photos of?

14     A.     The storage locker of which all the Burlingame

15 documents are stored.

16     Q.     Do you have any copies of these photos in

17 front of you?

18     A.     No.

19     Q.     Do you recall the photos of the storage locker

20 as you sit here today?

21     A.     Yes.

22     Q.     And do they accurately represent the current

23 condition of the storage locker today?

24     A.     Yes.

25     Q.     And do you have a recollection of the

1   condition of the storage locker independent from the

2   photos?

3       A.    I was present when the photos were taken, so

4   yes.

5       Q.    The photos show various boxes.  Some of the

6   boxes are brown, and some of the boxes are white.  Some

7   of the boxes have pink labels on the sides, and some do

8   not.  Do you know what I mean when I reference boxes

9   with pink labels on the side?

10      A.    I seem to recall that there were -- yes, some

11  of the boxes have pink labels.

12            MR. CAWDREY:  Do you want to hold up the

13  photographs to help the witness?  Or I can, if you'd

14  like me to.

15            MR. PERNICKA:  That would be great, Jeff.

16  Thank you.

17            MR. CAWDREY:  So, Bob, I don't know if you can

18  see these, but there's a pink label, for example, and

19  there are some --

20            THE WITNESS:  I can see that there's a pink

21  label.  I can't see what's on it.

22            MR. CAWDREY:  Let me get -- I'll get a little

23  closer.  Bob, I can't see what's on it either.  But do

24  you see those photos?

25            THE WITNESS:  I do.  But without sort of being

1    able to read the pink label, I don't know if that's

2    something we put on it or if it's something the moving

3    company put on it or where that pink label that came

4    from.

5    BY MR. PERNICKA:

6        Q.    Have you ever applied pink labels to any of

7    the boxes in the storage unit?

8        A.    Uh, I don't know.  If it's not a Post-it,

9    probably not.

10        Q.    Some of them labels list, for example, "Box."

11    And in one of the photos one of the boxes in the front

12    says, "Box No. 139."

13              Have you ever identified the boxes by box

14    number and put labels on --

15        A.    No.

16        Q.    -- to so identify them?

17        A.    Not by box number, no.

18        Q.    Are all of the boxes with pink labels on them

19    boxes that came from Allen Matkins?

20        A.    I don't know who put the box -- or put the

21    pink label on.  They may be -- may have been moved

22    around.  I don't -- I'm not sure I can be responsive

23    directly to your question.

24        Q.    Sure.  Let me -- Let me try it this way.

25              As I understand it, there are two categories,

1    roughly, of boxes in the storage unit.  There are boxes

2    that came from Allen Matkins and there are boxes of

3    materials that you and your wife have gathered and put

4    in the storage unit.

5            Do I have that correct?

6       A.    Yes.

7       Q.    Are there any other, broadly speaking,

8    categories of documents there other than those two:

9    They either came from Allen Matkins or you and your wife

10   placed them there?

11      A.    I think that would be correct.

12      Q.    And did you or your wife ever put pink sheets,

13   identifying boxes, on any of the boxes that the two of

14   you put in the storage unit?

15      A.    Not that I'm aware of, no.

16      Q.    So do you agree that if the boxes have pink

17   labels on the side they were boxes that came from Allen

18   Matkins?

19      A.    I would agree that that's highly probably,

20   without looking at it.  I don't want to say

21   unilaterally, but I think that's likely.

22      Q.    You've said that there were 300-some-odd boxes

23   that came from Allen Matkins, if I recall correctly?

24      A.    If I remember correctly, it was 370.

25      Q.    How do you know it was 370?

1      A.    Uh, I seem to recall that as the number that

2   the shipping company told us there were.

3      Q.    When were Allen Matkins documents provided to

4   Burlingame?

5      A.    About nine months after we asked for them.

6      Q.    And do you have a recollection as to when that

7   was?  One year ago?

8      A.    No.

9      Q.    Five years ago?

10     A.    Well, it would be after Allen Matkins filed

11  the lawsuit.  And I would say it was probably within 15

12  months of that date.

13     Q.    Do you recall when it is that Allen Matkins

14  filed its lawsuit?

15     A.    No.

16     Q.    2010 sound familiar?

17     A.    If you say so.

18     Q.    Do you recall signing a declaration in this

19  bankruptcy proceeding on or about March 6th of 2015?

20     A.    March 15th of this year?

21     Q.    March 6th of this year.  That's slightly less

22  than one month ago.

23     A.    Um, is this in connection with our brief, I

24  guess you'd call it, in --

25     Q.    The doc- --

1      A.      -- that would have been attached to Mr.

2    Cawdrey's motion or brief or whatever you guys call it?

3      Q.      The document is entitled, "Declaration of

4    Robert D. Judson, Jr. in Support of Robert D. Judson,

5    Jr.'s Opposition to Application for Second Order

6    Requiring Production of Documents and Appearance for

7    Examination by Burlingame Capital Partners II, L.P. and

8    Memorandum of Points and Authorities in Support."  It

9    does have Mr. Cawdrey's address in the upper right.

10          Do you recall signing a declaration, in

11    connection with that, a little bit less than a month

12    ago?

13      A.      I do recall signing a declaration.

14      Q.      This declaration says, in Paragraph 7, "Then

15    in November, 2010, Allen Matkins sued Debtor in

16    California state court."

17          Does November, 2010, south like the date to

18    you in which that lawsuit was filed?

19      A.      Uh, I'm sure the date that the lawsuit was

20    filed is probably November 10th, because I'm sure that

21    our counsel did a superb job making sure that this

22    declaration had nothing but accurate information in it.

23          MR. CAWDREY:  The date of the filing is a

24    public record and speaks for itself.

25          MR. PERNICKA:  That's right.  The reason I'm

1   doing this is because Mr. Judson said, well, if, you say

2   it was filed in 2010, it must have been.

3   BY MR. PERNICKA:

4   **Q.    Well, Mr. Judson, in this declaration you said**

5   **it was filed in November, 2010; right?**

6           MR. CAWDREY:  This is --

7   A.    That --

8           MR. CAWDREY:  This is argumentative.  The

9   filing of the lawsuit by Allen Matkins is known to Allen

10  Matkins since this is an Allen Matkins examination of

11  Mr. Judson.  To the extent that the date in the

12  declaration does not correspond with the filing of the

13  declaration, then the date in the -- or the filing of

14  the lawsuit, then the date of the declaration is

15  incorrect.  I don't know.

16          Do you have a copy of the complaint?  Let's

17  look at it.

18          MR. PERNICKA:  I'm trying to pin down the date

19  when the documents were provided, Jeff.  I would hope

20  that the declaration sworn to under penalty of perjury

21  is correct --

22          MR. CAWDREY:  Tell us --

23          MR. PERNICKA:  -- and I'm happy to use that

24  date.

25          MR. CAWDREY:  Tell us when the Superior Court

1    action was filed --

2              MR. PERNICKA:  Mr. Judson --

3              MR. CAWDREY:  -- the date that it was filed.

4              MR. PERNICKA:  Mr. Judson said it was filed in

5    November, 2010.

6    BY MR. PERNICKA:

7         Q.   Mr. Judson, do you have any reason to believe,

8    sitting here today, that the date you have in your

9    declaration is incorrect?

10        A.   My view is the lawsuit was filed on the day it

11   was filed.  To the extent that if the date in my

12   declaration is off by a few days here or there, it's

13   irrelevant, because the lawsuit was filed on the given

14   date and, if it was wrong by a day or two, it was wrong

15   by a day or two.  It is --

16        Q.   Mr. Judson, I'm trying to pin down some dates.

17   And, again, I'm doing this because you had said, well,

18   if you say so.  No.  If you said so is what I'm pointing

19   out to you.

20             So, again, you said it was filed in November,

21   2010.  Sitting here today, do you have any reason to

22   believe that date is incorrect?

23        A.   Uh, I don't know.  I don't know how to answer

24   it.  Do I know if it's correct or not?  You know, maybe

25   it is, maybe it isn't.  I assumed it was.  And I think

1   it's irrelevant if it's off a few days.

2      Q.    We have talked about a variety of things this

3   morning.

4      A.    This afternoon.

5      Q.    Depending on which part of the country you're

6   at.  We'll say we've talked about a variety of things

7   today.

8           You've been under penalty of perjury today.

9   You signed your declaration under penalty of perjury.

10  Is there anything that we have talked about today that

11  you believe, whether you are wrong or right or off by

12  some amount, is irrelevant?

13          MR. CAWDREY:  Argumentative.  Overbroad.

14     A.    Mr. Pernicka, I am doing my level best to give

15  you complete, truthful answers to the best of my

16  ability.  I'm not trying to parse things.  I'm trying to

17  be responsive to your questions where appropriate.  So

18  I'm doing the best I can.

19  BY MR. PERNICKA:

20     Q.    I understand, Mr. Judson.  My concern is that

21  you've just said things you signed under penalty of

22  perjury you don't necessarily view to be relevant.  And

23  I'm trying to find out if there's anything that we've

24  talked about today that you have that same view about as

25  to whether it's accurate is an irrelevant detail or a

1   relevant detail.

2          Is there anything that you feel is not

3   relevant that you have been accurate about during our

4   conversation today?

5          MR. CAWDREY:  Misstates his testimony.

6   Overbroad.  Argumentative, calls for speculation, rolls

7   -- You're expecting him to roll back through three hours

8   of deposition.  I object to the question.

9          You can answer it if you understand it.

10     A.   As I've said, I've tried to give you the most

11  truthful, accurate answers, as I sit here, that I can.

12  To -- as you've misstated what I said about irrelevance.

13  What I said to you previously was whether the lawsuit

14  was filed on the 8th of November, the 10th, or the 12th,

15  isn't particularly relevant.  It was filed.  It was

16  filed about then.  As it relates to my testimony today,

17  I am doing my absolute best to give you the truthful

18  answers under the oath that I took.  I would hope that's

19  what you were asking me to do.

20  BY MR. PERNICKA:

21     Q.   Are there any answers that you have given so

22  far today that you, in your mind, consider to be

23  irrelevant as to whether or not they're accurate?

24          MR. CAWDREY:  Same objections.

25     A.   I have not given my answers based on

1    relevance.  I think there may be a number of questions

2    you asked me that I don't particularly think is

3    relevant.  But what I think isn't particularly

4    important.  I have tried, the best I can, to answer your

5    questions that you posed to me to the best of my ability

6    and to give you truthful answers.  I'm a human being.

7    BY MR. PERNICKA:

8         Q.    Let me get back to when the documents from

9    Allen Matkins were provided to Burlingame.  Your

10   declaration states that the lawsuit between Allen

11   Matkins and Burlingame was commenced in November of

12   2010.  For purposes of determining when Allen Matkins'

13   documents were provided, does November of 2010 sound

14   like the appropriate date to you to use as the starting

15   date of that lawsuit?

16        MR. CAWDREY:  So let me say it again:  I

17   object to this as argumentative.  Allen Matkins, which

18   is your law firm, Mr. Pernicka, knows when it, A, filed

19   the lawsuit, and, B, knows when it delivered the

20   documents to the Judsons, to Burlingame.  So if you want

21   to provide those dates to us, fine.  But this is

22   information you already have.  So it's argumentative.

23   It's overbroad.

24   BY MR. PERNICKA:

25        Q.    Mr. Judson?

1      THE WITNESS:  Court reporter, could you read

2  the question back, please?

3  BY MR. PERNICKA:

4      Q.   This is -- Let me try this.  And the fact that

5  we're arguing about this is nonsense.  I'm trying to get

6  a start date so we can figure out about when the Allen

7  Matkins documents were provided.

8      MR. CAWDREY:  Listen --

9  BY MR. PERNICKA:

10     Q.   And we're starting from November, 2010,

11  Mr. Judson, unless you believe that's not the date that

12  the lawsuit was filed.  And we'll then -- we'll talk

13  about how long after that these documents were provided

14  so that I can attempt to help give you some triggers in

15  your memory to recall, as best you're able, about when

16  the documents were filed.  I would hate for you to

17  say -- or were provided.  I would hate for you to say

18  that they were provided in 2009 when in fact they were

19  provided sometime after the lawsuit was filed, and that

20  lawsuit was filed at the end of 2010.  That is the

21  purpose of this.

22     MR. CAWDREY:  Then in order to make this a

23  clear record, let's ascertain the date of the filing of

24  the lawsuit by your law firm and that let's ascertain

25  the date that your law firm shipped the documents to the

1    Judsons.

2           MR. PERNICKA:  And I'm doing that based on

3    Mr. Judson's recollection, which is the purpose of the

4    examination.  If you want to dispute it later and say

5    Mr. Judson was wrong, you're welcome to.  If you want to

6    affirm it based on whatever information you feel

7    appropriate later on, you're welcome to do that as well.

8           MR. CAWDREY:  All right.

9           MR. PERNICKA:  This is about Mr. Judson's

10   recollection.

11          MR. CAWDREY:  Okay.

12   BY MR. PERNICKA:

13     **Q.    Mr. Judson, do you have any reason to believe**

14   **that November, 2010, is not at or about the time that**

15   **the Allen Matkins-Burlingame lawsuit began?**

16     A.    That seems about reasonable.  But the date is

17   what it is, and I don't -- as I sit here, I don't know

18   the exact -- I didn't review yesterday and say, ah,

19   there's the date.

20     **Q.    And about how long after that lawsuit began**

21   **did Burlingame receive Allen Matkins' records?**

22     A.    It was a long time.  We spent a lot of money

23   fighting because Allen Matkins tried to deny us of those

24   files.  And finally Judge Munter told them you got no

25   choice.  And then they tried to put a whole bunch of

1    conditions on it and, long story short, they had to

2    deliver them to us and we could ship them, then, to

3    Florida because that's where we live.

4         Q.    Mr. Judson --

5         A.    Exactly -- I think I'm trying to answer your

6    question.

7              Exactly what date that was, I can't tell you

8    as I sit here.  All I can tell you is that we spent a

9    lot of time and over a hundred thousand dollars fighting

10   over this.  And whether it was 9 or 29 months after the

11   lawsuit was filed, I can't tell you, but it sure as hell

12   wasn't when it was filed.  It was a long time after

13   that.

14        Q.    What's your best estimate of how long after

15   that, after the lawsuit was filed, were the documents

16   provided?

17        A.    Sometime between 9 and 29 months after the

18   lawsuit was filed.  That's the best guesstimate I can

19   give you.

20        Q.    And do you know to whom Allen Matkins provided

21   the documents?  Did they go to Burlingame?  Did they go

22   to your house?  Did they go to your lawyer?  Where did

23   they go?

24             MR. CAWDREY:  I'm going to object.  This

25   information is equally known to Mr. Pernicka and Mr.

1    Pernicka's law firm.

2          You can answer the question if you recall,

3    Mr. Judson.

4          Well, let me finish my objection.  Therefore,

5    it's burdensome and it's harassing and it's

6    argumentative.

7          Go ahead, Mr. Judson.

8    A.    I don't recall who actually took possession of

9    the documents from Allen Matkins.

10   BY MR. PERNICKA:

11   Q.    Who arranged for the documents to be

12   transported to Florida?

13   A.    Either my wife or myself.

14   Q.    How long after the documents were provided by

15   Allen Matkins was it before the documents were delivered

16   to Florida?

17   A.    I don't recall as I sit here.

18   Q.    Was it a couple days or a couple months or a

19   couple years?  What's your best estimate?

20   A.    It was not a couple years, and I'm pretty sure

21   it wasn't a couple of days.

22   Q.    Was it a couple of months, then?

23   A.    That's as good a guess as any.

24   Q.    Mr. Judson, I know we're getting close to the

25   end of the afternoon in Florida right now, but I do have

1   a little bit more that I'd like to ask you about. And I

2   do want to ask you to try to stay focused so that we can

3   get your best estimates and not have you throw your

4   hands in the air and give me guesses, which is what just

5   happened. That doesn't do anyone -- that doesn't do

6   anyone any good. If you need a break to take a minute,

7   I'm happy to do that.

8           Do you want to take a quick break?

9           MR. CAWDREY: It's argumentative.

10    A.    No.

11  BY MR. PERNICKA:

12    Q.    Okay. Let me ask it again. What's your best

13  estimate of the amount of time it was between when the

14  Allen Matkins documents were provided by Allen Matkins

15  and when they were delivered to Florida? As best you

16  recall.

17          MR. CAWDREY: Asked and answered.

18          MR. PERNICKA: Let the record reflect that we

19  have lost visual and perhaps audio -- it at least

20  appears audio, as well, on the video conference.

21          And with that, off the record.

22          (Recess taken.)

23  BY MR. PERNICKA:

24    Q.    Okay. We are back on the record, having

25  reconnected.

1          Mr. Judson, are you still able to see me and

2    to see Mr. Cawdrey?

3      A.    Yes.

4      Q.    And are you still able to hear me okay?

5      A.    Yes.

6      Q.    At this time who is in the room with you?

7      A.    My wife.

8      Q.    Anyone else?

9      A.    No.

10         MR. PERNICKA:  Can you go back to the last

11    question, please.

12              (Page 92, lines 12-16, read.)

13         THE WITNESS:  I can't give you anything close

14    to an exact date.  All I know is we fought for months

15    and months over getting the documents.  We finally got

16    them.  Obviously that fight must have existed after the

17    lawsuit was filed.  I can't give you anything other than

18    what I've already said.  And that was really a broad

19    span, and that's because I can't give you anything

20    direct.

21    BY MR. PERNICKA:

22      Q.    Who was the person that was responsible for

23    putting the Allen Matkins files into boxes?

24      A.    I don't know.

25      Q.    Were the Allen Matkins files delivered to

1 Burlingame, wherever that delivery might have occurred,

2 already in boxes or did you or someone else associated

3 with Burlingame put them in boxes?

4   A.  No. They arrived in boxes.

5   Q.  Since they arrived from Allen Matkins, has

6 anyone associated with Burlingame, so far as you know,

7 rearranged those files or moved them from box to box?

8   A.  Uh, yes.

9   Q.  Who has done that?

10   A.  Uh, it would be my wife or myself.

11   Q.  And about what percentage of the records in

12 the boxes that came from Allen Matkins have you or your

13 wife moved at any time?

14   A.  I have no idea as to the percentage.

15   Q.  Is it one or two files, one or two boxes, that

16 have things that were rearranged, or did you empty all

17 the boxes and rearrange all the files in all of them?

18   A.  We did not rearrange all of them, all 370.

19 No, we didn't. But the boxes themselves, many of the

20 things didn't make any sense, the order that they came

21 in. We even got documents from other clients of Allen

22 Matkins.

23   Q.  What did you do with the documents of other

24 Allen Matkins clients that were received?

25   A.  Uh, we informed our counsel, who I assume

1    passed it on -- I'm led to believe passed it on to Allen

2    Matkins.  They obviously didn't want it back because

3    they never asked for it back.

4         Q.    Who was the counsel that you informed of this?

5         A.    John Howard.

6         Q.    And do I -- Am I correct, then, that you and

7    your wife have rearranged at least some portion of the

8    files that came from Allen Matkins?

9         A.    Yes.  So that they make sense, yes.

10        Q.    You say, "so that they make sense."  Can you

11   explain what was rearranged and how it was rearranged?

12        A.    Well, for example, you might want to have

13   transcripts from the same trial in the same day or in

14   order of the same day in the same box instead of having

15   them spread amongst a whole variety of boxes.

16        Q.    Did you or your wife, or the two of you in

17   some combination, at some point after they were

18   delivered, go through all 370-plus of the boxes of

19   documents from Allen Matkins?

20        A.    Yes.

21        Q.    During the rearrangement of these files, did

22   you ever move files from boxes that came from Allen

23   Matkins into other boxes or did you rearrange them all

24   within the Allen Matkins boxes?

25        A.    Uh, some of both.

1     Q.    Based on the photos, it appears that in the

2   storage unit, in addition to boxes, there is a metal

3   file cabinet.  Are you familiar with what I'm referring

4   to?

5     A.    Yes.

6     Q.    Do you recall there being a metal file cabinet

7   in the storage unit?

8     A.    Yes.

9     Q.    Are there any documents that came from Allen

10   Matkins contained in this metal file cabinet?

11     A.    Could very likely be, yes.

12     Q.    When was the metal file cabinet put in the

13   storage unit:  Before or after the Allen Matkins

14   documents arrived?

15     A.    Don't know the answer to that.

16     Q.    In a general sense, what sort of documents are

17   in the metal file cabinet, to the best you recall?

18     A.    Uh, I haven't looked in it, so I'm not sure I

19   could give you a good answer.

20     Q.    Are there any boxes in the metal file cabinet

21   or are all the documents in the metal file cabinet

22   documents that are not in boxes?

23     A.    They would be documents not in boxes.

24     Q.    Is there any reason that certain documents are

25   not in boxes and in the metal file cabinet rather than

1  being in boxes in the storage unit generally?

2      A.    Uh, they would most likely be documents that

3  had been taken out of the boxes, they've been reviewed,

4  and we were still looking at them for whatever reason,

5  so they stayed in the file cabinet rather than going

6  back into the boxes.

7      Q.    Are the documents in the file cabinet

8  documents that you found to be of particular interest

9  for one reason or another?

10     A.    Possibly.

11     Q.    The photos show a metal cart in the storage

12  unit with what appear to be binders stacked on it.

13          Do you recall this metal cart being in the

14  storage unit?

15     A.    Yes.

16     Q.    Do you recall what sorts of documents are on

17  the metal cart?

18     A.    Yes.

19     Q.    And what sort of documents are those?

20     A.    Those were trial binders.

21     Q.    And why are those documents on the metal cart

22  and not in boxes?

23     A.    Because Allen Matkins gave us the binders and

24  the cart.

25     Q.    How was the cart delivered to Florida?

1      A.    In a truck.

2      Q.    **With all the boxes?**

3      A.    Uh, I don't know if it came with the boxes or

4 not. I don't recall.

5      Q.    **What shipping service delivered the boxes to**

6 **Florida?**

7      A.    Uh, I don't know exactly. I don't recall, as

8 I sit here, the name of the shipper and whether they had

9 their own truck or they had farmed it out to somebody

10 else for the actual delivery of the truck. I mean I

11 don't remember if it was Allied or any one of those

12 shippers.

13      Q.    **What was the cost to deliver those documents?**

14      A.    Approximately -- My recollection is it was

15 approximately about $10,000. But I could be off by

16 several thousand. But that's the number that I think it

17 was.

18      Q.    **What was the reason that you had the documents**

19 **provided by Allen Matkins sent to Florida?**

20      A.    We live in Florida.

21      Q.    **At the time when the documents were sent to**

22 **Florida, did Burlingame still have an office in**

23 **California?**

24      A.    Uh, our -- Burlingame's -- I don't know -- I'm

25 trying to think what the term is -- whatever, in

1   California, the registered address, or whatever you want

2   to call it, was our house in California. I don't know

3   if you want to call that an office. The office for

4   Burlingame was in our house.

5       Q.   **Do you still own that house?**

6       A.   Yes, we do.

7       Q.   **Why did you not leave these boxes at your**

8   **house in California instead of pay all the money to ship**

9   **them to Florida?**

10      A.   Well, it's awfully hard to work with those

11   documents if you live in Florida and they're in

12   California.

13      Q.   **Is the house that you own in California being**

14   **occupied by someone currently?**

15      A.   Yes.

16      Q.   **Is that you and --**

17      A.   I don't know how -- I don't know how that's

18   relevant to the documents.

19      MR. CAWDREY: Yeah. You can ask a question

20   about whether documents are in the house.

21   BY MR. PERNICKA:

22      Q.   **Do you and Ms. Judson still occupy the house**

23   **that you own in California?**

24      MR. CAWDREY: Exceeds --

25      A.   No. I just told you we live in Florida.

1   BY MR. PERNICKA:

2       Q.    Let me try it this way.  Does someone else

3   live there?  Does someone else, other than you and your

4   wife, live in the house you own in California?

5             MR. CAWDREY:  That exceeds the scope of the

6   examination.  It's argumentative.

7             Ask him about the documents, if you want, Mr.

8   Pernicka.  That's an appropriate question.

9             MR. PERNICKA:  Are you instructing him not to

10  answer?

11            MR. CAWDREY:  He can answer the question if he

12  wants.  It's argumentative and exceeds the scope of the

13  examination.

14      A.    Who lives in our house in California is not

15  what this is about.

16            MR. CAWDREY:  I'll instruct the witness not to

17  answer.

18            It exceeds the scope of the examination.  If

19  you want to ask a question whether documents are in that

20  house, ask away.

21  BY MR. PERNICKA:

22      Q.    Are you going to follow your attorney's

23  instruction, Mr. Judson?

24      A.    I've got great counsel, and of course I'm

25  going to follow his advice.

1    Q.    Is the house that you currently own in
2    California being rented to a tenant currently?
3          MR. CAWDREY:  Same objection.  And it's
4    argumentative.
5          If you want to ask a question about the
6    documents, ask it.
7          Instruct the witness not to answer.
8    BY MR. PERNICKA:
9    Q.    Are you going to follow that instruction?
10   A.    Yes, I am.
11   Q.    How large is the house that you currently own
12   in California?
13         MR. CAWDREY:  It's -- I'm going to object.
14   And if we don't get off this topic, I'm going to ask
15   that the deposition be curtailed and we can have a
16   discussion with Judge Latham.  This is so far outside of
17   the scope it's ridiculous.
18   BY MR. PERNICKA:
19   Q.    Let me try it this way.  Mr. Judson, are you
20   going to respond that question?
21         MR. CAWDREY:  I instruct the witness not to
22   answer.
23   A.    No.
24   BY MR. PERNICKA:
25   Q.    Is there space in the house that you currently

1   own in California to keep documents?

2           MR. CAWDREY:   I'm going to instruct the

3   witness not to answer.

4           It's outside of the scope of the examination.

5   BY MR. PERNICKA:

6       Q.   Are you going to respond to that question?

7       A.   No.

8       Q.   Does the house that you own in California have

9   a garage or a basement?

10          MR. CAWDREY:   Same instruction.

11          Same objection.

12          Ask him if he has any documents -- Burlingame

13  documents in the house, Mr. Pernicka.   It's a simple

14  question.

15  BY MR. PERNICKA:

16      Q.   Are you going to follow that instruction,

17  Mr. Judson?

18      A.   Yes, I am.

19      Q.   Does the house that you own in California have

20  a bedroom that is unoccupied?

21          MR. CAWDREY:   That is absolutely ridiculous.

22  One more question and we'll terminate and we can talk to

23  Judge Latham.   This is just harassing, Mr. Pernicka, and

24  you know it.

25          Instruct the witness not to answer.

1  BY MR. PERNICKA:

2      Q.    Are you going to follow that instruction?

3      A.    Yes, I am.

4      Q.    Do you currently keep any documents or records

5  of any sort at the house that you own in California?

6      A.    Are you asking me if we have any Burlingame

7  documents in the house in California?

8      Q.    I am not.

9            Do you currently keep any records or documents

10  of any sort at the house that you own in California?

11           MR. CAWDREY:  Exceeds the scope of the

12  examination.

13           Instruct the witness not to answer.

14           You can ask about Burlingame documents.

15  BY MR. PERNICKA:

16      Q.    Are you going to follow that instruction?

17      A.    Yes.

18      Q.    Do you currently have any records related to

19  Burlingame at the house that you own in California?

20      A.    No.

21      Q.    Why not?

22      A.    Because we have shipped them all to Florida.

23      Q.    And why have they been shipped to Florida, at

24  great expense, rather than keep them at your house in

25  California?

1          MR. CAWDREY:  Asked and answered.

2     Argumentative.  Harassing.

3        A.    Because we live in Florida.

4     BY MR. PERNICKA:

5        Q.    How much time do you spend, average in a year,

6     over the last five years, at the house that you own in

7     California?

8          MR. CAWDREY:  Exceeds the scope of the

9     examination.  It's harassing.  It's argumentative.

10         I'm going to instruct the witness not to

11    answer.

12    BY MR. PERNICKA:

13       Q.    Are you going to follow that instruction?

14       A.    Yes, I am.

15       Q.    Do you keep Burlingame's records in Florida to

16    make it more difficult for them to be obtained in

17    connection with Burlingame's activities in California?

18       A.    Absolutely not.

19       Q.    What's the address of the house that you

20    currently own in California?

21         MR. CAWDREY:  If it's --

22       A.    Two --

23         MR. CAWDREY:  Go ahead, Mr. Judson.

24       A.    230 Amherst Avenue, San Mateo, California,

25    which you well know.

1     BY MR. PERNICKA:

2         Q.    Mr. Judson, over the course of the last --

3     Strike that.  Let me ask a couple more questions.

4              You had mentioned that you're in a process of

5     printing and deleting electronic files.  Where are those

6     electronic files currently located?  In a cloud?  In a

7     laptop?  In a desktop?  In a removable hard drive?

8     Where are they located, to the extent that they've not

9     yet been deleted?

10        A.    You're referring to just the electronic files?

11        Q.    That's correct.

12        A.    They would be -- I guess they would be on -- I

13    don't know where -- whether it's on your hard drive.

14    Again, I don't have -- You're looking at the I.T.

15    department.  I don't know if it's the hard drive or if,

16    for e-mails, they're on some server up in the sky

17    somewhere or they'd be in the Cloud.  I think that would

18    be the answer.

19        Q.    Let's start with the files that you and your

20    wife scanned.  Where are those records located

21    electronically?

22        A.    They would be in the Cloud.

23        Q.    Which service do you use for those file

24    systems?

25        A.    Uh, Dropbox.

1    Q.    And under whose name is the account -- the

2    Dropbox account with the Burlingame records?

3    A.    It would be my personal account.

4    Q.    Are any Burlingame records -- and, again,

5    we're not yet talking about the e-mails.  These are the

6    files that have been scanned.  Are any of those on a

7    computer that you own?

8    A.    Well, I -- I don't know how to differentiate

9    between the Cloud and the computer, but -- yes --

10    Q.    Let me put it this way.  When you scanned

11    them, did they get scanned and put on a drive on a

12    computer and then from there you put them into Dropbox?

13    Is that generally the process?

14    A.    Something like that.  Although if they came in

15    electronically conceivably that would go directly from

16    the e-mail and store right into Dropbox.  So I don't

17    know whether that intermediate step technically takes

18    place or not.

19    Q.    What sort of machine do you use for organizing

20    the records on Dropbox and getting them into Dropbox?

21    A.    My computer.

22    Q.    Is that a laptop or a desktop?

23    A.    I use an iMac.

24    Q.    For how long have you used the particular iMac

25    that you're currently using?

1    A.    I think it's a year, maybe a year and a half

2    old.  I've been thinking about buying a new one, but my

3    counsel told me not to.

4         MR. CAWDREY:  That's not a general waiver of

5    the attorney-client privilege.

6         Don't communicate regarding our

7    communications.

8    BY MR. PERNICKA:

9    **Q.    What sort of system did you use before you**

10   **acquired the iMac that you've been using for the last**

11   **year to year and a half?**

12   A.    I think previously it was an earlier version

13   of an iMac.

14   **Q.    And for how long did you have that machine?**

15   A.    I don't recall.

16   **Q.    More than a year?**

17   A.    Probably.  But I don't recall.

18   **Q.    What happened to the machine that you had**

19   **before you acquired your current iMac?  Do you still**

20   **have it?**

21   A.    Uh, no.

22   **Q.    What happened to it?**

23   A.    It was turned in to Apple.

24   **Q.    When was that done?**

25   A.    When I bought the new one.

1      Q.    Do you use any other computers aside from the

2   personal iMac?

3      A.    What do you mean?

4      Q.    Is that the only computer that you use or do

5   you use others?

6      A.    Well, I mean I've got an iPhone or an iPad.

7   And I have a laptop that I use when I travel.  But

8   everything goes back onto the iMac.

9      Q.    Do you use the iMac for your e-mails?

10     A.    Yes.

11     Q.    Do you also use your travel laptop for

12  e-mails?

13     A.    Yes.

14     Q.    Do you use the iMac or your travel laptop for

15  only specific e-mail addresses or do you use your

16  devices for all of your various e-mail addresses?  Let

17  me try it --

18     A.    I don't --

19     Q.    Let me try it this way.

20           Do you use the travel computer for e-mails

21  only with your KC Funding address and the iMac for

22  e-mails only with your Burlingame address, or do you

23  access all of your various e-mail accounts from all of

24  your devices?

25     A.    I access all of our -- If somebody sends me an

 1    e-mail, I can get it on all of the devices --

 2         Q.    No matter which --

 3         A.    -- whatever is the best way.

 4               I'm not a technical guy.  You're asking me a

 5    technical question.

 6         Q.    Sure.

 7         A.    If you send me an e-mail, I'll get it.

 8         Q.    No matter which e-mail address I send it to?

 9         A.    Hopefully.

10         Q.    And it will come through on any of your

11    devices?

12         A.    Hopefully.

13         Q.    Currently how many devices are you using that

14    you use for e-mail?  That includes your iMac, your

15    travel laptop, and anything else.

16         A.    Four?

17         Q.    That's the iMac, the travel laptop, and what

18    are the other two?

19         A.    An iPhone and an iPad.

20         Q.    For how long have you had the iPhone that you

21    currently use for e-mail?

22         A.    Whenever the Apple 6+ came out.  Probably

23    within two or three weeks of its -- getting your hands

24    on it, I had one.

25         Q.    As the best you can recall sitting here today,

1  is that more or less than a year?

2      A.    I don't think they've been out a year.

3      Q.    **What did you use before your current iPhone?**

4      A.    An Apple iPhone 5.

5      Q.    **And for how long did you use that device?**

6      A.    I don't know.  I don't know, a year, year and

7  a half, two years, something along those lines.

8      Q.    **Do you still have the device that you used**

9  **before your -- before you acquired your current iPhone?**

10     A.    No.

11     Q.    **What happened to it?**

12     A.    Traded it in to Apple.

13     Q.    **Did you do anything to ensure that the**

14 **information on that telephone was saved before you**

15 **traded it in to Apple?**

16     A.    I mean we back up our equipment on a

17 regular -- or periodic basis and -- typically back it up

18 to the Cloud, and then you get the new phone and they

19 download it and you're off to the races, so you don't

20 have to start from square one.  But beyond that, you're

21 getting into technical stuff that I don't know the

22 answers to.

23     Q.    **Were you involved in backing up your prior**

24 **telephone in some fashion before it was given to Apple?**

25     A.    Yeah.

1        Q.    What was your involvement in doing that?

2        A.    Well, we were at the Apple store, and we -- he

3   told us how we back it up to the Cloud so you could back

4   it up there, and then when you get the new phone, you

5   download it and you're ready to go.

6        Q.    When you talk about backing it up to the

7   Cloud, is this your Dropbox account or something else?

8        A.    Somehow they use iCloud.  I don't know exactly

9   how they do it.

10       Q.    Do you have access to the account on the Cloud

11  in which your old telephone was backed up?

12       A.    I would hope so.

13       Q.    Have you ever accessed it?

14       A.    We back up to it.

15       Q.    And have you ever accessed -- have you ever

16  accessed --

17       A.    Accessed --

18       Q.    -- it to see what's there?

19       A.    No.

20       Q.    Do you know how to access it to see what

21  information is there?

22       A.    Probably not.

23       Q.    You mentioned that you also have an iPad that

24  you use for e-mail.

25             Do I have that right?

1          A.    Yes.

2          Q.    For how long have you had this iPad?

3          A.    Uh, I don't know.  I'm going to say about a

4    year since they came -- whenever they came out with the

5    new one.

6          Q.    Did you have a tablet of some sort before you

7    acquired your current iPad?

8          A.    I had the previous version.

9          Q.    And for how long did you use that previous

10   version, as best you recall?

11         A.    I don't recall.  Probably when they came

12   out -- when that one was the new one.

13         Q.    For how long have you had tablets overall?

14   Five years?  Four years?  As best you recall.

15         A.    Um, I would say fairly close to when Apple

16   first announced their iPad.

17         Q.    Do you have the iPad that you used prior to

18   the one you have currently?

19         A.    Nope.

20         Q.    What happened to it?

21         A.    Traded it in to Apple.

22         Q.    Do you recall about how long ago that was?

23   Was it two months?  Six months?  A year?

24         A.    I don't recall.  As I think I testified,

25   probably not too long after they announced and when it

1   became available.

2       Q.    Did you take steps to make sure that the

3   information on that iPad was not lost?

4       A.    Well, we backed it up to the iCloud just -- I

5   mean IOS devices, you back it up to iCloud.

6       Q.    Do you know how to access the iCloud account

7   where your tablet was backed up to?

8       A.    No.  I mean other than I know how to sign into

9   my iCloud account.  But beyond that, I wouldn't know how

10  to go check on backups.

11      Q.    If you sign into your iCloud account, are you

12  able to get access to the information that you believe

13  is backed up off your telephone and tablet?

14      A.    I don't know.  I would assume so, but -- I

15  don't know.

16      Q.    Have you ever tried to do that?

17      A.    No.

18      Q.    Regarding your e-mails -- Well, let me ask

19  another question.  We've talked about computers,

20  tablets, telephones that you have used to access your

21  various e-mail accounts.  Do you use the same equipment

22  when you are preparing letters or looking at agreements

23  or other things that you may receive in relation to your

24  businesses?  Or do you have other machines you would use

25  for that?

1    A.    No.  I'd use the same equipment.

2    Q.    Who owns all of this equipment that is -- is

3    the equipment you use?

4    A.    Either ourselves or KC Funding.

5    Q.    When you say "ourselves," are you referring to

6    you and Ms. Judson personally?

7    A.    Yes.

8    Q.    What, of the equipment that you use for

9    e-mails and your various businesses, do you and

10   Ms. Judson own personally?

11   A.    I have to go back and look at the records to

12   determine which ones we bought and which ones KC Funding

13   bought.

14   Q.    Has Burlingame ever owned any computers,

15   laptops, telephones, or tablets?

16   A.    You're referring to the debtor?

17   Q.    That's correct, Burlingame.

18   A.    No.

19   Q.    During the time that Burlingame operated, did

20   you ever use computers, telephones, or tablets to access

21   Burlingame e-mails or Burlingame documents?

22   A.    Have we ever used e-mail during the entirety

23   of Burlingame's existence?  Is that the question?

24   Q.    I don't mean it to be a difficult question.

25   It is pretty basic.  Burlingame never owned any

1    computers, phones, or tablets.  Did you ever use

2    computers, telephones, or tablets to operate e-mails for

3    Burlingame or deal with Burlingame's business?

4        A.    Yes.

5        Q.    And who owned those machines?

6        A.    Uh, up until -- I'm going to say 2011 -- no,

7    2010 -- and I may be a little off, but up until then

8    Burlingame Capital LLC, the general partner, owned the

9    equipment that was used for Burlingame.

10       Q.    After 2010 who owned the equipment used for

11   Burlingame?

12       A.    Well, don't hold me to the 2010 time frame.

13   But when we moved over to Apple equipment, KC Funding or

14   ourselves owned the equipment.

15       Q.    From approximately 2010 -- and understanding

16   that that's an approximate date -- has Burlingame's

17   business, whether it's e-mails or dealing with documents

18   or other sorts of business activities, keeping

19   QuickBooks, keeping finances, et cetera -- Has any of

20   that business for Burlingame ever been conducted on

21   equipment that was not owned either by KC Funding, you

22   or your wife personally?

23       A.    I'm confused.  I got lost in the question.

24       Q.    Sure.  Let me try it again.

25             You mentioned that prior to 2010 the equipment

1    used for Burlingame's business was owned by Burlingame's

2    general partner.  Do I have that right?  And, again,

3    understanding 2010 to be an approximate date.

4        A.    Yes.

5        Q.    Since 2010, the approximate date, has any of

6    Burlingame's business, whether it's e-mails, whether

7    it's QuickBooks, whether it's addressing documents,

8    correspondence, other accounting information, anything,

9    ever been conducted from equipment that was owned by

10   someone other than KC Funding or you or your wife

11   personally?

12       A.    I don't think so.

13       Q.    During the last -- we'll say from 2009

14   forward, has Burlingame ever had documents related to

15   its corporate organization, Secretary of State filings,

16   minutes of meetings, those sorts of things -- Have any

17   of those documents ever been prepared?  And this is a

18   broad question over a long time.  Just looking at ever.

19   Since 2009.

20       A.    Yes.

21       Q.    Generally who is it that prepared Burlingame's

22   documents?  Is it you?  Is it an attorney?  Is it an

23   accountant?  Is it someone else?  Again, from 2009

24   through today.

25       A.    Yes.

1      Q.    Can you list all the people who have been

2   involved in preparing Burlingame's what we'll term

3   official documents:  Secretary of State filings,

4   minutes, corporate organization documents, that sort of

5   thing.

6      A.    Um, we would have -- I do -- It would depend

7   upon the complexity.  I mean I did some, because

8   statements of information to the state and stuff like

9   that are pretty simple.  We had a renewal of the

10  trademark for Burlingame -- I think that's what it was

11  called, or copyright -- that was done by an attorney.

12  And I'm sure we had some stuff done by CPAs, whether it

13  be tax filings or whatever.

14     Q.    Since 2009 how many attorneys has Burlingame

15  had do its copyright renewal or various other corporate

16  organization work?

17     A.    Well, I think the answer would be two.

18     Q.    Who are they?

19     A.    Allen Matkins, I suspect, and John Howard.

20     Q.    And how many different CPAs has Burlingame

21  used since 2009?

22     A.    I want to say three.

23     Q.    Who are they?

24     A.    Moss Adams, and then I'm trying to think what

25  the name of the other one was, it's a local Bay-area

1   firm that we went to for a year, and then G.T. Kelly &

2   Company.

3        Q.    Can you spell that third one, please?

4        A.    G.T. Kelly & Company.

5        Q.    Kelly is K-e-l-l-y?

6        A.    Correct.

7        Q.    Where is Moss Adams located?

8        A.    Well, they're the tenth largest firm in the

9   country.  But they're headquarter's in Seattle.

10       Q.    Where is the office that you dealt with

11  located?

12       A.    San Francisco.

13       Q.    Is there a specific individual at Moss Adams

14  who you worked with on behalf of Burlingame?

15       A.    We worked with a lot of people.

16       Q.    Do you recall any of the names of the people

17  that you worked with at Moss Adams for Burlingame?

18       A.    No, not as I sit here.

19       Q.    Do you recall when it is that Burlingame

20  stopped using Moss Adams?

21       A.    I don't recall the date.  They just got too

22  expensive.

23       Q.    You mentioned that for some period after using

24  Moss Adams Burlingame used another San Francisco

25  Bay-area firm.

1           Do I have that right?

2      A.    I think that's correct.  I'm not sure.

3      Q.    Do you have any records that would identify

4  that firm?

5      A.    If they did work on Burlingame, I would.

6      Q.    Where would those records be located?

7      A.    In the storage locker.

8      Q.    Do you recall the names of any people at this

9  Bay-area firm who Burlingame dealt with or who you

10  worked with on behalf of Burlingame?

11      A.    Well, if this firm did work on behalf of

12  Burlingame as compared to some other entity, the

13  fellow's first name is Kyle, but I don't know or recall

14  his last name.  And I'm not sure that they did any work

15  for Burlingame.  I'm just saying they might have.

16      Q.    When did Burlingame begin using G.T. Kelly &

17  Company?

18      A.    Uh, I believe it was -- I don't know if it was

19  '13 or '14.

20      Q.    Where's the office of G.T. Kelly & Company

21  located that you dealt with for Burlingame?

22      A.    In Redwood City, California.

23      Q.    Who's the individual or who are the

24  individuals who you dealt with at G.T. Kelly & Company?

25      A.    Jerry Kelly.

1      Q.    Anyone else?

2      A.    No.

3      Q.    How did you -- Well, let me ask this.  Did you

4 provide any documents or records of Burlingame's to any

5 of these accountants?

6      A.    I'm sure -- Yeah.  Yes.

7      Q.    How were those provided?  Did you bring boxes

8 of hard copies?  Did you send e-mails?  Did you make

9 disks?  How did you provide information?

10      A.    I think probably all of the above, depending

11 on when -- you know, various things.  Depending on what

12 the request was.

13      Q.    Was at least some amount of the information

14 provided to the accountants provided by e-mail?

15      A.    I believe so.

16      Q.    And were those e-mails that were sent by you

17 or your wife or someone else?

18      A.    Um, depending on when it was, there were times

19 when we had more than just my wife and I.  But most of

20 the time it would come from one or both of us, primarily

21 me.

22      Q.    Who are the other people from time to time who

23 may have provided Burlingame information by e-mail to

24 accountants?

25      A.    Well, I'm not saying that they in fact did

1    that.  I'm saying there were more than Jan and I as

2    principals of the general partner over time.

3        Q.    Who were the others?

4        A.    One other.  His name was Mack Clapp,

5    C-l-a-p-p.

6        Q.    When did Mr. Clapp cease involvement with

7    Burlingame?

8        A.    As I sit here, I don't know the exact date,

9    but it was quite a while ago.  I don't know the exact

10   date, but it was 2006, -7, -8 time frame, something like

11   that.

12       Q.    So since 2006 or -7 or 2008, any information

13   provided by e-mail to accountants concerning Burlingame

14   would have been sent by you or Ms. Judson?

15       A.    Um, that's very likely to be correct.

16       Q.    Where are those e-mails located today?

17       A.    To the extent that we've kept them, they'd be

18   in the storage locker.

19       Q.    Have any of the e-mails by which Burlingame

20   provided information to accountants been deleted?

21       A.    Um, yes.

22       Q.    Have those e-mails been deleted as part of

23   your systematic printing and deleting of electronic

24   files over the last 14 months or so?

25       A.    No.

1      Q.    When were they deleted?

2      A.    You know, whenever the project or whatever it

3   was was done and there didn't appear to be any need to

4   keep all the stuff that we sent them.

5      Q.    You mentioned that Burlingame began using G.T.

6   Kelly & Company in about 2013 or 2014.  Any of the

7   Burlingame e-mails with G.T. Kelly & Company been

8   deleted?

9      A.    To the extent that we provided whatever Jerry

10  asked for, have we deleted some of those?  I don't know

11  as I sit here.  I think probably yes, because they'd be

12  for the presentation -- preparation of a tax return.

13  And once you got the tax return, the information is in

14  the financial records of the company anyway, so we

15  probably did delete some of those.  I just can't tell

16  you for sure.  Maybe not.  I just don't know.

17     Q.    Have you ever been told by any of the

18  accountants that Burlingame has used about whether the

19  accountants maintain records for Burlingame for any

20  period of time?

21     A.    Uh, not specific -- Maybe.  I don't recall

22  anything specifically, but I wouldn't be surprised.

23     Q.    Have you ever been notified by any of the

24  accountants Burlingame uses that the accountants are

25  disposing of their records related to Burlingame?

1    A.    I don't recall any.

2    Q.    Since 2009 how many different attorneys has

3    Burlingame used for any purpose?  You mentioned John

4    Howard as one.  Have there been others?

5    A.    Yes.

6    Q.    Who else?

7    A.    I don't know as I sit here.

8    Q.    Since 2009 how many attorneys, other than John

9    Howard, has Burlingame used for various purposes?

10   A.    I don't know the -- I don't know the answer to

11   that.

12   Q.    Can you give me an estimate?  One other?  Two

13   others than Mr. Howard?  Ten others than Mr. Howard?

14   A.    I doubt it's 10.  It's probably more than two.

15   Q.    What sort of legal work has Burlingame had

16   that John Howard did not handle?

17   A.    Oh, God.  Well, as Allen Matkins knows, we had

18   other counsel as well.  Some of the expert witnesses

19   were lawyers.  I don't know.

20   Q.    Were the only attorneys Burlingame has used

21   since 2009, in addition to Mr. Howard, attorneys

22   connected to the lawsuit between Allen Matkins and

23   Burlingame?

24   A.    I think that's correct.  But, you know, if

25   there was some particular filing or something, maybe

1    there was somebody else.  But I think that's correct.

2            MR. CAWDREY:  Like the bankruptcy?

3            THE WITNESS:  Well, I forget -- There's Jim

4    Beshears.

5    BY MR. PERNICKA:

6        Q.    Did you ever communicate with any of the

7    attorneys involved in the lawsuit between Burlingame and

8    Allen Matkins directly other than Mr. Howard?  That is

9    to say, were you communicating directly with these

10   various experts and other attorneys or was everything

11   between you and Mr. Howard and then Mr. Howard

12   communicated with them?

13       A.    Um, largely through Mr. Howard.

14       Q.    Were there instances in which you communicated

15   directly with the other attorneys?

16       A.    Uh, yes.

17       Q.    Did Burlingame use attorneys after Allen

18   Matkins in -- or other than Allen Matkins in any

19   capacity in connection with Python Injection?  That

20   would include -- That would include Burlingame's

21   ownership interest in Python Injection, any obligations

22   or rights Burlingame had vis-a-vis Python Injection, the

23   wrapping up of Python Collect- -- Connection, the sale

24   of Python Connection assets, et cetera.

25       A.    You know, I don't recall.  I don't think so,

1    but I don't recall.

2        Q.    After 2009, who were all the attorneys that

3    Burlingame used in connection with Kids Connection or KC

4    Funding?

5        A.    That Burlingame used or -- Are you asking who

6    Kids Connection -- or KC Funding, who their attorneys

7    are?  I'm not sure what the question.

8            MR. CAWDREY:  No.  The question is --

9            Would you read the question back, please,

10   Katrina.

11   BY MR. PERNICKA:

12       Q.    Burlingame attorneys.  Who represented

13   Burlingame in connection with Kids Connection and KC

14   Funding after Allen Matkins?

15       A.    Who represented Burlingame in connection

16   with -- I don't understand the question.  I really --

17   I'm confused.

18       Q.    Allen Matkins stopped representing Burlingame

19   right around the time that the Kids Connection property

20   was acquired by KC Funding through the bankruptcy in San

21   Francisco.

22            Do I have that right?

23       A.    Yes.

24       Q.    Who were all the attorneys that represented

25   Burlingame since then in connection with Kids

1   Connection, Burlingame's interest in Kid Connection, the

2   operation of Kids Connection, the sale of Kids

3   Connection, the distribution of proceeds of Kids

4   Connection, et cetera?

5       A.    To the -- Burlingame's attorneys, subsequent

6   to Allen Matkins' stepping aside, was John Howard.

7       Q.    **Was there anyone else?**

8       A.    Uh, well, as I said, there were others later,

9   when the lawsuit came about and so forth.  We used one

10  other law firm for negotiation of some -- I'm trying to

11  remember the type of agreement with Alturdyne.  I think

12  that was a restructuring.  But I think other than that

13  the other lawyers had to do with the lawsuit or the

14  bank --

15      Q.    **Who was --**

16      A.    Or Jim Beshears, who filed the bankruptcy.

17      Q.    **Who was the attorney that Burlingame used in**

18  **connection with Alturdyne?**

19      A.    Uh, Hill Blackett, III.

20      Q.    **Can you spell that, please?**

21      A.    Hill, H-i-l-l, Blackett, B-l-a-c-k-e-t-t, III,

22  three -- Roman numeral III.

23      Q.    **And is that the name of an attorney with a law**

24  **firm or name of a law firm?**

25      A.    An attorney at a law firm.

1        Q.    Which law firm is Mr. Blackett with?

2        A.    Uh, I don't know if he's still practicing.

3   And I don't remember the full name of the firm.

4        Q.    What part of the name do you recall?

5        A.    I think -- I think there's Springwater is part

6   of the name.  It's three names.

7        Q.    Where was Mr. Blackett's office located when

8   Burlingame was represented by him?

9        A.    In San Francisco.

10       Q.    And approximately when was it that Mr.

11  Blackett was representing Burlingame, as best you

12  recall?

13       A.    I don't -- I really don't have a good

14  recollection as to the time.

15       Q.    Who associated with Burlingame communicated

16  with Mr. Howard about Burlingame's affairs?

17       A.    Uh, myself and my wife.

18       Q.    Anyone else?

19       A.    No.

20       Q.    Did you ever communicate with Mr. Howard about

21  Burlingame's affairs by e-mail?

22       A.    Yes.

23       Q.    Where are those e-mails currently located?

24       A.    Uh, they -- Some of them are already in

25  storage, and the rest are -- either have already been

1   printed out but the box has not been delivered to

2   storage or they are on -- or in the process --

3   they're -- electronically they're there, but they're

4   going to be printed out over the next week to two weeks.

5       Q.    You say, "in storage."  Are we talking about

6   the storage unit that contains Burlingame documents?

7       A.    The storage.  Yes.

8       Q.    Did you ever provide documents or attachments

9   or other background materials to Mr. Howard by e-mail to

10  be attachments to e-mails, for example?

11      A.    Ever?

12      Q.    Yes.

13      A.    Yes.

14      Q.    Are those attachments being printed with the

15  e-mails that you are printing?

16      A.    As I've testified earlier, when we print out

17  an e-mail, we print out the e-mail and we print out the

18  attachment.

19      Q.    Do you have an understanding as to whether

20  Mr. Howard has maintained Burlingame documents that you

21  provided to him?

22      A.    I don't know.  You'd have to talk to

23  Mr. Howard.

24      Q.    Do you have an understanding as to whether

25  Mr. Howard has maintained e-mail correspondences between

1    you and he related to Burlingame?

2        A.    I don't know how he runs his practice.  You'd

3    have to ask him.

4        Q.    Has Mr. Howard ever provided to you his

5    documents related to Burlingame in a similar fashion;

6    for example, as Allen Matkins provided its records to

7    Burlingame?

8              MR. CAWDREY:  That's overbroad, vague,

9    ambiguous:  "Similar fashion," et cetera.

10       A.    Uh, I don't recall Mr. Howard ever providing

11   us documents in the fashion that Allen Matkins did.

12   BY MR. PERNICKA:

13       Q.    To the extent Mr. Howard had files, either he

14   has them or he's disposed of them, he's not given them

15   back to Burlingame; is that right?

16       A.    That's correct.

17       Q.    Did any attorneys on behalf of Burlingame ever

18   review documents related to the sale of the Kids

19   Connection property or the distribution of the proceeds

20   of that sale?

21       A.    Uh, Burlingame's lawyers did not -- or let me

22   put it to you this way.  The transaction you're making

23   reference to was handled by KC Funding's attorneys.

24       Q.    Who were those attorneys?

25       A.    Well, I don't know that -- Is that subject to

1  what we're talking about, who KC Funding's attorneys

2  are?

3      Q.    Yes.

4            MR. CAWDREY:   No.   This exceeds the scope of

5  the examination.

6  BY MR. PERNICKA:

7      Q.    Who were the KC Funding attorneys that

8  documented the sale of the KC Funding asset?

9            MR. CAWDREY:   Exceeds the scope of the

10  examination.

11            Instruct the witness not to answer.

12  BY MR. PERNICKA:

13      Q.    Are you going to follow that instruction?

14      A.    I'm paying for it.   You bet.

15      Q.    Did Burlingame have counsel reviewing or

16  drafting any of the documents related to the sale of the

17  KC Funding assets?

18      A.    No.

19      Q.    Who reviewed, commented on, et cetera, the

20  documents related to that sale on behalf of Burlingame?

21      A.    Uh, the general partner.

22      Q.    And who was that?

23      A.    Burlingame Capital, LLC.

24      Q.    Who was the person associated with Burlingame

25  Capital, LLC that reviewed or commented on or drafted

1    documents related to the sale of the KC Funding asset?

2        A.    Uh, I don't think anyone on behalf of

3    Burlingame drafted any documents.

4        Q.    **Who on behalf of Burlingame reviewed**

5    **documents?**

6        A.    Is there something interesting you guys are

7    looking at?

8        Q.    **Window washers have arrived.  I apologize for**

9    **the distraction.**

10       A.    The general partner of Burlingame reviewed the

11   documents.

12       Q.    **And who was the person that did that on behalf**

13   **of the general partner?**

14       A.    My wife and I.

15       Q.    **Did Burlingame have anyone -- attorney or**

16   **other person of any sort -- review, comment on, or**

17   **approve the documents related to the disbursement of the**

18   **proceeds of KC Funding's assets, other than you and your**

19   **wife?**

20       A.    Did Burlingame.  Did Burlingame have anyone --

21   I just want to make sure I understand the question.  Did

22   Burlingame have anyone review KC Funding's distribution

23   of assets?  Is that the question?

24       Q.    **Burlingame received a certain amount of assets**

25   **from that sale, or perhaps not, but Burlingame had an**

1 interest at the time of the sale.  Did anyone other than

2 you or your wife review documents, approve the

3 disbursement, et cetera, related to that sale on behalf

4 of Burlingame?

5   A. I don't recall.

6   Q. Do you recall whether Burlingame had an

7 attorney review any of those materials?

8   A. Yes.

9   Q. And what is your recollection?

10   A. Well, to the extent that Burlingame had an

11 interest, the transaction had -- the documents were

12 reviewed by counsel, and Burlingame was fully paid for

13 its interest in Burlingame.

14   Q. And was the counsel that represent- --

15   A. We -- You know, we've provided all that to the

16 trustee already.

17   Q. Was the counsel that represented Burlingame,

18 in relation to that, Mr. Howard?

19   A. Yes.

20   Q. And when I say, "the counsel who represented

21 Burlingame in relation to that," you understand that I'm

22 talking about the sale of the KC Funding assets and the

23 distribution of funds as it relates to the amounts

24 distributed to Burlingame; right?

25   A. Uh, I would -- In general, the transaction

1    you're referring to I understand, but your description

2    of the transaction was inaccurate.  But mr. Howard was

3    the attorney.

4        Q.    And represented Burlingame, so far as you

5    understand?

6        A.    That is correct.

7        Q.    Burlingame came to acquire all or

8    substantially all of the interest in Python Injection;

9    right?

10       A.    Yes.

11       Q.    As the sole owner of Python Injection or the

12   sole interested party in Python Injection, did

13   Burlingame have access to Python Injection's records and

14   documents?

15       A.    Your question is inaccurate.

16       Q.    In what way?

17       A.    Burlingame was not the sole owner of Python.

18       Q.    What percentage of Python did Burlingame hold?

19       A.    I don't know as I sit here.

20       Q.    Was it more than 95 percent?

21       A.    May have been.

22       Q.    As I recall testified in the 341 meeting in

23   connection with this bankruptcy that you believed it was

24   somewhere in the neighborhood of 97 percent of the

25   interest in Python that was owned by Burlingame.

1           Is 97 percent a fair estimate, as best you

2  recall sitting here today?

3     A.    In the neighborhood -- you know, give or take

4  3, 4, 5 percent.  It couldn't be 5 percent on one end.

5  But exactly what the number was -- It was more than 90.

6  I think it was less than -- you know, in the

7  neighborhood of 97 percent.

8     Q.    As the holder of in the neighborhood of

9  97 percent of Python Injection's interest, did

10  Burlingame have access to Python Injection's records?

11     A.    I suppose, technically.

12     Q.    Did representatives of Burlingame occupy

13  Python's board of directors or management positions, if

14  you will, in some capacity?

15     A.    On the board.  We were never in any kind of

16  operating capacity.

17     Q.    So far as you under- -- Were you the person on

18  the board of Python Injection, as representative of

19  Burlingame?

20     A.    I was on the board, yes.

21     Q.    So far as you understand, did Python

22  Injection's records include accounting records and

23  related -- records related to its financial condition?

24     A.    Yes.

25     Q.    And did Python Injection have records related

1  to its debts and liabilities?

2      A.    Yes.

3      Q.    And did Python Injection have records related

4  to its revenue stream and its profits and operating

5  expenses?

6      A.    Yes.

7      Q.    And did you, as representative of Burlingame

8  on the board of Python Injection, have access to all

9  those records?

10     A.    Yes.

11     Q.    Do those records exist today?

12     A.    I don't know.

13     Q.    Who would know that?

14     A.    Uh, geez.  I guess the best -- my best guess

15  would be the final CEO of Python.

16     Q.    And who was that?

17     A.    Zach Simma.

18     Q.    Can you spell that, please.

19     A.    I can try.  I think it's S-i-m-m-a.  But that

20  is an estimate.

21     Q.    When did Python Injections cease operations as

22  a company?

23     A.    I believe it was late summer-early fall of

24  2013, I believe.

25     Q.    At that time were you still a member of

1   Python's board, as representative of Burlingame?

2       A.   Yes.

3       Q.   And at that time did you still have access to

4   Python's records?

5       A.   I had access if I wanted to, yes.

6       Q.   As a member of the board, were you provided

7   with financial information related to Python?

8       A.   At some meetings, yes.

9       Q.   What was done with the financial information

10  that was provided to you as member of the board on

11  behalf of the 97 percent owner of Python?  What happened

12  to the information you received?

13      A.   Python retained it.

14      Q.   Did Burlingame retain any information related

15  to the finances of Python Injection?

16      A.   Very little, if any.

17      Q.   Why is that?

18      A.   We didn't -- We had access to it whenever we

19  wanted.  There's no need to keep it.  They had it.  Why

20  would we need it?

21      Q.   Does Burlingame still have it?

22      A.   Whatever we had, yes, what we have.  But we

23  didn't -- As I said, we didn't retain the vast, vast

24  majority of it because we didn't need to.

25      Q.   Where is the financial information that

1  Burlingame retained related to Python Injection

2  currently located?

3      A.    In the storage locker.

4      Q.    Did information related to Python Injection's

5  finances play any role in Burlingame's analysis of its

6  assets, liabilities, and its finances?

7      A.    Run that by me again.

8      Q.    Sure.

9          When preparing its own balance sheets and

10 other financial documents, did Burlingame take into

11 account the finances of Python Injection?

12     A.    Yes.  We're required to --

13     Q.    Did --

14     A.    -- or they were required to.

15     Q.    Did Burlingame rely on any documents from

16 Python Injection when it did that?

17     A.    Well, we relied on the information that Python

18 provided to us.

19     Q.    Was that provided as documents or was it

20 provided verbally to you, sitting at a table in a

21 meeting?

22     A.    No.  There would be financial statements and

23 various things that were provided as part of board

24 meetings or whatever.

25     Q.    Were those materials provided to Burlingame's

1   accountants?

2       A.    Uh, you know, I don't recall.  I just don't --
3   I don't remember.

4       Q.    Do you have any idea, sitting here today, as
5   to the volume of documents that Burlingame currently
6   holds that relate to Python Injection?

7       A.    Do I have some idea?  Yeah, I've got some
8   idea.

9       Q.    And what's that volume?

10      A.    Well, I know that we've got one file that's
11  got all the loan documents that we have that we're
12  providing responsive to one of the exhibit requests.
13  We've got a few documents that have to do with the board
14  meetings where the decision to cease operation was made
15  and the filings with the state that's part of that
16  cessation -- or Certificate of Cancellation, I think
17  it's called.  How much more we have, I'm not familiar.
18  What I'm really familiar with is more what was
19  responsive to the requests and the exhibits.

20      Q.    Are there any e-mails that you either sent or
21  received in connection with Python Injection, in your
22  role as board member as representative for Burlingame,
23  that are contained in any of your e-mail files?

24      A.    I don't recall as I sit here.  Maybe.  I
25  just -- I don't recall.

1    Q.    Do you know which e-mail address you used when
2    you e-mailed regarding Python?
3    A.    Uh, I would assume it's the Burlcap.
4    Q.    Did you correspond by e-mail regarding Python?
5    A.    From time to time.
6    Q.    Did you correspond by e-mail regarding
7    Python's finances with anyone?
8    A.    Well, we made a loan to Python.  So that would
9    have been one of our concerns.  But a lot of it was
10   telephone.  Some of it was by e-mail.  We didn't
11   necessarily keep it all because we always had access to
12   it.
13   Q.    Do you still have access to Python's
14   documents?
15   A.    I have no idea where they are.
16   Q.    When did you stop having access to Python's
17   documents?
18           MR. CAWDREY:  Misstates --
19   A.    When they went out of business.
20           MR. CAWDREY:  Misstates his testimony.
21   BY MR. PERNICKA:
22   Q.    And when was that that you lost access to
23   Python's records?
24   A.    When Python went out of business.
25   Q.    Were you involved in the decision to wrap up

1    Python's business?

2        A.    Yes.

3        Q.    At that point did you consider it important --

4        A.    Are you there?

5        Q.    I am.

6              Can you hear me?

7        A.    Picture is frozen.  I don't know if you can

8    hear me.

9        Q.    I can hear you.

10             MS. JUDSON:  The thing's still on.  So --

11   Hello?

12             THE WITNESS:  Hello.

13             MR. PERNICKA:  Yes.  Can you hear us?

14             THE WITNESS:  Hello.

15             MR. PERNICKA:  Can you hear us?

16             THE WITNESS:  Oh, you're back.  You're back

17   now.

18   BY MR. PERNICKA:

19       Q.    Can you both hear and see us now?

20             MR. PERNICKA:  We -- I'll put on the record we

21   have lost video and audio with the witness.  Let's go

22   off the record while we attempt to correct this.

23             (Recess taken.)

24   BY MR. PERNICKA:

25       Q.    We, I believe, have corrected our connection

1    issue.   Mr. Judson, are you able to hear me okay?

2        A.    Yes.

3        Q.    And are you able to see me and to see Mr.

4    Cawdrey okay?

5        A.    Yes.

6        Q.    Who is currently in the room with you?

7        A.    My wife.

8        Q.    Anyone else?

9        A.    No.

10        Q.    I want to resume where we left off.

11             MR. PERNICKA:   Can I get the last question,

12   please.

13             (Last three questions and answers read.)

14             MR. PERNICKA:   Got it.

15   BY MR. PERNICKA:

16        Q.    Mr. Judson, before the break we were talking

17   about Python's wrap-up of its business.   At the time

18   when Python wrapped up its business, did you on behalf

19   of Burlingame request that any of Python's documents be

20   provided to Burlingame?

21        A.    No.

22        Q.    Were any of Python's documents produced to

23   Burlingame at the time when Python wrapped up business?

24        A.    Provided to us by Python?

25        Q.    Yes.

1      A.     Um, only for signature -- for example, board

2   minutes, the Certificate of Cancellation.

3      Q.     Let me --

4      A.     That's it.

5      Q.     Let me put it this way.  As I understand it,

6   Burlingame kept only a limited volume of Python

7   documents because Burlingame believed they would be

8   available to it through Python.

9             Do I have that right?

10     A.     That is correct.

11     Q.     At the time when Python wrapped up, did you

12  believe that Python's documents would continue to be

13  available to Burlingame through Python?

14     A.     Uh, I don't remember thinking of it in that

15  way.

16     Q.     At the time when Python wrapped up, were there

17  any documents that Burlingame requested that it have so

18  that it could be sure they were still available?

19     A.     Uh, I don't believe we requested anything

20  because I don't -- because we didn't think we needed any

21  of it.

22     Q.     Is there any individual or entity who acquired

23  the ownership of Python Injection subsequent to

24  Burlingame?

25     A.     Not that I'm aware of.

1    Q.    As the sole owner of -- or 97 percent owner of

2    Python, was Burlingame involved in considering Python's

3    expenses and profits, et cetera?

4    A.    When?

5    Q.    At the time when Burlingame -- At the time

6    when you were on the board of Python and Python was

7    wrapping up business.

8    A.    So, in other words, you're asking me:  When

9    Python was going out of business, were we concerned

10   about the profitability of Python?

11   Q.    Let me try a new question.

12         As the 97 percent, approximately, owner of

13   Python, was Burlingame involved in Python's finances

14   during the last, say, six months of Python's operation?

15   A.    Well, Python -- or Burlingame had made loans

16   to Python that had not been repaid.  So were we involved

17   in the finances?  I suppose we were.  But it --

18   particularly when it got time to -- When they were

19   running out of cash and Burlingame wasn't going to put

20   any money in because it had to pay its lawyers, due to

21   the lawsuit with Allen Matkins, their -- Python could

22   not continue to exist.  So -- I don't know -- I mean

23   obvious -- If it doesn't continue to exist, its effect

24   on Burlingame is that we're not going to collect on the

25   loan.

1      Q.    At the time when Python went out of existence,

2   where were its documents located?

3      A.    At Python.

4      Q.    And what volume of space did those documents

5   take up?  Was it a file cabinet?  Was it a room full of

6   boxes?  Was it a half a shed?

7      A.    I don't recall.  I'm not sure I knew.  But I

8   don't recall.

9      Q.    Did anyone ever tell you it's going to cost a

10  certain amount of money to keep these documents once

11  Python wraps up?

12     A.    Not that I recall.

13     Q.    Did you have a belief that Python would be

14  able to keep its documents somehow once it wrapped up

15  operations?

16     A.    Uh, I don't know nec- -- I don't remember

17  considering that.

18     Q.    Did you consider at all what would happen to

19  Python's documents when it wrapped up operations?

20     A.    I don't recall.  And I don't recall having

21  that consideration.  From Burlingame's standpoint it

22  just meant we weren't going to collect.

23     Q.    Did you ever talk with anyone at Python about

24  what would happen to its documents when it went out of

25  business?

1    A.   Um, I don't recall any.  I may have, I just

2  don't recall.

3    Q.   Has Burlingame paid any attorneys, for any

4  reason, at any time from April 1st, 2013, through today?

5    A.   April, '13?

6    Q.   April 1, 2013.

7    A.   So are you referring to -- Are you referring

8  to the bankruptcy date or are you referring to one year

9  prior to the bankruptcy date?

10    Q.   We'll call it two years ago today, since today

11  is April 2nd.  Has Burlingame paid any attorney for any

12  reason at any time in the last two years?

13    A.   Uh, I believe the answer to that is yes.

14    Q.   Which attorneys has Burlingame paid in the

15  last two years?

16    A.   Um, I believe -- Well, first of all, Jim

17  Beshears.  And I believe John Howard was paid during

18  2013.

19    Q.   Does Burlingame have records related to those

20  payments?

21    A.   Yes.  And they've already been provided to the

22  trustee.

23    Q.   Where are Burlingame's copies of those records

24  currently located?

25    A.   In the storage unit.

1      Q.      Is there a file related to payments made by

2   Burlingame to attorneys?

3      A.      No.

4      Q.      Where would you expect to locate documents

5   related to those -- related to those payments?

6      A.      Uh, either in the computer file or you could

7   see it in the bank statements, which have been provided

8   to the trustee and -- because the bank statements

9   include copies of the checks.

10     Q.      You say, "the computer file."  Are you talking

11  about the accounting records on the thumb drive?

12     A.      Correct.

13     Q.      And when you reference copies of checks in

14  bank statements provided to the trustee, which person --

15  whom specifically -- were those provided to?

16     A.      Well, they were provided to Jim Beshears, who

17  in turn provided them to Gary Rudolph.

18     Q.      How do you know that Mr. Beshears provided the

19  bank statements and copies of checks to Mr. Rudolph?

20     A.      Because I believe him to be an honest person

21  and he had told me he had done so.

22     Q.      Were you copied or forwarded any

23  correspondence by which those records were provided?

24     A.      I don't know the answer to that.

25     Q.      Other than Mr. Beshears' statement to you that

1    he forwarded records, have you seen anything to confirm

2    for you that bank statements and copies of checks of

3    Burlingame were, in fact, provided to Mr. Rudolph?

4        A.    Possibly --

5              THE WITNESS:  Jeff, I don't want to invade

6    attorney-client privilege.

7              MR. CAWDREY:  Don't invade it.  It's -- Don't

8    invade the attorney-client privilege.

9        A.    All right.  So I don't want to invade the

10   attorney-client privilege.  And I'm not a lawyer, so I

11   don't know where the lines are here.

12   BY MR. PERNICKA:

13       Q.    Well, there is no attorney-client privilege as

14   regards Burlingame.

15             MR. CAWDREY:  But there is between Mr. Judson

16   and Mr. Cawdrey and Gordon & Rees.

17             THE WITNESS:  That's correct.

18             MR. CAWDREY:  So what's the question, again?

19   BY MR. PERNICKA:

20       Q.    Have you seen any correspondence or been

21   provided copies of any e-mails, et cetera, by which

22   Mr. Beshears provided bank statements or copies of

23   checks to Mr. Rudolph?

24             MR. CAWDREY:  So any communications outside of

25   our communications are fair game.

1      A.    Well, I don't know how to answer that, and I

2  don't want to invade attorney-client because I don't

3  know where the lines are.  I'm not trying to be

4  difficult -- The trustee's got the stuff, so --

5  BY MR. PERNICKA:

6      **Q.    Have you seen correspondence between Mr.**

7  **Beshears and Mr. Rudolph that is cover correspondence or**

8  **some other sort of correspondence accompanying the**

9  **copies of checks with payments to attorneys and bank**

10  **statements reflecting payments to attorneys, indicating**

11  **that that information was, in fact, provided to**

12  **Mr. Rudolph?**

13      A.    I don't know how I got stuff.  And if I got

14  stuff from my counsel, then I didn't -- don't know how

15  to answer that.

16      **Q.    It's not a privilege --**

17          MR. PERNICKA:  Jeff, it's not privileged

18  communication.  You can't change a fact by you sending

19  it to him.  It is what it is.

20          MR. CAWDREY:  Yeah, the question is has he

21  seen any documents that -- Look.  I'll tell you I have

22  copies of documents where Beshears is sending a host of

23  stuff to Jim Kennedy and Gary Rudolph.

24          MR. PERNICKA:  This is --

25          MR. CAWDREY:  I mean it's simple as that.  So

1   if --

2          MR. PERNICKA:  And I'm asking Mr. -- Have you

3   seen -- I'll move on.  It is what it is.

4          MR. CAWDREY:  I don't know -- I just don't

5   know the question.

6          MR. PERNICKA:  I'll go to Gary Rudolph.

7          MR. CAWDREY:  He's not copied on the e-mail.

8   I'm happy to give you copies of those, Charles.  I don't

9   --

10          MR. PERNICKA:  That would answer the question.

11   I'm not looking to trick anybody.

12          MR. CAWDREY:  Yeah, no, I get it.  And frankly

13   I don't know that I ever sent them to him.  So -- I

14   don't know.  Nobody's trying to trick anybody.

15   BY MR. PERNICKA:

16      Q.   Mr. Judson, how much money has been paid by

17   Burlingame to Mr. Beshears in the last two years?

18      A.   Uh, I don't know the exact number as I sit

19   here.

20      Q.   What's your estimate?

21      A.   I think 5,000 -- around 5,000 dollars.

22      Q.   And in the last two years how much money has

23   been paid to Mr. Howard by Burlingame?

24      A.   I don't know.

25      Q.   What's your estimate?

1        A.    I don't have an estimate.

2        Q.    **More than 5,000?**

3        A.    I don't have an estimate.  I don't recall

4   when, how many, how much.  This year -- Two years covers

5   the year prior to bankruptcy, and -- I don't know when

6   it is.  The trustee's got the information.  We provided

7   all the bank statements, and it would be in there.  But

8   I don't know, as I sit here -- I don't recall

9   sufficiently enough for me to feel comfortable giving

10  you a number.

11       Q.    **Do you still have copies of the bank**

12  **statements and copies of the checks concerning payments**

13  **made to Mr. Howard in the last two years?**

14       A.    They would be in the storage locker.  (Witness

15  nodded.)

16       Q.    **And they are still in the possess- -- They are**

17  **still in the possession of Burlingame?**

18       A.    The bank statements are, sure.

19       Q.    **And the copies of the checks are, as well?**

20       A.    Well, the copies of the checks are part of the

21  bank statements.

22       Q.    **As I understand it, there are Burlingame**

23  **records located in a storage unit in Florida and there**

24  **is some volume of electronic Burlingame records located**

25  **on equipment that you either carry with you or you keep**

1    at your home in Florida.

2              Do I have that correct?

3        A.    Uh, they're either in the storage unit, at our

4    home, or on the computer.  The fact that the stuff I

5    carry with is synced up is -- It's not like I carry this

6    stuff with me and I'm doing anything with it.  If I'm

7    going to do anything with it, I'm sitting in my office.

8        Q.    What volume of documents related to Burlingame

9    are at your home in Florida?  Is it like two files?  Two

10   boxes?  What's your estimate?

11       A.    I would say we're probably five or six boxes

12   by the time it all gets printed out.

13       Q.    Is there any location other than those three,

14   other than the storage unit in Florida, your home, or

15   electronically maintained documents, that are currently

16   within the possession of Burlingame?

17       A.    Yeah, unless I -- Yeah.  I was going to -- I

18   think that -- That would be correct.

19       Q.    Those are the only three locations?

20       A.    Well, unless I had sent a file to Counsel or

21   something like that.  But that would be -- That would

22   only be a copy of what exists in those three locations.

23       Q.    So there may also be Burlingame records in the

24   possession of Burlingame's attorneys, or its

25   accountants, I assume.

1    Right?

2    A.    Could be.  I mean yeah.  But in terms of in

3    the possession of Burlingame, it's in the storage locker

4    and/or in our house en route to the storage locker and

5    anything anybody else has is just going to be a copy of

6    it.

7    Q.    Mr. Judson, those are all the questions that I

8    have for you today.  Mr. Cawdrey and I will talk about

9    how these documents are going to be produced.  But I am

10   specifically notifying you now on the record and at

11   least audibly and over video:  Burlingame -- and whether

12   that's you, whether that's Ms. Judson, whether that's

13   anyone else on behalf of Burlingame -- is not to delete

14   any electronic files related to Burlingame.  No e-mails

15   are to be deleted.  No documents are to be deleted.  No

16   hard drive's to be deleted.  No thumb drive's to be

17   deleted.  No Dropbox accounts are to be deleted.  No

18   iPhone backup accounts are to be deleted.  And I'll be

19   sending follow-up correspondence to Mr. Cawdrey today,

20   but that practice needs to stop immediately.

21           Do you have any questions for me about that?

22           THE WITNESS:  I hear what you say.

23           MR. PERNICKA:  Very good.

24           Mr. Cawdrey, do you have any questions?

25           MR. CAWDREY:  I do.  I have one question.

```
 1                          EXAMINATION

 2   BY MR. PERNICKA:

 3       Q.    Mr. Judson, when the Allen Matkins documents

 4   and boxes were delivered to you, were you provided with

 5   an index to those documents and boxes?

 6       A.    No.

 7             MR. CAWDREY:  I have no further questions.

 8             MR. PERNICKA:  Let's go off the record and

 9   talk about the transcript.

10             (Discussion held off the record.)

11             MR. PERNICKA:  Back on the record.

12             The parties have agreed to reach a stipulation

13   regarding the handling of the transcript.  The

14   transcript is going to be expedited.  I will be

15   receiving a copy, certified copy, by Tuesday of next

16   week -- that is Tuesday, the 7th.  The original will be

17   delivered to Mr. Cawdrey also on Tuesday, the 7th.

18   Mr. Judson will then have 10 days to review, sign, make

19   whatever corrections he feels appropriate.  Those

20   corrections and the signature are to be completed by the

21   17th, understanding that the most Mr. Judson can do is

22   endeavor to meet that deadline.

23             Mr. Cawdrey, if you can electronically provide

24   to me any comments, corrections, revisions, as well as

25   the signature -- E-mail will be sufficient for that.  If
```

1   you're able to do that by noon on Monday, the 20th?

2           MR. CAWDREY:  Uh, no.  I don't --

3           MR. PERNICKA:  That's the Monday following

4   Mr. Judson's completion date.

5           MR. CAWDREY:  Let's do it by noon on Tuesday.

6   I will endeavor to do it by noon on Monday, but let's

7   move it to noon on Tuesday.  Or I will endeavor to do it

8   by noon on Monday but I'm not going to guarantee it.

9           MR. PERNICKA:  The original will then be

10  maintained by Mr. Cawdrey's office.  A certified copy

11  may be used for any and all purposes for which an

12  original might otherwise be required.  And Mr. Cawdrey

13  will make the original available if for some reason this

14  stipulation is insufficient and the original is

15  necessary, upon reasonable request and in a reasonable

16  time frame.

17          Did I leave anything out that you'd like to

18  add?

19          MR. CAWDREY:  I don't think so.

20          So stipulated?

21          MR. PERNICKA:  So stipulated.

22          And we're off the record.

23          THE WITNESS:  Okay.

24          THE REPORTER:  Did you say you need to

25  purchase a copy of the transcript?

1          THE WITNESS:  Jeff, would you call me, when

2    you get out, on my cell?

3          MR. CAWDREY:  Yes.  Absolutely.

4          THE WITNESS:  Thank you.  Bye-bye.

5          MR. CAWDREY:  No.  I'm getting the original.

6    That's fine.

7          MR. PERNICKA:  I need hard copy and

8    electronic.

9          (Deposition was concluded at 2:27 p.m.)

10

11                    ---oOo---

12

13          (DECLARATION UNDER PENALTY OF PERJURY APPEARS

14    ON THE FOLLOWING PAGE HEREOF.)

15

16

17

18

19

20

21

22

23

24

25

Katrina F. Burlason

```
 1              DECLARATION UNDER PENALTY OF PERJURY
 2     Case Name: In re Burlingame Capital Business Partners II
 3     Date of Deposition: 04/02/2015
 4     Job No.: 10015832
 5
 6              I, ROBERT D. JUDSON, JR., hereby certify
 7     under penalty of perjury under the laws of the State of
 8     _____ that the foregoing is true and correct.
 9              Executed this  14th  day of
10     April          , 2015, at  Village of Golf, FL      .
11
12
13              _____
14                       ROBERT D. JUDSON, JR.
15
16     NOTARIZATION (If Required)
17     State of _____
18     County of _____
19     Subscribed and sworn to (or affirmed) before me on
20     this _____ day of _____, 20__,
21     by_____,     proved to me on the
22     basis of satisfactory evidence to be the person
23     who appeared before me.
24     Signature: _____ (Seal)
25
```

DEPOSITION ERRATA SHEET

Case Name: In re Burlingame Capital Business Partners II
Name of Witness: Robert D. Judson, Jr.
Date of Deposition: 04/02/2015
Job No.: 10015832
Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.

Page _18_ Line _1_ Reason _Boynton Beach, Florida_

From _____ to _____

Page _50_ Line _21_ Reason _Keyus_

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

```
 1 │ DEPOSITION ERRATA SHEET
 2 │ Page _____ Line _____ Reason _____
 3 │ From _____ to _____
 4 │ Page _____ Line _____ Reason _____
 5 │ From _____ to _____
 6 │ Page _____ Line _____ Reason _____
 7 │ From _____ to _____
 8 │ Page _____ Line _____ Reason _____
 9 │ From _____ to _____
10 │ Page _____ Line _____ Reason _____
11 │ From _____ to _____
12 │ Page _____ Line _____ Reason _____
13 │ From _____ to _____
14 │ Page _____ Line _____ Reason _____
15 │ From _____ to _____
16 │ Page _____ Line _____ Reason _____
17 │ From _____ to _____
18 │ Page _____ Line _____ Reason _____
19 │ From _____ to _____
20 │ Page _____ Line _____ Reason _____
21 │ From _____ to _____
22 │ _____ Subject to the above changes, I certify that the
   │          transcript is true and correct
23 │ _____ No changes have been made. I certify that the
   │          transcript  is true and correct.
24 │
25 │          _____
   │                   ROBERT D. JUDSON, JR.
```

## $

**$10,000**  98:15

## -

**---o0o---**  155:11

**-7**  121:10,12

**-8**  121:10

## 1

**1**  52:22 76:11,13 145:6

**10**  6:23 18:18 28:11, 13 33:22 50:19 52:25 123:14 153:18

**10,000**  52:14

**10-page**  33:21

**10th**  82:20 86:14

**12**  35:6 69:9

**12,000**  52:16

**12-**  18:22

**12-16**  93:12

**12th**  86:14

**13**  119:19 145:5

**139**  79:12

**14**  18:22 35:1,6 51:18 61:6 69:9,10 119:19 121:24

**15**  37:25 50:19 81:11

**15th**  81:20

**170**  18:14

**17th**  153:21

**18**  35:1,6 51:18 61:6 69:10

**1st**  145:4

## 2

**2**  5:1

**20**  36:7

**2000**  24:23 43:8 68:20

**2004**  6:15 58:21

**2006**  121:10,12

**2007**  7:16

**2008**  121:12

**2009**  7:9 25:20,22,25 26:1,2 44:14 88:18 116:13,19,23 117:14, 21 123:2,8,21 125:2

**2010**  7:9 25:22 30:15 42:23 44:14 81:16 82:15,17 83:2,5 84:5, 21 87:12,13 88:10,20 89:14 115:7,10,12, 15,25 116:3,5

**2010-to-2011**  29:11

**2011**  25:22 30:15 115:6

**2012**  25:22

**2013**  122:6 135:24 145:4,6,18

**2014**  122:6

**2015**  5:1 81:19

**20th**  154:1

**230**  104:24

**29**  90:10,17

**2:27**  155:9

**2nd**  145:11

## 3

**3**  134:4

**30**  36:14,15

**300**  21:17

**300-some-odd**  80:22

**341**  133:22

**370**  16:1 21:15 80:24, 25 94:18

**370-plus**  95:18

## 4

**4**  134:4

**40**  36:14,15

**400-plus**  58:23

## 5

**5**  110:4 134:4

**5,000**  149:21 150:2

**50**  17:10

**51/49**  14:21 34:2

**52-card**  27:14

## 6

**6+**  109:22

**60/40**  14:12

**6th**  81:19,21

## 7

**7**  82:14

**7th**  153:16,17

## 8

**80**  34:6

**85**  35:21 36:3 45:14, 21,24 46:6,10,12,13, 14

**8th**  86:14

## 9

**9**  90:10,17

**90**  34:6 35:21 36:3 45:15,21,24 46:10, 12,13,14 134:5

**900**  52:8,10

**92**  93:12

**95**  133:20

**97**  133:24 134:1,7,9 136:11 143:1,12

**9:36**  5:2

## A

**A.M.**  5:2

**ability**  9:25 85:16 87:5

**absolute**  86:17

**absolutely**  66:4 102:21 104:18 155:3

**access**  11:21 19:1 20:1,3,6 23:8 36:9 41:8,10,16,20 108:23,25 111:10,20 113:6,12,20 114:20 133:13 134:10 135:8 136:3,5,18 139:11, 13,16,22

**accessed**  19:3 111:13,15,16,17

**accompanying**  148:8

**account**  41:17 45:4,9 71:24 106:1,2,3 111:7,10 113:6,9,11 137:11

**accountant**  116:23

**accountants**  120:5, 14,24 121:13,20 122:18,19,24 138:1 151:25

**accounting**  116:8 134:22 146:11

**accounts**  53:11 108:23 113:21 152:17,18

**accurate** 9:13 82:22 85:25 86:3,11,23

**accurately** 77:22

**accusing** 25:14

**acquire** 133:7

**acquired** 25:19 107:10,19 110:9 112:7 125:20 142:22

**action** 84:1

**activities** 56:19 104:17 115:18

**actual** 98:10

**Adams** 117:24 118:7, 13,17,20,24

**add** 154:18

**addition** 96:2 123:21

**address** 18:10 42:8 46:16,20 49:12 51:21 52:4 53:4,18,24 56:16 60:16,22 61:3 62:7 63:23 65:3,8,17 66:9,17,18,19 67:2, 13 82:9 99:1 104:19 108:21,22 109:8 139:1

**addresses** 41:3,8 42:6 46:25 47:8 108:15,16

**addressing** 116:7

**administered** 5:5

**advantage** 33:5

**advent** 43:19

**advice** 100:25

**Advisors'** 51:12

**affairs** 41:22 42:5 46:19,22 49:12 50:15 56:11,21 127:16,21

**affect** 9:25

**affirm** 89:6

**afternoon** 85:4 91:25

**agree** 80:16,19

**agreed** 153:12

**agreement** 71:6 126:11

**agreements** 71:1,5 113:22

**ahead** 14:8 42:11 57:8 58:4 74:24,25 91:7 104:23

**air** 19:9 92:4

**alcohol** 9:23 10:3

**aligned** 38:6

**Allen** 7:20 15:25 16:2, 11,15 17:5,10,16,19 20:10,13 21:11,15,18 24:13,16,22 25:4,10, 13,23 26:18,25 27:5, 7,10 36:11,25 42:1 44:6 76:4 79:19 80:2, 9,17,23 81:3,10,13 82:15 83:9,10 87:9, 10,12,17 88:6 89:15, 21,23 90:20 91:9,15 92:14 93:23,25 94:5, 12,21,24 95:1,8,19, 22,24 96:9,13 97:23 98:19 117:19 123:17, 22 124:8,17,18 125:14,18 126:6 129:6,11 143:21 153:3

**alleyway** 18:25

**Allied** 98:11

**alter** 24:25 25:14,17

**Alturdyne** 126:11,18

**ambiguous** 6:11 45:6 55:17 57:3 59:16 62:9 64:4 65:9,21 66:21 129:9

**Amherst** 104:24

**amount** 33:3 43:23, 25 44:1 85:12 92:13 120:13 131:24 144:10

**amounts** 8:13 132:23

**anal** 28:18

**analysis** 137:5

**and/or** 152:4

**announced** 112:16, 25

**answers** 8:3 12:13 15:2 22:16 85:15 86:11,18,21,25 87:6 110:22 141:13

**Antarctic** 49:2

**anymore** 6:7

**Anytime** 43:7

**apologize** 24:10 28:6 131:8

**Appearance** 82:6

**appearing** 14:23

**appears** 92:20 96:1 155:13

**Apple** 42:15,18,22, 24,25 43:3 45:4 107:23 109:22 110:4, 12,15,24 111:2 112:15,21 115:13

**Application** 82:5

**applied** 79:6

**apportion** 13:23

**approval** 11:18

**approve** 131:17 132:2

**approximate** 31:2 115:16 116:3,5

**approximately** 98:14, 15 115:15 127:10 143:12

**April** 5:1 145:4,5,6,11

**arguing** 88:5

**argument** 50:2

**argumentative** 60:7

**61**:21 62:12 83:8 85:13 86:6 87:17,22 91:6 92:9 100:6,12 101:4 104:2,9

**arranged** 91:11

**arrived** 24:14 27:6,8, 10 94:4,5 96:14 131:8

**article** 44:8

**ascertain** 88:23,24

**aspires** 27:25

**asset** 67:20 130:8 131:1

**assets** 54:19 56:24 57:2,20 58:9,15 59:5, 13,14,22 60:6,13 62:8,17,25 63:14 65:15 66:16 67:4 124:24 130:17 131:18,23,24 132:22 137:6

**assume** 35:9 37:16, 17 41:4 94:25 113:14 139:3 151:25

**assumed** 84:25

**attach** 76:11

**attached** 82:1

**attachment** 40:17,20 128:18

**attachments** 69:21 128:8,10,14

**attempt** 88:14 140:22

**attorney** 116:22 117:11 126:17,23,25 131:15 132:7 133:3 145:11

**attorney's** 66:3 100:22

**attorney-client** 44:18 107:5 147:6,8,10,13 148:2

**attorneys** 117:14

123:2,8,20,21 124:7,
10,15,17 125:2,6,12,
24 126:5 129:17,23,
24 130:1,7 145:3,14
146:2 148:9,10
151:24

**audibly** 152:11

**audio** 92:19,20
140:21

**Authorities** 82:8

**Avenue** 104:24

**average** 104:5

**avoid** 25:13

**aware** 10:13 41:19
46:24 80:15 142:25

———————

**B**

**B-l-a-c-k-e-t-t** 126:21

**b-u-r-l-c-a-p** 42:9

**back** 7:16 14:3,4
26:12 38:21 41:25
42:20 55:23,24 63:4,
6 64:1 68:18,20
69:23 86:7 87:8 88:2
92:24 93:10 95:2,3
97:6 108:8 110:16,17
111:3,14 113:5
114:11 125:9 129:15
140:16 153:11

**backed** 73:9 111:11
113:4,7,13

**background** 128:9

**backing** 110:23 111:6

**backup** 152:18

**backups** 113:10

**balance** 137:9

**bank** 71:24 126:14
146:7,8,14,19 147:2,
22 148:9 150:7,11,
18,21

**bankers** 16:1

**bankruptcy** 6:10
10:20,25 12:7 44:20
74:4 81:19 124:2
125:20 126:16
133:23 145:8,9 150:5

**based** 42:18 45:15
86:25 89:2,6 96:1

**basement** 102:9

**basic** 114:25

**basis** 110:17

**Bay-area** 117:25
118:25 119:9

**Beach** 5:17

**bedroom** 102:20

**began** 30:8,15,22
68:8,21 89:15,20
122:5

**begin** 29:7 34:24
68:15 69:3 119:16

**behalf** 47:18 118:14
119:10,11 129:17
130:20 131:2,4,12
132:3 136:11 141:18
152:13

**belief** 53:3 63:1
144:13

**believed** 133:23
142:7

**beneficial** 16:10

**Beshears** 11:25 12:7,
25 124:4 126:16
145:17 146:16,18
147:22 148:7,22
149:17

**Beshears'** 146:25

**bet** 130:14

**big** 17:9 18:15 30:1
32:13

**binders** 97:12,20,23

**bit** 17:21 33:25 35:21
82:11 92:1

**Blackett** 126:19,21
127:1,11

**Blackett's** 127:7

**blue** 8:10

**board** 134:13,15,18,
20 135:8 136:1,6,10
137:23 138:13,22
142:1 143:6

**Bob** 16:19 43:10 57:8
78:17,23

**Bob-judsonfamily**
53:11

**Bob@judson-family.
com.** 47:11

**Bob@
turtlegroveadvisors.
com.** 47:11

**body** 51:17

**bought** 107:25
114:12,13

**box** 14:2,3,4 16:25
21:17 29:2,3,5 33:1,
3,10,19,20 34:20
36:7 39:19 74:15,18
75:1,2,5,11,13,14,17,
20,21,22,25 76:8
79:10,12,13,17,20
94:7 95:14 128:1

**boxes** 12:20 16:2,14
17:5,12 21:1,3,14,15,
18,23 23:2 24:15,16
26:16,19 27:11,15,
16,17 28:24,25
32:22,24 33:7,9,13,
14,15 36:7,11,12,14,
15,23,25 37:1,2
58:23 73:21 76:5,18
78:5,6,7,8,11 79:7,
11,13,18,19 80:1,2,
13,16,17,22 93:23
94:2,3,4,12,15,17,19
95:15,18,22,23,24
96:2,20,22,23,25
97:1,3,6,22 98:2,3,5
99:7 120:7 144:6
151:10,11 153:4,5

**Boynton** 18:1

**break** 55:1,2,5,8,15,
19,25 57:23 92:6,8
141:16

**bring** 120:7

**broad** 28:20 56:13,14
93:18 116:18

**broadly** 80:7

**brought** 7:11

**brown** 78:6

**building** 19:8,13

**bunch** 31:24 54:12
89:25

**burdensome** 91:5

**Burlcap** 67:11 139:3

**Burlingame** 7:21
10:21,24 11:1 12:8
13:2 16:12,16 17:3,
17,19,24 18:2,15
19:17 20:11,14
21:10,18 22:7,10,15,
23,24 23:2,4,11,15,
22,23 24:1,4,7,12,19
25:2,5,11 26:9,19,24
27:1,2 30:16,22,23
31:7,12,15,19,20
32:3 35:24 41:2,7,22
43:5,13 44:9,15 46:1,
22 47:3 48:24 49:3,
15,17,18 50:15,18,
23,25 51:7,13 52:1,
20 53:5,8,20 54:2,3,
16 61:1,11,12,18
62:17,25 64:11,15
65:8 66:8,12,17 68:8
69:19 70:1,12,19
71:23 72:12,17 73:24
77:14 81:4 82:7 87:9,
11,20 89:21 90:21
94:1,3,6 98:22 99:4
102:12 103:6,14,19
106:2,4 108:22
114:14,17,19,21,25
115:3,8,9,11,20
116:14 117:10,14,20
118:14,17,19,24

119:5,9,10,12,15,16,
21 120:23 121:7,13,
19 122:5,7,18,19,24,
25 123:3,9,15,20,23
124:7,17,22 125:3,5,
12,13,15,18,25
126:17 127:8,11,15
128:6,20 129:1,5,7,
15,17 130:15,20,23,
24 131:3,4,10,15,20,
22,24,25 132:4,6,10,
12,13,17,21,24
133:4,7,13,17,18,25
134:10,12,19 135:7
136:1,14,21 137:1,
10,15 138:5,22
141:19,20,23 142:6,
7,13,17,24 143:2,5,
13,15,19,24 145:3,
11,14,19 146:2
147:3,14 149:17,23
150:17,22,24 151:8,
16,23 152:3,11,13,14

**Burlingame's** 11:5,
11,21 15:6,11,14
17:22 19:14 34:10,16
39:25 40:3 42:5
46:19 48:5 51:10
64:11 68:16 71:20
72:6,17,23 98:24
104:15,17 114:23
115:3,16 116:1,6,21
117:2 120:4 124:20
126:1,5 127:16,21
129:21 137:5,25
144:21 145:23
151:24

**Burlingame-related**
53:10 54:8

**business** 11:17 22:25
51:10,11,12 115:3,
17,18,20 116:1,6
139:19,24 140:1
141:17,18,23 143:7,9
144:25

**businesses** 113:24
114:9

**buying** 107:2

**buzz** 38:20

**Bye-bye** 155:4

————————

**C**

**C-l-a-p-p** 121:5

**cabinet** 96:3,6,10,12,
17,20,21,25 97:5,7
144:5

**California** 5:1 82:16
98:23 99:1,2,8,12,13,
23 100:4,14 101:2,12
102:1,8,19 103:5,7,
10,19,25 104:7,17,
20,24 119:22

**call** 24:6 38:19 81:24
82:2 99:2,3 145:10
155:1

**called** 117:11 138:17

**calling** 43:2

**calls** 16:20 25:16
86:6

**Cancellation** 138:16
142:2

**capacity** 6:20 124:19
134:14,16

**Capital** 10:21 11:1
54:2 82:7 115:8
130:23,25

**card** 18:7 19:22

**care** 6:22 23:23

**carry** 75:12 150:25
151:5

**cart** 97:11,13,17,21,
24,25

**case** 7:22 74:11

**cases** 16:9,11

**cash** 143:19

**categories** 69:25
79:25 80:8

**categorize** 30:12

**Cawdrey** 5:19,25
6:11 8:20 11:24 12:5,
14 14:8 16:17,19
25:15 45:6 48:4,19
49:13 50:5,10 54:23,
25 55:9,12,16 56:5
57:3,8,12,21,24 58:2,
16,18 59:6,16,24
60:7 61:9,20 62:9,19
63:3,15,24 64:3,14,
22 65:4,9,20,21
66:20 67:6,22 68:24
69:4 74:19,22,25
76:1,10,24 77:1
78:12,17,22 82:23
83:6,8,22,25 84:3
85:13 86:5,24 87:16
88:8,22 89:8,11
90:24 92:9,17 93:2
99:19,24 100:5,11,16
101:3,13,21 102:2,
10,21 103:11 104:1,
8,21,23 107:4 124:2
125:8 129:8 130:4,9
139:18,20 141:4
147:7,15,16,18,24
148:20,25 149:4,7,12
152:8,19,24,25
153:7,17,23 154:2,5,
12,19 155:3,5

**Cawdrey's** 82:2,9
154:10

**CD** 43:19

**cease** 121:6 135:21
138:14

**cell** 155:2

**cents** 18:14

**CEO** 135:15

**Certificate** 138:16
142:2

**certified** 153:15
154:10

**cessation** 138:16

**cetera** 40:21 115:19
124:24 126:4 129:9
130:19 132:3 143:3

147:21

**chairs** 36:23

**chance** 12:11

**change** 148:18

**changed** 18:7 28:12
43:15

**channeling** 75:20

**charge** 18:7 19:21

**Charles** 149:8

**check** 40:19 113:10

**checks** 146:9,13,19
147:2,23 148:9
150:12,19,20

**chiefly** 10:19

**choice** 89:25

**choose** 55:9

**chronological** 32:7,
15 33:17

**City** 119:22

**CK4US** 50:20

**Clapp** 121:4,6

**clarification** 17:4

**clean** 58:6

**cleaner** 24:24

**clear** 12:11 46:7
88:23

**client** 59:18 61:13

**clients** 94:21,24

**close** 91:24 93:13
112:15

**closer** 78:23

**closest** 74:18

**closing** 30:1

**cloud** 105:6,17,22
106:9 110:18 111:3,
7,10

**code** 19:5,7

cognizant 43:20

coherent 10:6

collect 143:24 144:22

Collect- 124:23

collectively 76:11

college 22:11 24:2

combination 19:5 20:7 95:17

comfortable 150:9

commenced 87:11

comment 131:16

commented 130:19, 25

comments 49:24 153:24

commingle 23:6

commingling 24:4

communicate 54:9, 17 55:6 56:10,23 57:19 60:5,12 107:6 124:6 127:20

communicated 41:6, 21 42:4 44:3 58:7 60:17 124:12,14 127:15

communicating 44:2 124:9

communication 148:18

communications 62:5 63:11,12,20 107:7 147:24,25

company 6:21 79:3 81:2 118:2,4 119:17, 20,24 122:6,7,14 135:22

compared 51:10 75:19 119:12

complaint 83:16

complete 9:12 10:1

31:22 85:15

completed 45:14 153:20

completion 154:4

complexity 117:7

compound 66:20

computer 34:16,18 39:10,18 40:15 72:16 73:3,4,13 106:7,9,12, 21 108:4,20 146:6,10 151:4

computers 35:3 108:1 113:19 114:14, 20 115:1,2

conceivable 25:25

conceivably 106:15

concern 85:20

concerned 143:9

concerns 48:5 58:20 139:9

concluded 155:9

concocted 25:1

condition 77:23 78:1 134:23

conditioned 19:9

conditions 90:1

condo 20:20,23 22:12

conducted 115:20 116:9

conducting 5:14 34:9

conference 5:15,18, 23 16:6 76:20 92:20

confident 50:24

confirm 147:1

confused 60:11 115:23 125:17

confusion 60:4

connected 10:23 123:22

connection 12:7 41:7 42:4 43:5 46:19 47:19 48:14 49:10,11 54:18 58:8 62:7,24 81:23 82:11 104:17 124:19,23,24 125:3, 6,13,15,19,25 126:1, 2,3,4,18 129:19 133:23 138:21 140:25

consideration 144:21

constrained 33:6 36:20

consume 10:3

consumed 9:24

contained 66:8 96:10 138:23

contents 76:3,4

context 6:10 49:11 51:16

continue 142:12 143:22,23

continuously 33:23

conversation 86:4

convinced 39:20

copied 72:11 146:22 149:7

copies 38:23 66:7 68:4 77:16 120:8 145:23 146:9,13,19 147:2,21,22 148:9,22 149:8 150:11,12,19, 20

copy 36:2,4 39:23 72:13,15 83:16 151:22 152:5 153:15 154:10,25 155:7

copyright 117:11,15

corner 24:19

corners 27:23

corporate 116:15 117:4,15

correct 17:15 23:13 26:21 27:4,6,8 35:10 37:18 45:17 46:23 58:14 68:5 70:5 80:5, 11 83:21 84:24 95:6 105:11 114:17 118:6 119:2 121:15 123:24 124:1 129:16 133:6 140:22 142:10 146:12 147:17 151:2, 18

corrected 140:25

corrections 153:19, 20,24

correctly 5:11 26:23 80:23,24

correspond 83:12 139:4,6

corresponded 46:18 66:15 67:3

correspondence 43:17 116:8 146:23 147:20 148:6,7,8 152:19

correspondences 128:25

cost 98:13 144:9

counsel 12:25 44:17, 21 48:18 54:22 82:21 94:25 95:4 100:24 107:3 123:18 130:15 132:12,14,17,20 148:14 151:20

country 85:5 118:9

couple 7:18 8:24 52:11 77:12 91:18, 19,20,21,22 105:3

court 5:19 6:1 7:11, 17 9:8 50:2 63:25 82:16 83:25 88:1

courtroom 9:11

cover 54:5 148:7

covered 44:18

covers 150:4

CPAS 117:12,20

crash 71:18

create 43:21

created 75:11,14

credit 18:7 19:22

criteria 75:4

Cube 18:8

current 57:15 77:22
107:19 110:3,9 112:7

curtailed 101:15

---

**D**

dangerous 32:12

date 25:7 39:11 81:12
82:17,19,23 83:11,
13,14,18,24 84:3,8,
11,14,22 87:14,15
88:6,11,23,25 89:16,
19 90:7 93:14 115:16
116:3,5 118:21
121:8,10 145:8,9
154:4

dates 8:9 84:16 87:21

day 10:16 35:9,11
84:10,14,15 95:13,14

days 35:15 77:12
84:12 85:1 91:18,21
153:18

deadline 153:22

deal 115:3

dealing 24:22 115:17

dealt 52:24 118:10
119:9,21,24

debtor 10:20,21,25
21:16 40:1 82:15
114:16

debts 135:1

decide 21:23 74:13

decided 38:7

Decimal 28:19

decision 138:14
139:25

declaration 81:18
82:3,10,13,14,22
83:4,12,13,14,20
84:9,12 85:9 87:10
155:13

degree 44:2

Del 5:17

delete 44:21 45:12
69:5,12,20,23,24
122:15 152:13

deleted 43:4,9 44:10
45:1,5,20,22,25 46:5,
11,15 64:21 68:4,19
69:15,17 70:7,11,19
71:16 105:9 121:20,
22 122:1,8,10
152:15,16,17,18

deleting 68:15,22
70:2 105:5 121:23

deletion 68:7,13,14
69:2

deliver 90:2 98:13

delivered 26:18 27:1
87:19 91:15 92:15
93:25 95:18 97:25
98:5 128:1 153:4,17

delivery 94:1 98:10

deny 89:23

department 32:10
37:17 105:15

depend 117:6

depending 85:5
120:10,11,18

depends 15:12 38:25

deposed 6:19 7:10

deposition 6:17 7:4
63:5 76:12 86:8
101:15 155:9

describe 29:13 33:16
71:8

description 133:1

desk 75:7,9

desktop 105:7 106:22

destroy 13:22

destroyed 13:18

destruction 13:25

detail 85:25 86:1

determination 29:22

determine 51:6,9
52:20 60:25 114:12

determined 39:9

determining 87:12

developing 30:15

device 110:5,8

devices 108:16,24
109:1,11,13 113:5

Dewey 28:19

DIEGO 5:1

differentiate 106:8

difficult 44:12 104:16
114:24 148:4

diligent 47:6 51:19

dimensions 18:17

direct 93:20

directly 13:3 18:25
49:21 79:23 106:15
124:8,9,15

directors 134:13

disbursement 131:17
132:3

discuss 50:7 55:10,
11

discussion 101:16
153:10

disk 73:14

disks 120:9

disposed 129:14

disposing 122:25

disposition 59:13

dispute 89:4

distraction 131:9

distributed 132:24

distribution 63:21
65:14 66:6 67:4
126:3 129:19 131:22
132:23

distributions 67:19

division 66:15

divisions 63:13

doc- 81:25

document 21:14
22:2,3 33:21,22,23
37:19,23,24 38:23
39:3,7,14,21 69:19
71:4,6,15,16 82:3

documented 130:8

documents 10:20
11:11,22 12:13 13:2,
16 14:7,16,17 15:7,
11,12 16:15,16 17:2,
3,5,6,7,9,11,22,24
18:16 19:14,20 20:25
21:10,12,14,20,24
22:3,5,9,15,18,20,22,
23 23:2,3,7,12,15,25
24:4,5,6,13,21 25:13
26:10,18 27:3,6,7,8,
9,12 29:1,3,4 30:1,3,
12 31:4 32:4,5,20
33:1,7,9,18 35:23
37:8,10,14,22 38:1,
10,21 39:25 40:2
46:12 48:6,24 49:15,
17,18 50:24,25
58:21,22,24 61:11,12
64:12,15 70:1,4,8
71:2,7,8 72:9 77:15
80:8 81:3 82:6 83:19
87:8,13,20 88:7,13,

16,25 90:15,21 91:9,
11,14,15 92:14 93:15
94:21,23 95:19 96:9,
14,16,21,22,23,24
97:2,7,8,16,19,21
98:13,18,21 99:11,
18,20 100:7,19 101:6
102:1,12,13 103:4,7,
9,14 114:21 115:17
116:7,14,17,22
117:3,4 120:4 128:6,
8,20 129:5,11,18
130:16,20 131:1,3,5,
11,17 132:2,11
133:14 137:10,15,19
138:5,11,13 139:14,
17 141:19,22 142:7,
12,17 144:2,4,10,14,
19,24 146:4 148:21,
22 151:8,15 152:9,15
153:3,5

**dollars** 18:14 90:9
149:21

**door** 18:24 19:4,7
60:9

**dot** 38:20

**doubt** 50:9 123:14

**download** 110:19
111:5

**drafted** 130:25 131:3

**drafting** 130:16

**Drake** 5:12

**drink** 9:24

**drive** 71:18 73:14,18,
20,25 74:6,14,17
75:8,12,18 105:7,13,
15 106:11 146:11

**drive's** 152:16

**drives** 43:19

**Dropbox** 105:25
106:2,12,16,20 111:7
152:17

**due** 43:15 143:20

---

**E**

**e-mail** 32:8 33:13
40:9 41:3,7,14,15,22
42:4,5,8 43:17,23,25
44:1,2,4,5,8 46:7,16,
19,20,24 47:8,14
49:12,19 51:8,15,17,
21 52:4 53:4,12,18,
23,24 54:10,13,17
55:6 56:10,16,20,23
57:19 58:8 60:5,12,
16,17,22,25 61:3
62:7 63:23 65:3,8,17
66:8,12,17,18 67:2,
13,17 68:20 69:6,18,
20,22 70:2 106:16
108:15,16,23 109:1,
7,8,14,21 111:24
113:21 114:22
120:14,23 121:13
127:21 128:9,17,25
138:23 139:1,4,6,10
149:7 153:25

**e-mailed** 43:10 139:2

**e-mails** 32:8 36:10
37:6,13 40:5,6,16
41:12,25 42:12 43:4,
9,13 44:15,21 45:3,4,
7,8,20,21,24 46:3,4,
10,13,15 49:11
50:13,17 51:2,4,5,7,
20 52:1,3,19 53:1,4,
10 54:3,8,12,14
60:20,21 61:3,7 64:9,
13,21 65:2,7,10,14
66:5,7,12 67:8,19
68:3 69:17 70:7,9,11,
12,21 105:16 106:5
108:9,12,20,22
113:18 114:9,21
115:2,17 116:6
120:8,16 121:16,19,
22 122:7 127:23
128:10,15 138:20
147:21 152:14

**earlier** 9:22 49:23
107:12 128:16

---

**effect** 10:9 143:23

**ego** 25:1,14,17

**elbow** 6:2

**electronic** 30:7,14,
21,24 31:7,18 32:3
36:1 37:5 38:22,23
39:23 40:4 45:21
46:2,8 65:16 68:4,7,
15,22 69:12 70:3,8,
20 71:16 72:22
73:10,17 105:5,6,10
121:23 150:24
152:14 155:8

**electronically** 38:22
40:10 46:11 72:25
73:2 105:21 106:15
128:3 151:15 153:23

**else's** 41:16 64:12

**empty** 94:16

**en** 152:4

**end** 35:18 37:14 38:2
88:20 91:25 134:4

**endeavor** 153:22
154:6,7

**enlighten** 58:13

**ensure** 110:13

**entire** 69:21 71:15

**entirety** 114:22

**entities** 10:23 13:1
23:25 30:20 62:5

**entitled** 8:11 63:1
82:3

**entity** 119:12 142:22

**Entourage** 43:1

**envelope** 74:16 75:21

**equal** 14:6,9,12

**equally** 90:25

**equipment** 110:16
113:21 114:1,2,3,8
115:9,10,13,14,21,25
116:9 150:25

---

**estimate** 8:12 18:18
36:15,17 45:18,19
51:20,22 52:7 90:14
91:19 92:13 123:12
134:1 135:20 149:20,
25 150:1,3 151:10

**estimates** 92:3

**evaluate** 50:14

**evening** 9:23

**everything's** 32:15

**exact** 25:7 89:18
93:14 121:8,9 149:18

**exam** 6:16

**examination** 5:8,14
6:10,12 9:19 14:23
48:5,21 49:14,17
55:18 58:20 61:10,23
62:1 64:16 67:23
82:7 83:10 89:4
100:6,13,18 102:4
103:12 104:9 130:5,
10 153:1

**examinations** 58:25

**examine** 49:25

**examined** 5:5

**exceed** 48:22

**exceeding** 65:22

**exceeds** 48:4,20
49:13 55:17 58:19,25
59:6,16 61:9 62:9
64:14,15 67:22 99:24
100:5,12,18 103:11
104:8 130:4,9

**Excellent** 50:5

**excuse** 63:11

**exhibit** 12:21 13:7
76:11,13 138:12

**exhibits** 138:19

**exist** 58:24 135:11
143:22,23

**existed** 93:16

existence 58:20
114:23 144:1

exists 151:22

expanded 30:18,22

expect 146:4

expecting 86:7

expedited 153:14

expense 103:24

expenses 135:5
143:3

expensive 118:22

expert 123:18

experts 124:10

explain 34:14 50:12
51:5 95:11

explanation 49:8

explore 49:6

extent 12:25 16:20
28:3,15 30:13 32:25
37:9 41:1,23 45:4
61:11,24 64:14 76:19
83:11 84:11 105:8
121:17 122:9 129:13
132:10

Eyeball 51:15

---

**F**

facility 18:10,13

fact 39:21 55:1 88:4,
18 120:25 147:3
148:11,18 151:4

fail 28:2,15

fair 12:14 17:20 134:1
147:25

fairly 112:15

fall 135:23

familiar 76:16 81:16
96:3 138:17,18

farmed 98:9

fashion 110:24 129:5,
9,11

February 26:1

feel 24:20 48:8 86:2
89:6 150:9

feels 153:19

fellow's 119:13

felt 29:16 31:19 43:13

fight 93:16

fighting 89:23 90:9

figure 44:12 75:20
88:6

file 27:11,14,17
30:14,21,24 33:13
34:18 38:2,3 39:21
50:13 51:21 61:3
71:17 96:3,6,10,12,
17,20,21,25 97:5,7
105:23 138:10 144:5
146:1,6,10 151:20

file's 31:18

filed 74:4 81:10,14
82:18,20 83:2,5 84:1,
3,4,10,11,13,20
86:14,15,16 87:18
88:12,16,19,20
90:11,12,15,18 93:17
126:16

files 21:23 27:22
28:8,23 29:4,8 30:7
31:7,22 32:3,21 33:8,
12,14,15 34:4,10
37:4 38:22 50:21,22
52:1 53:8,18,22 54:1,
2,5,13,16 60:22 65:2,
8,16 66:8 67:17 68:8,
16,18,22 69:12 70:3,
8 72:23 73:3,5,17,24
74:5,11 89:24 93:23,
25 94:7,15,17 95:8,
21,22 105:5,6,10,19
106:6 121:24 129:13
138:23 151:9 152:14

filing 37:24 82:23
83:9,12,13 88:23

123:25

filings 116:15 117:3,
13 138:15

final 31:10 135:15

finally 89:24 93:15

finances 72:18,23
115:19 136:15 137:5,
6,11 139:7 143:13,17

financial 15:21 71:20,
23 72:11 122:14
134:23 136:7,9,25
137:10,22

find 12:21 17:2 22:21
24:4,5 28:17 31:25
32:1 33:3 39:12,13
40:25 48:23 49:5
69:24 85:23

finding 43:18

fine 5:21 8:16 9:3
48:19 55:10 87:21
155:6

finish 8:3,4 91:4

firm 7:11 14:13 24:23
87:18 88:24,25 91:1
118:1,8,25 119:4,9,
11 126:10,24,25
127:1,3

fit 50:6

flip 36:18 39:2

floor 19:13,15 27:12,
13

Florida 5:17 18:1
22:13 58:23 90:3
91:12,16,25 92:15
97:25 98:6,19,20,22
99:9,11,25 103:22,23
104:3,15 150:23
151:1,9,14

focused 92:2

folder 34:18 66:12

folders 27:11,15,17
66:12 70:20

folks 5:23

follow 59:20 66:2
100:22,25 101:9
102:16 103:2,16
104:13 130:13

follow-up 152:19

forget 53:24 124:3

form 46:2,8,9 50:4

format 37:19 40:5,7

forward 25:20 43:8
68:20 116:14

forwarded 146:22
147:1

fought 93:14

found 53:14 97:8

foundation 25:16

frame 6:6 25:21 29:12
115:12 121:10
154:16

Francisco 16:6
118:12,24 125:21
127:9

frankly 149:12

free 48:8

front 77:17 79:11

frozen 140:7

full 11:17 23:3 24:12
33:3 75:23 127:3
144:5

fully 132:12

function 38:10

Funding 47:16,17,18,
21,22 48:2,14,17,25
49:2,5,9,19 50:20,21
51:1,7,21 52:4,19
53:4,10,18,21 54:1,5,
10,18 56:11,19 58:14
59:3,14,22,23 60:6,
19,22 61:3,8,19 62:6,
7,8,17,18,25 63:13,
14,21,23 64:10 65:3,

15,16 66:5,7,16,18
67:4,13,20 108:21
114:4,12 115:13,21
116:10 125:4,6,14,20
130:7,8,17 131:1
132:22

**Funding's** 49:12
51:10 56:21,24 57:20
58:8 59:12 60:13
61:17 129:23 130:1
131:18,22

**funds** 132:23

**furniture** 23:25

---

**G**

**G-mail** 42:13

**G.P.** 31:19 40:1

**G.T.** 118:1,4 119:16,
20,24 122:5,7

**game** 43:11 147:25

**garage** 18:24 102:9

**garbled** 26:22

**Gary** 146:17 148:23
149:6

**gathered** 80:3

**gave** 7:17 38:18
97:23

**geez** 7:5 41:4 135:14

**general** 11:16 17:21
27:20,21,24 28:7
29:5 34:12 43:12
48:25 58:21 96:16
107:4 115:8 116:2
121:2 130:21 131:10,
13 132:25

**generally** 14:6 47:14
71:9,11 97:1 106:13
116:21

**generated** 39:15

**give** 6:22 8:12 9:12,
18,25 10:14 15:2
18:18 34:7 39:3,10

51:22 71:1 85:14
86:10,17 87:6 88:14
90:19 92:4 93:13,17,
19 96:19 123:12
134:3 149:8

**giving** 48:7 150:9

**go-round** 61:23

**God** 123:17

**good** 18:22 91:23
92:6 96:19 127:13
152:23

**Gordon** 147:16

**great** 7:25 23:23
78:15 100:24 103:24

**greater** 14:16,18

**Grove** 51:11 54:19
57:1

**grown** 30:14

**guarantee** 154:8

**guess** 6:23 11:14
18:23 19:20 22:3,4
25:7 26:4 28:2,20
32:7 33:15 34:3,8
36:16 39:9 40:11,13,
14 41:4 44:16 70:13,
22 81:24 91:23
105:12 135:14

**guesses** 8:9,10 25:8
92:4

**guesstimate** 90:18

**guy** 52:23 109:4

**guys** 24:25 82:2
131:6

---

**H**

**H-i-l-l** 126:21

**half** 33:3 55:2 107:1,
11 110:7 144:6

**hall** 36:22

**halls** 19:11

**hallway** 19:10

**handful** 52:21 53:13

**handle** 123:16

**handled** 129:23

**handles** 42:12

**handling** 153:13

**hands** 92:4 109:23

**hang** 16:19 19:11

**happen** 32:8 144:18,
24

**happened** 73:10 92:5
107:18,22 110:11
112:20 136:11

**happy** 83:23 92:7
149:8

**harassing** 91:5
102:23 104:2,9

**hard** 34:3 36:2,4
71:18 72:11,13,15
99:10 105:7,13,15
120:8 152:16 155:7

**hard-and-fast** 38:12

**hard-copy** 35:23
50:22 72:9

**hardware** 31:17
42:24

**hate** 88:16,17

**hazard** 34:3

**headquarter's** 118:9

**hear** 6:5 8:21,22 9:1,3
56:7 93:4 140:6,8,9,
13,15,19 141:1
152:22

**heard** 38:19

**heck** 24:2

**held** 27:18 153:10

**hell** 90:11

**helpful** 49:8 76:19

**HEREOF** 155:14

**high** 36:6

**highly** 80:19

**Hill** 126:19,21

**historically** 72:2

**history** 61:17

**hit** 38:1 40:9

**hold** 20:20,23 21:10,
11,13 28:5 61:18
78:12 115:12 133:18

**holder** 62:18 134:8

**holding** 73:16 76:18,
21

**holds** 138:6

**home** 29:18 151:1,4,
9,14

**honest** 146:20

**hope** 83:19 86:18
111:12

**host** 12:8 148:22

**hour** 55:2

**hours** 16:5 86:7

**house** 75:10,11 90:22
99:2,4,5,8,13,20,22
100:4,14,20 101:1,
11,25 102:8,13,19
103:5,7,10,19,24
104:6,19 152:4

**houses** 17:23

**How's** 19:3

**Howard** 95:5 117:19
123:4,9,13,16,21
124:8,11,13 126:6
127:16,20 128:9,20,
23,25 129:4,10,13
132:18 133:2 145:17
149:23 150:13

**huge** 44:24

**human** 87:6

**hundred** 18:19,21
21:7,8 34:5 52:12

70:14,23 90:9

**hundreds** 51:24 52:4, 6,8

**hypothetical** 25:15

---

**I**

---

**I.T.** 32:10 37:17 105:14

**icloud** 111:8 113:4,5, 6,9,11

**idea** 11:8 28:25 44:23 94:14 138:4,7,8 139:15

**identification** 76:14

**identified** 50:22 79:13

**identify** 79:16 119:3

**identifying** 75:24 76:7 80:13

**II** 10:22 11:1 82:7

**III** 126:19,21,22

**imac** 106:23,24 107:10,13,19 108:2, 8,9,14,21 109:14,17

**imagine** 45:1

**immediately** 152:20

**importance** 30:3

**important** 8:1 87:4 140:3

**inaccurate** 37:21 133:2,15

**inch** 36:6

**inclined** 50:1

**include** 124:20 134:22 146:9

**included** 12:3

**includes** 48:25 58:22 70:2,3 109:14

**Incomplete** 25:15

**incorrect** 57:4,7,11 83:15 84:9,22

**incredible** 45:1

**independent** 78:1

**index** 153:5

**indicating** 148:10

**indicator** 29:25

**individual** 15:20 38:5 118:13 119:23 142:22

**individually** 6:20 38:8

**individuals** 62:6 119:24

**Indulge** 23:18

**Info@family** 47:12

**information** 11:9 82:22 87:22 89:6 90:25 110:14 111:21 113:3,12 116:8 117:8 120:9,13,23 121:12, 20 122:13 136:7,9, 12,14,25 137:4,17 148:11 150:6

**informed** 94:25 95:4

**Injection** 124:19,21, 22 133:8,11,12 134:18,25 135:3,8 136:15 137:1,11,16 138:6,21 142:23

**Injection's** 133:13 134:9,10,22 137:4

**Injections** 135:21

**inquiry** 49:16

**inside** 19:7,8

**instances** 124:14

**instruct** 59:8,18 61:13,22 62:11 64:17 100:16 101:7,21 102:2,25 103:13 104:10 130:11

**instructed** 65:20,24

67:24

**instructing** 100:9

**instruction** 59:20,25 61:21 62:20 63:3,16 64:23 66:3 100:23 101:9 102:10,16 103:2,16 104:13 130:13

**instructions** 25:9 65:4

**insufficient** 154:14

**intended** 56:13

**interest** 61:18 62:18 71:10,13 97:8 124:21 126:1 132:1,11,13 133:8,25 134:9

**interested** 49:4 133:12

**interesting** 131:6

**interests** 62:6

**intermediate** 106:17

**interpose** 48:20

**interrupting** 28:6

**interruption** 60:9

**invade** 147:5,7,8,9 148:2

**investors** 54:10 63:13,21

**involved** 13:3 20:14 22:19 43:16 47:23 48:2,14,17 49:2,5,9 63:12 110:23 117:2 124:7 139:25 143:2, 13,16

**involvement** 111:1 121:6

**involving** 66:5

**IOS** 113:5

**ipad** 108:6 109:19 111:23 112:2,7,16,17 113:3

**iphone** 108:6 109:19, 20 110:3,4,9 152:18

**irrelevance** 86:12

**irrelevant** 84:13 85:1, 12,25 86:23

**issue** 57:14 141:1

**items** 12:21

---

**J**

---

**J-u-d-s-o-n** 5:13

**Jan** 41:5,16 121:1

**Janice** 13:12

**Jeff** 78:15 83:19 147:5 148:17 155:1

**Jerry** 119:25 122:9

**Jim** 124:3 126:16 145:16 146:16 148:23

**Jjudson@burlcap. com.** 46:17

**job** 7:25 40:2 45:15 82:21

**John** 95:5 117:19 123:3,8,16 126:6 145:17

**Jr** 5:4,13 82:4

**Jr.'s** 82:5

**judge** 7:16,22 9:11 44:10 50:7 63:6 89:24 101:16 102:23

**Judson** 5:4,13,16,21 6:9 8:24 10:19 12:12, 17 13:13,16,23 14:5 22:19 23:8 25:10 27:3 35:8 38:13 41:21 48:7 49:14 50:1,12 55:10,14,18, 24 59:10 60:2,11 61:15 64:6,13 65:13 66:2 76:16 82:4 83:1, 4,11 84:2,4,7,16 85:20 87:25 88:11

89:5,13 90:4 91:3,7,
24 93:1 99:22 100:23
101:19 102:17
104:23 105:2 114:6,
10 121:14 140:10
141:1,16 147:15
149:16 152:7,12
153:3,18,21

**Judson's** 89:3,9
154:4

**judson-family.com.**
47:12

**Judsons** 87:20 89:1

**July** 25:24

---

**K**

**K-e-l-l-y** 118:5

**Katrina** 125:10

**KC** 47:16,17,18,21,22
48:1,14,17,24 49:2,5,
9,12,19 50:20,21
51:1,7,10,21 52:3,19
53:4,10,18,21,25
54:5,10,18 56:11,18,
21,24 57:19 58:8,14
59:3,12,14,22,23
60:6,13,19,22 61:3,8,
17,19 62:6,7,8,17,18,
25 63:13,14,21,22
64:10 65:3,15,16
66:5,6,16,17 67:3,13,
20 108:21 114:4,12
115:13,21 116:10
125:3,6,13,20 129:23
130:1,7,8,17 131:1,
18,22 132:22

**KC4US** 50:13 56:20
67:11

**KC4US.COM** 56:19

**keeping** 27:20 29:15
30:4 39:18 115:18,19

**Kelly** 118:1,4,5
119:16,20,24,25
122:6,7

**Kennedy** 148:23

**keys** 20:6

**Kid** 126:1

**kids** 47:19 48:14
49:10 125:3,6,13,19,
25 126:2,3 129:18

**kids'** 22:11 24:2,20

**kind** 14:12 20:23
28:21 41:18,19 69:6
71:4 134:15

**kinds** 25:8

**Kinko's** 29:19

**knew** 24:23 42:1
144:7

**knowledge** 10:5
11:17 15:11

**Knowledgeable** 15:6

**Kyle** 119:13

---

**L**

**L.P.** 10:22 11:1 82:7

**label** 78:18,21 79:1,3,
21

**labeled** 75:22

**labels** 78:7,9,11 79:6,
10,14,18 80:17

**laborious** 40:22

**Lacks** 25:15

**laptop** 105:7 106:22
108:7,11,14 109:15,
17

**laptops** 114:15

**large** 101:11

**largely** 124:13

**largest** 118:8

**late** 135:23

**Latham** 50:7 63:6
101:16 102:23

**latitude** 48:7

**law** 87:18 88:24,25
91:1 126:10,23,24,25
127:1

**lawsuit** 20:14 81:11,
14 82:18,19 83:9,14
84:10,13 86:13
87:10,15,19 88:12,
19,20,24 89:15,20
90:11,15,18 93:17
123:22 124:7 126:9,
13 143:21

**lawyer** 9:20 90:22
147:10

**lawyers** 123:19
126:13 129:21
143:20

**leave** 99:7 154:17

**led** 95:1

**ledgers** 71:24

**left** 19:12 31:8 56:9
141:10

**leg** 16:9

**legal** 18:8 123:15

**letters** 113:22

**level** 85:14

**liabilities** 135:1 137:6

**life** 52:24

**light** 29:9,10 37:9

**limited** 33:2 142:6

**limiting** 68:14

**lines** 93:12 110:7
147:11 148:3

**list** 13:7 38:10 40:16
79:10 117:1

**Listen** 88:8

**literally** 51:14

**litigation** 7:11 43:16
44:5

**live** 90:3 98:20 99:11,
25 100:3,4 104:3

**lives** 100:14

**LLC** 115:8 130:23,25

**loan** 30:1 37:8,10
138:11 139:8 143:25

**loans** 143:15

**local** 117:25

**locate** 146:4

**located** 5:15 17:22,25
18:11 19:14 45:3
54:14 65:2,7,16 75:9
105:6,8,20 118:7,11
119:6,21 121:16
127:7,23 137:2 144:2
145:24 150:23,24

**location** 58:20 61:10
151:13

**locations** 151:19,22

**lock** 20:7

**locker** 11:14,15
12:19,23 13:5,22
22:17 23:1,6,24 24:7
25:20 26:15,17,20
27:3,5,10,19 28:4,7
31:5,21 32:2 35:4
36:21,24 39:22 51:14
72:24 73:8,9,12,14,
19 74:14 75:12
77:14,19,23 78:1
119:7 121:18 137:3
150:14 152:3,4

**lockers** 24:9

**log-in** 41:17

**logical** 75:18

**long** 21:22 40:21
51:18 88:13 89:20,22
90:1,12,14 91:14
106:24 107:14
109:20 110:5 112:2,
9,13,22,25 116:18

**longer** 59:3,4,14 74:2

**looked** 19:20 51:8,14
60:25 96:18

loose 27:11,13,23 29:3 32:22 33:9,11, 14,16 34:7

lose 6:5 13:21 71:19

lost 13:18 34:17,21 40:3,23 46:8 69:22 71:18 92:19 113:3 115:23 139:22 140:21

lot 17:12 36:11 43:21 51:22,23 52:9,12,18 53:1 70:25 89:22 90:9 118:15 139:9

loudly 8:22

**M**

Mac 43:1,2

machine 106:19 107:14,18

machines 113:24 115:5

Mack 121:4

made 44:6 62:6 63:22 138:14 139:8 143:15 146:1 150:13

mail 42:15,22,25 43:3 45:4

maintain 28:8 74:11 122:19

maintained 13:17 48:6 71:20 128:20,25 151:15 154:10

maintaining 11:4 71:22

maintenance 13:24

majority 16:9 24:15 31:9 45:10 136:24

make 8:1,6,8,9,20,22 10:6 12:11 13:15 14:3 23:23 25:8 26:4, 23 29:13,22 32:16 36:6 40:2,19,22 47:2,

4 50:22 53:17 71:14, 17 88:22 94:20 95:9, 10 104:16 113:2 120:8 131:21 153:18 154:13

making 13:21 14:7 29:7 34:17 47:7 82:21 129:22

management 134:13

March 81:19,20,21

marked 76:13

Mateo 104:24

materials 68:3 80:3 128:9 132:7 137:25

math 14:10 52:23

Matkins 7:20 15:25 16:2,11,15 17:5,16, 19 20:11,14 21:11, 15,18 24:13,16,22 25:5,11,24 26:18,25 27:5,7,10 36:11,25 42:1 44:6 76:5 79:19 80:2,9,18,23 81:3,10, 13 82:15 83:9,10 87:9,11,17 88:7 89:23 90:20 91:9,15 92:14 93:23,25 94:5, 12,22,24 95:2,8,19, 23,24 96:10,13 97:23 98:19 117:19 123:17, 22 124:8,18 125:14, 18 129:6,11 143:21 153:3

Matkins' 17:10 25:14 87:12 89:21 126:6

Matkins-burlingame 89:15

matter 7:21 109:2,8

means 17:9 65:22

meant 144:22

medications 9:23 10:4,8

medium 73:16

meet 153:22

meeting 133:22 137:21

meetings 116:16 136:8 137:24 138:14

member 135:25 136:6,10 138:22

Memorandum 82:8

memory 10:9 88:15

mentioned 68:2 105:4 111:23 115:25 118:23 122:5 123:3

mess 32:13

metal 96:2,6,10,12, 17,20,21,25 97:11, 13,17,21

mind 86:22

minds 22:2

mine 41:5

minus 6:23

minute 92:6

minutes 8:24 116:16 117:4 142:2

misfiled 53:2,7,14,22

misled 52:17

missed 47:6

misspoke 20:25

misstated 86:12

Misstates 74:19 86:5 139:18,20

mistake 46:25

moment 30:25

Monday 154:1,3,6,8

money 89:22 99:8 143:20 144:10 149:16,22

month 34:25 70:10, 18 81:22 82:11

monthly 18:13

months 35:1,6,7 51:18 61:6 69:9,11 81:5,12 90:10,17 91:18,22 93:14,15 112:23 121:24 143:14

moon 38:6

Moore 43:10

morning 85:3

Moss 117:24 118:7, 13,17,20,24

motion 82:2

move 6:6 95:22 149:3 154:7

moved 21:3 53:7 54:1 72:6,7 79:21 94:7,13 115:13

moving 22:20 79:2

multiple 24:11

Munter 89:24

Munter's 7:17,22

mystical 75:20

**N**

named 38:24,25

names 39:4 118:16 119:8 127:6

nature 58:21 61:10 71:12

nearest 74:15

nec- 144:16

necessarily 85:22 139:11

needed 29:16 30:4 31:25 37:3 142:20

nefarious 34:22

negotiation 126:10

neighborhood

133:24 134:3,7,8

**night** 10:3

**Nobody's** 149:14

**nodded** 29:10 30:13
150:15

**non-burlingame**
23:21 24:6

**non-burlingame-
related** 23:5

**nonsense** 88:5

**noon** 154:1,5,6,7,8

**note** 55:13 71:10

**nothing's** 34:20
69:22

**notified** 122:23

**notifying** 152:10

**November** 82:15,17,
20 83:5 84:5,20
86:14 87:11,13 88:10
89:14

**number** 17:18 36:12
39:9,16 49:20 52:3,
12,13,15 79:14,17
81:1 87:1 98:16
134:5 149:18 150:10

**numbers** 8:13 52:24
53:17

**numeral** 126:22

---

**O**

**oath** 5:5 9:9,10,17
32:17 86:18

**object** 49:13 58:19
86:8 87:17 90:24
101:13

**objected** 65:22

**objection** 16:17,20
48:20 50:6 59:6,24
60:7 61:20 62:19
63:15 64:22 66:20
91:4 101:3 102:11

**objections** 50:3,6
63:4 64:3 65:5 86:24

**obligations** 9:18
124:21

**obtained** 58:22
104:16

**obvious** 143:23

**occasion** 76:2

**occupied** 99:14

**occupy** 99:22 134:12

**occurred** 94:1

**October** 26:2

**offer** 49:23

**office** 5:18,24 29:19
98:22 99:3 118:10
119:20 127:7 151:7
154:10

**office's** 16:6

**offices** 16:8 17:10
72:6

**official** 117:3

**open** 37:23 41:13

**opened** 22:21 60:24

**opens** 18:25

**operate** 115:2

**operated** 114:19

**operates** 47:21

**operating** 72:17
134:16 135:4

**operation** 126:2
138:14 143:14

**operations** 22:25
135:21 144:15,19

**opposed** 10:15 39:15
42:3

**Opposition** 82:5

**order** 15:1,4 32:7,16
33:17 82:5 88:22
94:20 95:14

**ordered** 14:24

**organization** 28:1
116:15 117:4,16

**organized** 14:7 28:1
30:8 32:5

**organizing** 14:17
106:19

**original** 153:16
154:9,12,13,14 155:5

**originally** 21:13

**outlier** 47:1

**Outlook** 42:13,17,19
43:1,2

**outpost** 49:2

**overbroad** 55:17
85:13 86:6 87:23
129:8

**overflow** 21:14

**owned** 18:2 58:15
114:14,25 115:5,8,
10,14,21 116:1,9
133:25

**owner** 18:9 59:3,4
133:11,17 136:11
143:1,12

**ownership** 40:1
124:21 142:23

**owns** 59:14 114:2

---

**P**

**p.m.** 155:9

**pages** 33:23

**paid** 132:12 145:3,11,
14,17 149:16,23

**paper** 21:1 28:23
29:8,9,10,15 33:11,
14,16 34:7 37:9,13
46:2,9

**paper-based** 28:13

**paper-light** 28:16

**paperless** 28:14 29:8

**Paragraph** 82:14

**Pardon** 72:10

**parents** 54:6

**parse** 85:16

**part** 11:16 13:1 39:25
58:25 69:13,20 85:5
121:22 127:4,5
137:23 138:15
150:20

**parties** 153:12

**partner** 11:16 115:8
116:2 121:2 130:21
131:10,13

**partners** 10:21 11:1
16:10 82:7

**party** 133:12

**passed** 95:1

**passes** 16:7

**password** 41:18

**past** 10:9 42:16 48:17

**pay** 11:14 99:8
143:20

**paying** 11:14 130:14

**payments** 145:20
146:1,5 148:9,10
150:12

**payroll** 54:6

**PC** 42:17

**PDF** 37:18 38:2

**PDFS** 37:15

**penalty** 9:9 83:20
85:8,9,21 155:13

**people** 38:14 41:12
117:1 118:15,16
119:8 120:22

**percent** 17:10 34:5,6
36:3 45:15,21,24
46:10,13,14 50:19
52:19,22 133:20,24

134:1,4,7,9 136:11
143:1,12

**percentage** 34:8
35:19 46:3,4 94:11,
14 133:18

**percentage-wise**
44:22

**perfect** 33:1

**period** 118:23 122:20

**periodic** 110:17

**perjury** 9:10 83:20
85:8,9,22 155:13

**Pernicka** 5:9 6:13
8:23 12:2,6,10,16
14:14 16:22 26:7
45:13 48:10,12,22
49:7,22 50:8,9,11
55:2,4,13,20,22 57:6,
10,16,22,25 58:5
59:2,9,19 60:1,10
61:14 62:2,13,21
63:8,17 64:8,18,24
65:6,11 66:1 67:1,9,
16 68:1 69:1,7 74:20
75:3 76:6,15 78:15
79:5 82:25 83:3,18,
23 84:2,4,6 85:14,19
86:20 87:7,18,24
88:3,9 89:2,9,12
90:25 91:10 92:11,
18,23 93:10,21 99:21
100:1,8,9,21 101:8,
18,24 102:5,13,15,23
103:1,15 104:4,12
105:1 107:8 124:5
125:11 129:12 130:6,
12 139:21 140:13,15,
18,20,24 141:11,14,
15 147:12,19 148:5,
17,24 149:2,6,10,15
152:23 153:2,8,11
154:3,9,21 155:7

**Pernicka's** 91:1

**person** 11:4,20 15:6,
10 34:10 93:22
130:24 131:12,16
134:17 146:14,20

**personal** 19:21 23:24
51:11 106:3 108:2

**personally** 15:5,8
19:18,19 114:6,10
115:22 116:11

**phone** 38:18 110:18
111:4

**phones** 115:1

**photographs** 78:13

**photos** 76:10,17,23
77:5,9,13,16,19 78:2,
3,5,24 79:11 96:1
97:11

**pick** 56:9

**picked** 75:5

**pickup** 27:14

**picture** 18:21 32:23
140:7

**pictures** 24:15 33:6

**piles** 27:23 32:22

**pin** 83:18 84:16

**pink** 78:7,9,11,18,20
79:1,3,6,18,21 80:12,
16

**place** 31:15 35:5 72:5
75:18 106:18

**places** 31:24 72:3

**play** 137:5

**playing** 27:14

**point** 11:6 12:12 16:6,
7 23:21 29:7 32:11
42:21 43:3 58:14
68:21 95:17 140:3

**pointing** 84:18

**Points** 82:8

**portion** 95:7

**posed** 87:5

**positions** 134:13

**possess** 13:16

**possess-** 150:16

**possesses** 11:11

**possession** 12:1
50:25 91:8 150:17
151:16,24 152:3

**possibilities** 67:10

**Possibly** 97:10 147:4

**Post-it** 79:8

**potentially** 43:21
58:25

**practice** 27:20,24
28:8,12 29:5 30:18
34:12 39:6 43:12,15
56:20 129:2 152:20

**practicing** 127:2

**prefer** 49:21 55:10,11

**preparation** 122:12

**prepared** 116:17,21

**preparing** 113:22
117:2 137:9

**present** 5:12 50:2
78:3

**presentation** 122:12

**preserved** 48:6

**pretty** 24:14 91:20
114:25 117:9

**preventing** 13:24

**previous** 57:15,18
112:8,9

**previously** 43:24
86:13 107:12

**primarily** 56:16,19
120:20

**principals** 121:2

**print** 32:6 34:17
36:12 39:17 40:9,16,
17 41:13,15 69:5,19,
21,24 71:14 128:16,
17

**printed** 31:3,9,13

32:4,20 35:24 36:4
37:22 40:6 41:3 45:9,
10,11,23,25 46:3,13
50:18,19 53:9,16
54:2,4,15 64:9,13
67:21 68:4 69:16
128:1,4,14 151:12

**printer** 33:12,20,24

**printing** 31:6 34:9,24
35:12 36:1 37:5
39:19 45:15 68:3,10,
22 69:21 70:1 75:16
105:5 121:23 128:15

**prior** 7:12 43:19
110:23 112:17
115:25 145:9 150:5

**privilege** 44:19 107:5
147:6,8,10,13 148:16

**privileged** 148:17

**problem** 6:5

**procedure** 34:13

**proceed** 5:22

**proceeding** 10:21
81:19

**proceeds** 63:1,13,22
65:15 66:6,16 67:4,
20 126:3 129:19
131:18

**process** 30:8 31:6
40:22 43:3,18 51:5,
18 68:2 69:8 75:16
105:4 106:13 128:2

**produced** 11:24 12:8
36:8 141:22 152:9

**Production** 82:6

**profit/loss** 71:24

**profitability** 143:10

**profits** 135:4 143:3

**program** 42:12,13,22
68:21 69:2,13

**project** 14:10 34:9,24
35:13 122:2

promise 32:15,16

promissory 71:10

proper 50:3,5

properties 66:16

property 31:18 47:24
48:3,15 49:11 54:18
57:1 61:8 64:10 66:7
125:19 129:19

protect 74:11

protected 13:17

protects 71:18

provide 43:17 76:23
87:21 120:4,9 128:8
153:23

provided 16:15,16
17:3,18 21:10,18
76:10 77:1 81:3
83:19 87:9,13 88:7,
13,17,18,19 90:16,20
91:14 92:14 98:19
120:7,14,23 121:13,
20 122:9 128:21
129:4,6 132:15
136:6,10 137:18,19,
20,23,25 141:20,24
145:21 146:7,14,15,
16,17,18,23 147:3,
21,22 148:11 150:6
153:4

providing 129:10
138:12

public 82:24

Pulling 34:7

purchase 154:25

purpose 28:9 71:17
88:21 89:3 123:3

purposes 87:12
123:9 154:11

put 19:5,7 21:20,24
22:5,22 23:4,20
24:15 26:20 27:3
28:22,24 29:2,3 31:4,
9,20 32:18,21,25

33:4,7,8 34:4 35:5
37:2 38:1 50:23
53:14 73:9,25 74:13,
16 75:8,12,18,21,22
79:2,3,14,20 80:3,12,
14 89:25 94:3 96:12
106:10,11,12 129:22
140:20 142:5 143:19

putting 33:13 39:19
47:2 75:7,16 93:23

Python 124:19,21,22,
23,24 133:8,11,12,
13,17,18,25 134:9,
10,18,21,25 135:3,8,
15,21 136:7,11,13,15
137:1,4,11,16,17
138:6,21 139:2,4,8,
24 141:18,23,24
142:6,8,11,13,16,23
143:2,6,9,10,13,15,
16,21 144:1,3,11,13,
23

Python's 134:13
136:1,4 139:7,13,16,
23 140:1 141:17,19,
22 142:12 143:2,13,
14 144:19

---

## Q

question 12:3,15,18
20:16 22:8 24:10
25:23 26:22 38:5
42:2 48:4,8,11,16
50:4 51:3 52:23
54:21 55:6,14,16
56:13 57:9,11,13,15,
18,25 58:3 60:8,14
61:12 62:3,14,22
63:9,18 64:2 65:13,
19,20 67:15 68:12
79:23 86:8 88:2 90:6
91:2 93:11 99:19
100:8,11,19 101:5,20
102:6,14,22 109:5
113:19 114:23,24
115:23 116:18 125:7,
8,9,16 131:21,23
133:15 141:11

143:11 147:18
148:20 149:5,10
152:25

question's 58:18

questions 8:5,18 9:4,
14,17 10:7,15 12:12
22:15 61:24 85:17
87:1,5 105:3 141:13
152:7,21,24 153:7

quick 92:8

Quickbooks 72:21,22
73:5,24 115:19 116:7

quickly 7:24

---

## R

races 110:19

Raiders 43:11

randomly 39:9,15

Ray 5:17

reach 153:12

read 63:25 64:2 79:1
88:1 93:12 125:9
141:13

ready 111:5

real 56:25

rearrange 94:17,18
95:23

rearranged 94:7,16
95:7,11

rearrangement 95:21

reason 10:13 12:6
25:13 30:5 31:12,14
82:25 84:7,21 89:13
96:24 97:4,9 98:18
145:4,12 154:13

reasonable 89:16
154:15

recall 7:5,8,10,14
21:4,6 66:11,13
67:13 77:19 78:10
80:23 81:1,13,18

82:10,13 88:15 91:2,
8,17 92:16 96:6,17
97:13,16 98:4,7
107:15,17 109:25
112:10,11,14,22,24
118:16,19,21 119:8,
13 122:21 123:1
124:25 125:1 127:4,
12 129:10 132:5,6
133:22 134:2 138:2,
24,25 144:7,8,12,20
145:1,2 150:3,8

receive 89:21 113:23

received 16:1 94:24
131:24 136:12
138:21

receiving 17:11
153:15

recess 55:21 92:22
140:23

recollection 7:15
8:11 66:14 77:25
81:6 89:3,10 98:14
127:14 132:9

recollections 10:2,14

reconnected 92:25

record 5:11 50:1
55:13,15,20,23,24
58:6 82:24 88:23
92:18,21,24 140:20,
22 152:10 153:8,10,
11 154:22

records 11:5,22 12:4,
8 15:11,13,14,16,17,
19,21,22,23,25 16:4
22:23 26:8,14,24,25
27:10,21,24 30:9,17,
23 31:12 36:1 37:5
48:25 49:1,6 63:5
68:3,8,22 70:2,19
71:20,23 72:12 73:4
75:25 89:21 94:11
103:4,9,18 104:15
105:20 106:2,4,20
114:11 119:3,6 120:4
122:14,19,25 129:6
133:13 134:10,22,23,

25 135:3,9,11 136:4 139:23 145:19,23 146:11,23 147:1 150:23,24 151:23

red 38:20

reduced 44:4

Redwood 119:22

Rees 147:16

refer 13:2 56:25

reference 78:8 129:23 146:13

referring 13:9 15:13 19:24 22:14,18 58:12 96:3 105:10 114:5,16 133:1 145:7,8

reflect 92:18

reflecting 148:10

refresher 17:13

refused 55:14

regard 13:20

registered 99:1

regular 110:17

relate 44:15 49:17 71:6 138:6

related 22:6 23:3 28:4,6 43:13 48:24 51:6,13 54:19 58:15 59:4 68:10,13,15 103:18 116:14 122:25 129:1,5,18 130:16,20 131:1,17 132:3 134:23,25 135:3 136:7,14 137:1,4 145:19 146:1,5 151:8 152:14

relates 30:16,17 47:3 86:16 132:23

relating 54:3 61:10

relation 62:16 113:23 132:18,21

relevance 87:1

relevant 85:22 86:1,3, 15 87:3 99:18

relied 137:17

rely 137:15

remaining 53:9

remember 6:15 22:1 27:18 80:24 98:11 126:11 127:3 138:3 142:14 144:16

remind 9:8

removable 105:7

renewal 117:9,15

rent 18:13 20:23 23:9, 10,15,18 25:4

rental 19:16

rented 18:3,4,5 20:8, 10,13,18,21 21:2,9, 10,11,13,17,21 22:6, 10 23:4,14 25:12,25 26:2,10,17,20,25 27:2,5 101:2

renting 19:17

repaid 143:16

repeat 48:11

repeatedly 49:15

reporter 5:20 6:1 9:9 63:25 88:1 154:24

represent 77:22

represent- 132:14

representative 6:20 134:18 135:7 136:1 138:22

representatives 134:12

represented 125:12, 15,24 127:8 132:17, 20 133:4

representing 16:12 17:17 20:11 25:5,11, 24 125:18 127:11

reproduced 39:22

request 12:21 49:23 58:22 120:12 141:19 154:15

requested 142:17,19

requests 138:12,19

require 9:12

required 15:1,2,5 20:6 137:12,14 154:12

Requiring 82:6

respon- 74:9

respond 55:14 61:13, 15 64:19,25 65:13 101:20 102:6

responded 12:17 49:14 60:8

responses 9:12,13, 18 10:1,6,15

responsibility 13:24 14:6,16,18

responsible 11:4,18 93:22

responsive 10:17 12:21 13:6 58:21 79:22 85:17 138:12, 19

rest 127:25

restructuring 126:12

result 31:19 53:9,25

resume 141:10

retain 69:20 136:14, 23

retained 40:24 50:17 136:13 137:1

return 122:12,13

returns 72:14

revenue 135:4

review 17:13 89:18 129:18 131:16,22

132:2,7 153:18

reviewed 16:14,24 17:1,4,6,7,8,17 60:19,21,23 97:3 130:19,25 131:4,10 132:12

reviewing 14:6,16 17:16 130:15

revisions 153:24

rid 44:7

ridiculous 101:17 102:21

rights 124:22

rjudson@burlcap 42:9 47:9

rjudson@kc4us.com 47:15

Rjudson@kc4us. com. 47:10

road 39:12 43:21

Robert 5:4,12 82:4

role 137:5 138:22

roll 86:7

rolls 86:6

Roman 126:22

room 5:18,24 16:6 36:24 37:2 38:14,17 55:25 93:6 141:6 144:5

roughly 44:14 80:1

route 152:4

Rudolph 146:17,19 147:3,23 148:7,12,23 149:6

rule 38:12

rules 7:25

run 7:24 33:23 72:17 137:7

running 143:19

runs 129:2

rush 38:9

---

**S**

S-i-m-m-a 135:19

sale 54:18 55:7 56:24,25 57:1,19 58:8,11 59:4,12 60:5, 13,17 61:8 62:8,16, 25 63:2,14,22 65:15 66:6 67:3,5,20 124:23 126:2 129:18, 20 130:8,16,20 131:1,25 132:1,3,22

San 5:1 16:5 104:24 118:12,24 125:20 127:9

sat 6:9

save 37:20

saved 44:1 51:21 72:23,25 73:1 110:14

scan 29:17,25 30:2,5 37:10,14 38:2,9 39:3

scanned 29:23 30:23 37:25 39:7 40:8 71:7, 15 105:20 106:6,10, 11

scanner 29:18,20

scanning 30:9,18

school 47:20,21,23 48:2,3,15 49:10 54:19 58:15 59:4

scope 48:4,21,22 49:14,16 55:17 58:19 59:1,7,17 61:9 62:10 64:15 65:23 67:23 100:5,12,18 101:17 102:4 103:11 104:8 130:4,9

scored 40:10

search 50:12

searched 50:20 51:5

searching 47:4

Seattle 118:9

Secretary 116:15 117:3

security 71:10,13

segregating 25:13

selection 75:4

send 53:23,24 109:7, 8 120:8

sending 148:18,22 152:19

sends 108:25

sense 8:6 17:22 27:21 48:25 94:20 95:9,10 96:16

separate 24:21,24 25:2 37:24 67:13

separated 27:22

separately 37:23

server 40:9,12,13,14 105:16

serves 40:13

service 98:5 105:23

set 24:8 30:1

share 14:18

shed 144:6

sheer 43:16

sheets 80:12 137:9

ship 90:2 99:8

shipped 88:25 103:22,23

shipper 98:8

shippers 98:12

shipping 81:2 98:5

short 90:1

shortly 31:4

show 15:2,5,7,8 78:5 97:11

shrunk 43:22,25

side 78:9 80:17

sides 78:7

sign 113:8,11 153:18

signature 142:1 153:20,25

signed 85:9,21

significance 43:14

signing 81:18 82:10, 13

similar 6:14 45:19 129:5,9

Simma 135:17

simple 55:5 102:13 117:9 148:25

single 16:24 17:7 33:22 51:8,15 53:12 60:25

sir 5:10 62:14 63:9,18

sit 11:11 36:22 39:15 52:1 54:4 60:18 65:18 67:15 73:23 77:20 86:11 89:17 90:8 91:17 98:8 118:18 121:8 122:11 123:7 133:19 138:24 149:18 150:8

sitting 5:18 9:11 14:15 66:14 71:21 84:8,21 109:25 134:2 137:20 138:4 151:7

sky 105:16

slightly 38:13 81:21

small 20:20

Smart 18:8

software 31:17

sold 59:23

sole 133:11,12,17 143:1

soliloquies 49:24

sort 28:1 32:12 39:10 42:12 71:25 73:14,16 75:19 78:25 96:16 97:19 103:5,10 106:19 107:9 112:6 117:4 123:15 131:16 148:8

sorts 21:11,20 22:23 37:4 70:3,8,19 71:2,8 97:16 115:18 116:16

sound 81:16 87:13

south 82:17

space 29:2 33:3,5,6 36:20 37:3 101:25 144:4

span 93:19

speak 6:4 55:18 58:11

speaking 8:21 71:11 76:17 80:7

speaks 82:24

specific 28:19 32:21 108:15 118:13 122:21

specifically 71:12 122:22 146:15 152:10

speculating 20:12

speculation 16:21 25:16 86:6

spell 5:10 118:3 126:20 135:18

spend 104:5

spent 16:5 89:22 90:8

spread 95:15

Springwater 127:5

sprinklers 19:8

square 110:20

stack 33:9,16 36:6 38:1

stacked 97:12

stage 50:24

standpoint 144:21

stapled 33:18,22 34:1,2

stars 38:6

start 21:8 25:18 31:23 37:6 67:17 69:8 88:6 105:19 110:20

started 38:18 44:6 68:18,19

starting 68:19 87:14 88:10

state 5:10 7:11 50:6 82:16 116:15 117:3,8 138:15

statement 28:21 57:4 146:25

statements 71:24,25 117:8 137:22 146:7, 8,14,19 147:2,22 148:10 150:7,12,18, 21

states 87:10

stay 92:2

stayed 97:5

step 106:17

stepping 126:6

steps 113:2

stipulated 154:20,21

stipulation 153:12 154:14

stolen 40:3

stop 28:5 139:16 152:20

stopped 20:11 25:5, 24 26:1 43:22 44:2 118:20 125:18

storage 11:14 12:19, 23 13:4,22 14:4 17:23,24 18:6,11,24 19:3,13 20:1,8,18,24

21:2,9,21,24 22:6,9, 17,20,22 23:1,7,16 24:7,9 25:4,12 26:9, 15,24 27:10,18 28:4, 7 31:5,10,21 32:2 34:20 35:4 36:21 39:22 47:3 51:14 53:16 54:4,16 58:23 72:8,24 73:8,9,12,14, 19 74:14 75:12,19, 23,25 76:8,18 77:14, 19,23 78:1 79:7 80:1, 4,14 96:2,7,13 97:1, 11,14 119:7 121:18 127:25 128:2,5,6,7 137:3 145:25 150:14, 23 151:3,14 152:3,4

store 106:16 111:2

stored 77:15

story 90:1

straight 33:19

stream 32:9 135:4

streams 40:19

street 18:25

stretch 31:10

strike 60:20 105:3

strive 28:14

stuff 14:10 23:22,23, 24 25:2,3 31:15,20 32:18 33:4 34:6 35:3, 4 36:19 37:1,2 39:5, 17 41:18 43:20 54:6 74:10 75:7,16 110:21 117:8,12 122:4 148:4,13,14,23 151:4,6

subfiles 30:11

subject 51:16 129:25

subsequent 17:11 126:5 142:23

subsequently 42:24 53:8

substances 9:24

substantially 133:8

sued 82:15

sufficient 153:25

sufficiently 150:9

suggest 34:21

summation 17:20

summer-early 135:23

sun 38:6

superb 82:21

Superior 83:25

supplies 20:19,22,23 54:6

Support 82:4,8

suppose 11:13 134:11 143:17

supposed 53:15

surprised 43:9 122:22

suspect 19:19 27:15, 16 117:19

suspended 63:6

switched 42:22,24,25 43:2

swore 9:9

sworn 83:20

synced 151:5

system 28:19,22,23 30:14,21,24 37:25 45:12,21 46:5 72:16, 20 75:24 76:7 107:9

systematic 121:23

systems 105:24

_____

**T**

table 5:24 76:3,4 137:20

tablet 112:6 113:7,13

tablets 112:13 113:20 114:15,20 115:1,2

takes 14:17 106:17

talk 10:19 17:21 40:4 41:24 48:18 51:2,4 54:22 55:1 59:12 64:11 88:12 102:22 111:6 128:22 144:23 152:8 153:9

talked 17:23 44:8 85:2,6,10,24 113:19

talking 8:2,4,25 10:25 52:25 56:25 59:13 68:9 71:2 73:3 106:5 128:5 130:1 132:22 141:16 146:10

tax 72:13,14 117:13 122:12,13

teachers 54:7

technical 6:4 109:4,5 110:21

technically 106:17 134:11

telephone 44:24 110:14,24 111:11 113:13 139:10

telephones 113:20 114:15,20 115:2

telling 52:17

ten 18:19,21 123:13

tenant 19:16 101:2

tenth 118:8

term 25:17 98:25 117:2

terminate 102:22

terms 28:20 152:2

terribly 44:12

testified 5:6 6:24 69:10,18 112:24 128:16 133:22

testify 7:20

**testimony** 7:17 74:19 86:5,16 139:20

**theory** 25:1 40:14

**thick** 38:10

**thing** 33:24 71:25 117:5

**thing's** 140:10

**things** 21:1 22:12 23:3,5 30:19 32:13 34:4 40:8 71:1,11,13 85:2,6,16,21 94:16, 20 113:23 116:16 120:11 137:23

**thinking** 71:11 107:2 142:14

**thought** 30:4 39:11 41:1 44:18 57:24 58:2

**thousand** 52:25 70:16 90:9 98:16

**threw** 74:18

**throw** 32:13 75:1 92:3

**thrown** 37:1

**thumb** 43:19 73:13, 18,20,25 74:5,13,17 75:8,12,18 146:11 152:16

**THURSDAY** 5:1

**time** 7:3,13 8:13 11:6 17:14,16 20:19 21:22 23:14,19 24:11 25:11,21 27:1,19 29:11 38:6,7 39:11 42:3 43:15 44:18 46:18 49:25 61:17 62:16,24 72:16 74:16 75:17 89:14,22 90:9, 12 92:13 93:6 94:13 98:21 104:5 114:19 115:12 116:18 120:20,22 121:2,10 122:20 125:19 127:14 132:1 135:25 136:3 139:5 141:17,

23 142:11,16 143:5, 18 144:1 145:4,12 151:12 154:16

**times** 6:19 7:1 38:8 59:22 120:18

**today** 6:14 9:22 10:2, 15,19 11:12 14:15,23 28:10,13 42:15 54:5 66:15 71:21 77:20,23 84:8,21 85:7,8,10,24 86:4,16,22 109:25 116:24 121:16 134:2 135:11 138:4 145:4, 10 152:8,19

**told** 25:6,7 26:5 75:15 81:2 89:24 99:25 107:3 111:3 122:17 146:21

**topic** 27:22 38:13 101:14

**total** 52:3,20 53:4,19

**town** 35:15

**track** 63:7

**traded** 110:12,15 112:21

**trademark** 117:10

**transaction** 15:21 55:7 129:22 132:11, 25 133:2

**transactional** 37:10

**transcript** 76:12 153:9,13,14 154:25

**transcripts** 24:2,20 95:13

**transferred** 74:5

**transition** 29:8,14

**transported** 91:12

**travel** 108:7,11,14,20 109:15,17

**treatments** 9:24

**trial** 6:24 7:13,18,20 95:13 97:20

**trick** 149:11,14

**triggers** 88:14

**trouble** 5:22

**truck** 98:1,9,10

**true** 32:15

**trustee** 11:10,19,25 12:9 13:1 31:16,25 74:11 132:16 145:22 146:8,14

**trustee's** 11:17 74:10 76:13 148:4 150:6

**truthful** 9:12 15:3 85:15 86:11,17 87:6

**Tuesday** 153:15,16, 17 154:5,7

**turn** 146:17

**turned** 21:15 107:23

**turns** 52:16

**Turtle** 51:11 54:19 57:1

**Turtlegroveadvisors** 53:11

**two-day** 7:17

**type** 32:25 126:11

**types** 61:24

**typically** 110:17

---

**U**

**ultimately** 21:15

**Um-hmm** 12:14

**under-** 134:17

**understand** 8:15 9:15,20 10:22 22:8 26:17,23 37:5 45:14 53:17 57:12 59:15 60:14 64:5 66:22,23 69:25 79:25 85:20 86:9 125:16 131:21 132:21 133:1,5 134:21 142:5 150:22

**understanding** 14:22,25 15:4,8 49:1 58:12 115:15 116:3 128:19,24 153:21

**understood** 44:10

**unilaterally** 80:21

**unit** 17:23,24 18:2,11, 15,24 19:3,14,16 20:1,6,8,18,24 21:2, 9,21,24 22:6,10,20, 22 23:14 24:12,18 25:4 26:9,24 75:25 76:8,18 79:7 80:1,4, 14 96:2,7,13 97:1,12, 14 128:6 145:25 150:23 151:3,14

**United** 18:6

**units** 23:4,7,16,18 24:11,18,21 25:12

**unoccupied** 102:20

**untold** 16:5

**upper** 82:9

---

**V**

**vague** 6:11 45:6 55:16 57:3 59:16 62:9 64:3 65:9,21 66:20 129:8

**vaguely** 76:22

**varies** 35:15

**variety** 10:4 24:5 67:7 72:3 85:2,6 95:15

**vast** 16:9 31:8 45:10 136:23

**vehicles** 19:1

**vendors** 54:6

**ventures** 22:25

**verbally** 137:20

**verse** 22:2

**version** 107:12 112:8, 10

versions 72:22 73:10

video 5:15 6:5 8:1 76:19 92:20 140:21 152:11

videoconference 5:12

view 10:12 84:10 85:22,24

views 12:11

vis-a-vis 124:22

visit 63:6

visual 92:19

volume 17:23 26:19 27:2 29:24 35:23 36:7 43:16,23 44:5, 25 45:20 138:5,9 142:6 144:4 150:24 151:8

Volume's 9:3

---

**W**

waiver 107:4

wanted 32:1 40:22,25 74:12 136:5,19

washers 131:8

ways 19:12 49:20

week 34:25 35:14,15 128:4 153:16

weeks 109:23 128:4

whatever-format 38:2

when's 7:13

white 78:6

whomever 22:19

wife 10:11 11:13,21 13:10 14:17,20 15:17,23 16:3,14 19:25 20:2 34:11 38:16 41:9 42:4 46:16 54:20 56:1

57:2 77:4,8 80:3,9,12 91:13 93:7 94:10,13 95:7,16 100:4 105:20 115:22 116:10 120:17,19 127:17 131:14,19 132:2 141:7

wife's 13:11

wild 18:23 25:7 26:4 70:13,21

Window 131:8

witnesses 123:18

word 10:24 13:8

words 143:8

work 11:2 16:9,11 17:15 36:22 43:21 47:16,17,18,19 99:10 117:16 119:5,11,14 123:15

worked 24:23 118:14, 15,17 119:10

working 35:8,12

wrap 139:25

wrap-up 141:17

wrapped 141:18,23 142:11,16 144:14,19

wrapping 124:23 143:7

wraps 144:11

wrong 36:14 74:21 84:14 85:11 89:5

wrote 44:8

---

**Y**

yada 54:7

year 27:23 30:6,8,11 31:2 34:25 60:22 61:5 74:2,3 81:7,20, 21 104:5 107:1,11,16 110:1,2,6 112:4,23 118:1 145:8 150:4,5

years 7:6,18 16:1 20:9 28:11,13 42:20, 22 47:9 50:17 81:9 91:19,20 104:6 110:7 112:14 145:10,12,15 149:17,22 150:4,13

yesterday 9:22 69:14, 15,16,17 70:7,9 89:18

---

**Z**

Zach 135:17

*EXHIBIT 4*

# Allen Matkins

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law
501 West Broadway, 15th Floor | San Diego, CA 92101-3541
Telephone: 619.233.1155 | Facsimile: 619.233.1158
www.allenmatkins.com

Charles L. Pernicka
E-mail: cpernicka@allenmatkins.com
Direct Dial: 619.235.1531   File Number: 374533-00001/SD829081.01

<u>**Via Facsimile and Email**</u>

April 3, 2015

James W. Beshears, Esq.
110 West C Street, Suite 1300
San Diego, CA 92101
Facsimile (619-233-1018)
jwblaw@sbcglobal.net

Jeffrey D. Cawdrey, Esq.
Gordon & Rees LLP
101 W. Broadway, Suite 2000
San Diego, CA  92101
Facsimile (619-696-7124)
jcawdrey@gordonrees.com

> Re:   **Burlingame Capital Partners II, L.P.**
> **Burlingame Capital, LLC**
> **KC Funding, LLC**
> **Robert Judson**
> **Janice Judson**
>
> **DEMAND TO HALT DESTRUCTION OF RECORDS AND EVIDENCE**

Dear Mr. Beshears and Mr. Cawdrey:

Southern District Local Bankruptcy Rule 4002-1(a) requires that a debtor maintain and preserve all of its records.  It is basic, black-letter law that records and evidence may not be destroyed.  See, e.g., *Kronisch v. United States*, 150 F.3d 112, 126 (2nd Cir. 1998); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996) ("[T]here is an uncompromising duty to preserve relevant records."); *Waters v. Kohl's Dept. Stores, Inc.*, 2015 U.S. Dist. LEXIS 2160, * (N.D. Cal. Jan. 8, 2015) ("[A]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.").

On August 12, 2014, at the Section 341(a) meeting of creditors, Trustee James Kennedy informed Mr. Judson that Burlingame's records are not to be destroyed.  On February 13, 2015, a Notice of Duty to Preserve Documents was delivered to each of you, and to attorney John Howard, in relation to debtor Burlingame Capital Partners II, L.P. ("Burlingame"), and also Burlingame's related affiliates and principals Burlingame Capital, LLC, KC Funding, LLC, Robert Judson, and Janice Judson.

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law

James W. Beshears, Esq.
Jeffrey D. Cawdrey, Esq.
April 3, 2015
Page 2

Despite this, at the examination of Robert Judson as person most knowledgeable regarding Burlingame's documents and records, conducted on April 2, 2015, Mr. Judson testified that he and Mrs. Judson have programmatically over the course of the last approximately 14 months intentionally and deliberately deleted all emails and electronic files related to Burlingame. Mr. Judson testified that electronic records were deleted as recently as April 1, 2015, the day before the examination.

The deletion of emails and electronic files destroys, or could destroy, the electronic evidence associated with those emails and files. Further, it destroys Burlingame's document file system as Burlingame's files are maintained in the ordinary course of business. In addition to causing the loss of potentially important evidence, the printing of electronic files and emails and the placement of the resulting paper in boxes without any organizational system or index, and without even fastening together the pages that make up each individual document (as Mr. Judson testified was occurring), appears to be intended to frustrate the Trustee's ability to obtain information and evidence concerning Burlingame's finances and transactions.

BURLINGAME, AND ALL INDIVIDUALS ACTING ON BEHALF OF BURLINGAME, INCLUDING WITHOUT LIMITATION ROBERT JUDSON, JANICE JUDSON, AND THEIR ATTORNEYS, ARE DEMANDED TO IMMEDIATELY HALT ALL DELETION OF ALL EMAILS AND ELECTRONIC FILES, AND TO IMMEDIATELY HALT ANY AND ALL OTHER DESTRUCTION OF DOCUMENTS, RECORDS, AND EVIDENCE, WITHOUT LIMITATION AS TO THE LOCATION OF THOSE RECORDS OR FILES OR THE MEDIUM ON OR IN WHICH THEY ARE STORED.

Any and all rights to sanctions, recovery of attorneys' fees and/or other costs, and other remedies resulting from Burlingame's willful destruction of evidence are reserved. Please contact me if you have any questions.

Sincerely,

Charles L. Pernicka

cc:    Gary Rudolph, Esq. (via email (rudolph@sullivanhill.com))
       John W. Howard, Esq. (via facsimile and email (619-234-1716 /
       johnh@jwhowardattorneys.com))

```
x  x  x COMMUNICATION RESULT REPORT ( APR. 3. 2015  3:03PM )  x  x  x

                                                      FAX HEADER 1:  ALLEN MATKINS SD
                                                      FAX HEADER 2:

TRANSMITTED/STORED : APR. 3. 2015  2:58PM
FILE MODE        OPTION        ADDRESS                        RESULT    PAGE
----------------------------------------------------------------------------------
6083 MEMORY TX                         6192331018              OK        3/3
                              286*16196967124                  OK        3/3
                                     unknown                   OK        3/3
----------------------------------------------------------------------------------
  REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL                 E-2) BUSY
  E-3) NO ANSWER                            E-4) NO FACSIMILE CONNECTION
```

# Allen Matkins

**Facsimile**

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law
www.allenmatkins.com

**To: James W. Beshears, Esq.**
Fax: 619.233.1018

**Jeffrey D. Cawdrey, Esq.**
Gordon & Rees LLP
Fax: 619.696.7124

cc: John W. Howard, Esq.
Fax: 619.234.1716

**From: Charles L. Pernicka**

Date: April 3, 2015

Telephone: 619.235.1531
E-mail: cpernicka@allenmatkins.com
File Number: 374533-00001/SD829093.01

Total pages including cover sheet: 03

**Subject: Burlingame Capital Partners**

**Comments:**

Please see attached letter from Charles Pernicka.

Original will: ☐ be sent via mail  ☐ be sent via messenger  ☐ be sent via fedex/courier  ☑ be sent via email  ☐ not be sent

Note: The information contained in this facsimile document is confidential and is intended only for the use of the individual named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original document to us at the above address via U.S. Mail. We will reimburse you for the postage. Thank you.

Los Angeles | Orange County | San Diego | Century City | San Francisco
501 West Broadway, 15th Floor | San Diego, CA 92101-3541 | Telephone: 619.233.1155 | Facsimile: 619.233.1158

| TRANSMITTED/STORED : APR. 3. 2015  3:04PM | | | |
|---|---|---|---|
| FILE MODE | OPTION | ADDRESS | RESULT | PAGE |
| 6084 MEMORY TX | | unknown | OK | 3/3 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

# Allen Matkins

**Facsimile**

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law
www.allenmatkins.com

**To: James W. Beshears, Esq.**
Fax: 619.233.1018

**Jeffrey D. Cawdrey, Esq.**
Gordon & Rees LLP
Fax: 619.696.7124

cc:  John W. Howard, Esq.
Fax: 619.234.1716

**Subject:  Burlingame Capital Partners**

**From: Charles L. Pernicka**

Date: April 3, 2015

Telephone: 619.235.1531
E-mail: cpernicka@allenmatkins.com
File Number: 374533-00001/SD829093.01

Total pages including cover sheet: 03

**Comments:**

Please see attached letter from Charles Pernicka.

Original will: ☐ be sent via mail   ☐ be sent via messenger   ☐ be sent via fedex/courier   ☑ be sent via email   ☐ not be sent

*Note: The information contained in this facsimile document is confidential and is intended only for the use of the individual named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original document to us at the above address via U.S. Mail. We will reimburse you for the postage. Thank you.*

Los Angeles | Orange County | San Diego | Century City | San Francisco
501 West Broadway, 15th Floor | San Diego, CA 92101-3541 | Telephone: 619.233.1155 | Facsimile: 619.233.1158

| | |
|---|---|
| **From:** | Trickey, Glenda |
| **Sent:** | Friday, April 3, 2015 2:54 PM |
| **To:** | 'jwblaw@sbcglobal.net'; 'jcawdrey@gordonrees.com' |
| **Cc:** | 'rudolph@sullivanhill.com'; 'johnh@jwhowardattorneys.com'; Pernicka, Charles |
| **Subject:** | Burlingame Capital Partners |
| **Attachments:** | Beshears-Cawdrey letter.pdf |

Please see attached letter from Charles Pernicka.

*Glenda S. Trickey*

Assistant to Valentine S. Hoy and Charles L. Pernicka
Allen Matkins Leck Gamble Mallory & Natsis LLP
501 W. Broadway, 15th Floor
San Diego, CA 92101
619.233.1155 x32211
619.233.1158 Fax
gtrickey@allenmatkins.com
## Allen Matkins

*EXHIBIT 5*







*EXHIBIT 6*

# PURCHASE AGREEMENT

**THIS AGREEMENT**, made this _28_ day of September, 2011 by and between Burlingame Capital Partners II, L.P., hereinafter referred to as "BCP", of the one part, and Janice H. Judson, and Robert D. Judson, Jr., hereinafter referred to in the collective as "Judson", of the second part, (the parties shall be referred to in the collective as "Parties"),

## WITNESSETH

### RECITALS:

A. BCP negotiated the purchase of the assets of Kids Connection, Inc. ("Kids Connection") through an asset purchase agreement approved by the Bankruptcy Court in San Francisco, California.

B. In completing the purchase of the Kids Connection assets ("Assets"), BCP formed a California limited liability company named "KC Funding, LLC." ("KC") to receive and own said Assets.

C. The purchase of the Assets was facilitated by capital provided by some, but not all, of the limited partners of BCP, identified herein as the "Preferred Interests" and conversion of a $227,000 portion of BCP's bankruptcy claim into KC equity.

D. The Assets are comprised of two real estate properties (1970 and 1998 Beach Park Blvd., Foster City, CA), valued at six million dollars ($6,000,000.00), and an operating school (including all non-real estate assets), valued at six hundred twenty-one thousand, five hundred eighty-two dollars and seventy-one cents ($621,582.71).

E. KC has, since its formation, managed the Assets as an actively operating school.

F. BCP is the sole legal owner of KC and holds the interests therein for itself and in trust for the Preferred Interests in accordance with the agreement between BCP and the Preferred Interests which sets forth the respective beneficial interests in KC and has the power to transfer all of its right, title and interest in same.

G. Robert Judson and Janice Judson are residents of the State of Florida and principals in Burlingame Capital, LLC, a California limited liability company, which is the general partner of BCP.

H. Judson has agreed to purchase and BCP to sell KC on the terms and conditions set forth herein.

I. All of the Preferred Interests have agreed to the sale of KC to Judsons.

**NOW THEREFORE**, in consideration of the premises and of the mutual promises as hereinafter set forth,

BE IT AGREED AND CONTRACTED, as follows:

1. **Purchase of KC**. Judson agrees to purchase and BCP agrees, for itself and as trustee for the Preferred Interests, to sell all of the right, title and interest in KC, both legal and equitable, together with all assets owned and all liabilities owed thereby ("Common Ownership Interests" or "COI") for the price and on the terms set forth herein. The promise to purchase hereunder is subject to (1) formal approval of the loan constituting part of the Purchase Price, as defined herein, by the Small Business Administration ("SBA"), (2) approval of the loan constituting part of the Purchase Price herein by Bank of Marin; (3) full execution of the Preferred Investor Agreement and (4) closing of the transaction documented herein. BCP and the Preferred Interests shall be referred to herein as "Owners".

2. **Purchase Price**. Judson shall pay six million, six hundred twenty-one thousand, five hundred eighty-two dollars and seventy-one cents ($6,621,582.71) in lawful money of the United States of America as and for the complete consideration for the purchase of all of the Owners' right title and interest in KC. The parties have agreed to the purchase price set forth herein after an analysis and valuation of the Assets. The Parties agree that the real estate owned by KC is conclusively presumed to have a value of six million dollars ($6,000,000.00) and the operating school known as "Kids Connection" is conclusively presumed to have a value of six hundred twenty-one thousand, five hundred eighty-two dollars and seventy-one cents ($621,582.71). The purchase price includes, but is not limited to, the conversion of the moneys due Preferred Investors identified as follows into either Preferred Ownership Interests ("POI") or Member Interests:

| | |
|---|---|
| Roberts Children 1987 Trust fbo Eric Roberts | $138,129.49 |
| Roberts Children 1987 Trust fbo Courtney Roberts | $138,129.49 |
| Gleam Co, Inc. | $138,129.49 |
| Roberts Foundation | $207,194.24 |
| | |
| Robert and Janice Judson | $400,000.00 |

The total of these converted Preferred Interests is one million twenty-one thousand five hundred eighty-two dollars and seventy-one cents ($1,021,582.71). The balance of the purchase price shall be the proceeds of loans from the Bank of Marin and SBA in the amount of five million, six hundred thousand dollars ($5,600,000.00).

3. **Title**. Title to the COI interests transferred hereunder shall be in the names of Janice Judson, to whom sixty percent (60%) of the member interests ("Member Interests") shall be transferred, and Robert Judson, to whom forty percent (40%) of the Member Interests shall be transferred. Title to the real estate will be held by Janice H. Judson and Robert D. Judson, Jr. or their assignee.

4. **Escrow**. An escrow shall be established at Old Republic Title Company, 475 Sansome Street, Suite 1700, San Francisco, CA 94111, Attn: Martha Seno Nakagawa, into which all cash and credit proceeds of the Purchase Price in the amounts set forth in Paragraph "2" hereof shall be deposited, together with all documents of transfer and/or conversion. Documents to be deposited into escrow will be those necessary to transfer same to Janice Judson and Robert Judson in the percentages set forth herein as well as in the Preferred Interest Agreement, a copy of which is attached. When all moneys have been deposited with the escrow company, the transaction shall be closed, documents of transfer delivered and all moneys disbursed as set forth herein.

5. **KC Purchase "As Is"**. Judson's purchase of KC is undertaken after a thorough investigation and review of all assets and accounting and financial information related to KC's business and operations. After said review, Judson's agreement to purchase herein is based on a full understanding of the business and assets belonging to KC and Judson's belief that the purchase price to be paid herein is fair and reasonable.

6. **Representations and Warranties of Seller**. BCP represents and warrants that:

a. It is a limited partnership duly formed and existing under the laws of the State of Delaware and qualified to do business in the State of California.
b. BCP is the legal and beneficial owner of an interest in KC and holds sole legal title to the totality of the interests in KC, holding ownership of a portion of those interests in trust for the Preferred Interests in accordance with a contract related to same between BCP and the Preferred Interests. No other person or entity has any ownership, encumbrance or lien, colorable or otherwise, which would prevent BCP from transferring true and complete title in KC free of any and all liens or encumbrances thereon.
c. That it has the power and authority to enter into the transaction set forth herein.
d. That it has obtained all approvals of all of the Preferred Interests to enter into the transaction memorialized by the instant Agreement.
e. That when the transaction is complete, neither BCP nor the Preferred Interests shall own no title to any asset and no interest in KC, except as set forth herein, and no claim therefor shall be made at any time thereafter.

7. **Indemnity**. With the exception of an action for enforcement of this Agreement, BCP agrees to defend, indemnify and hold Judson completely free and harmless from any and all claims, demands and causes of action on behalf of itself or made by anyone claiming through it arising from the instant transaction. In the event that any claim is made by any limited partner of BCP, BCP shall provide and pay for legal counsel of Judson's choice to defend against any such claims and pay any award or judgment arising therefrom.

8. **Transfers of Licenses**. To the extent it is necessary, BCP shall cooperate and provide all logistical support required to ensure transfer of any and all licenses necessary to operate the school, including signing and execution any and all documents necessary to accomplish same.

9. **Warranty of Ownership**. BCP warrants that all assets belonging to KC are owned by KC in the entirety and no claim, encumbrance or lien of any sort has been asserted with respect to any such assets.

10. **Delivery of Proceeds**. At the close of escrow, the following amounts shall be paid over to BCP for delivery to the Preferred Interests in accordance with the previously approved BCP KC sales proceeds distribution plan:

| | |
|---|---|
| Bellemont Group, L. P. | $414,388.49 |
| William V. Campbell Foundation | $ 30,000.00 |
| RJM Campbell Family Foundation | $ 30,000.00 |
| Lawrence G. Foley | $414,388.49 |
| Paul Hazen | $103,597.13 |
| MacDonnell Children's Trust dated 11/9/88 | $103,597.13 |
| William George Marr Trust Dtd. 10/15/90 | $ 48,000.00 |
| Steppe Family Trust | $ 11,400.00 |
| Robert W. Matschullat | $103,597.13 |
| Ariane M. H. Matschullat | $103,597.13 |
| Stephen T. & Catherine A. McLin Trust UA DTD 12/01/87 | $103,597.13 |
| Mack Clapp | $ 45,000.00 |
| Russell D. Garrett | $ 24,000.00 |
| | |
| Burlingame Capital Partners II, L. P. | $227,000.00 |

11. **Attorneys Fees**. In the event that either party hereto shall institute legal action for the enforcement of this Agreement or any of its terms, or initiate any action arising from the execution or performance of this Agreement, irrespective of whether or not any such action is for breach of contract or for tort, the prevailing party in any action for breach of contract shall be entitled to receive actual attorney's fees and court costs in addition to any other damages to which said party shall be entitled. For purposes of this paragraph, "legal action" shall contemplate and include institution of arbitration proceedings, the filing of any complaint in a court of law or the hiring or employment of attorneys at law for the purpose of securing the performance of a party under the Agreement irrespective of whether or not official proceedings are initiated. In no event is this provision to be construed as agreement to or authority for any award of attorney's fees in any action in tort, whether arising from this Agreement or otherwise. The parties specifically agree that there shall be no award of attorney's fees to either party in any action in tort. In the event that legal action is commenced to enforce this Agreement or any of its provisions, service of process may be effectuated by mailing, by first class mail, a copy of same to the address set forth herein under the "Notices" provision hereof.

12. **Severability**. Each of the clauses hereof is separate and severable. In the event that any clause, condition or provision hereof shall be declared illegal, unenforceable or void by a court of competent jurisdiction all other clauses, conditions and provisions hereof shall,

nevertheless, be fully enforceable and effective. Notwithstanding the foregoing, however, in the event that a clause is declared illegal, unenforceable or void and said declaration would leave this Agreement enforceable against only one party hereto, then the instant paragraph shall be void and unenforceable.

13. **Prompt Enforcement**. The failure of either party to promptly enforce this Agreement or any of its terms shall not be deemed to be a waiver of enforcement or implied modification of the Agreement regardless of the number of times or the frequency with which any such term is violated.

14. **Amendments**. This Agreement may not be amended or modified in any way except by a writing, which is dated and signed by all parties hereto.

15. **Timeliness**. Time is of the essence of this Agreement.

16. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their valid assigns and their successors in interest.

17. **Counterparts**. This agreement may be signed in one or more counterparts and signature on one counterpart shall be deemed to be signature of all.

18. **Assignments**. The parties may not assign this Agreement without the expressed written consent of the non-assigning party.

19. **Warranty of Authority**. Each party represents and warrants to the other party that he (a) has full capacity to enter into this Agreement and, by executing, delivering or performing under this Agreement he will not breach any agreement to which he is currently a party and (b) has the legal right, free of any right or interest of any third party, to perform his obligations hereunder.

20. **Choice of Law**. This Agreement is executed and intended to be performed in the State of California and the laws of that State shall govern its interpretation and effect.

21. **Jurisdiction and Venue**. This Agreement is entered into and expected to be performed entirely in the County of San Mateo, California. Any action filed pursuant to this Agreement shall be filed exclusively in the Superior Court of the State of California for the County of San Mateo. No other court shall have jurisdiction over any such dispute and venue shall not be proper in any other court or any branch of any other court.

22. **Mutual Drafting**. The parties hereto have both participated in the negotiation and drafting of this Agreement and no ambiguity herein shall be construed against one party as against the other.

23. **Advice of Counsel**. All parties do represent and warrant that they have been advised by counsel with respect to the drafting, execution, meaning, effect and implications of this Agreement and have relied solely on their own judgment and that of their respective counsel as

to its meaning and effect. The parties hereto do warrant and acknowledge that they fully understand all provisions hereof either through their own knowledge or through the advice of their legal counsel.

24. **Notices**. Notices under this agreement shall be made by sending same by the United States Postal Service, first class mail, registered or certified mail with return receipt requested to the following addresses:

| | | |
|---|---|---|
| Robert D. Judson, Jr. | Janice H. Judson | Burlingame Capital Partners II, L.P. |
| 4590 Kittiwake Court | 4590 Kittiwake Court | 3182 Campus Drive #306 |
| Boynton Beach, FL 33436 | Boynton Beach, FL 33436 | San Mateo, CA 94403 |
| Tel: (561) 200-0256 | Tel: (561) 200-0256 | Tel: (650) 212-5600 |
| Fax: (800) 670-8096 | Fax: (800) 670-8096 | Fax: (800) 670-8096 |
| Email: rjudson@kc4us.com | Email: jjudson@kc4us.com | Email: rjudson@burlcap.com |

| | | |
|---|---|---|
| Copies to: | John W. Howard | KC Funding, LLC |
| | JW Howard Attorneys, Ltd | Attn: Janice H. Judson, CEO |
| | 1508 West Lewis Street | 1998 Beach Park Blvd. |
| | San Diego, CA 92103 | Foster City, CA 94404 |
| | Tel: (619) 234-2842 | Tel: (650) 578-6691 |
| | Fax: (619) 234-1716 | Fax: (650) 578-6699 |
| | Email: johnh@jwhowardattorneys.com | Email: jjudson@kc4us.com |

Notice may also be given by messenger, personal delivery, professional courier service, such as UPS or FedEx, or by verified electronic transmission such as facsimile transmission or confirmed electronic mail. Notice given in any manner other than that provided for herein shall be conclusively presumed to be invalid. Unless notice of change of address shall be given in the manner provided for "notices" hereunder in this paragraph, notice shall conclusively be presumed to be valid if delivered to the addresses set forth hereinabove.

25. **Entire Agreement**. The parties hereto have entered into this Agreement after extensive discussion and have set forth in this Agreement the sum and substance of all such discussions and representations leading up to agreement and as to its meaning and effect. This Agreement constitutes the entire agreement of the parties hereto and no other representations, agreements or promises, either written or oral, either as an inducement to enter into this Agreement or as to its meaning or effect, have been made which are not contained herein. No representation or assertion of fact has been made by either party to the other as an inducement to entering into this Agreement which is not specifically and in detail set forth herein and both parties hereby specifically and knowingly waive any and all claims, existing and potential, based on any such representations. In the event evidence is propounded of representations made by either party hereto as an inducement to the other to enter into this Agreement, the parties hereto do hereby warrant and agree that such representations were irrelevant and immaterial and did not constitute an inducement to either party to enter into this Agreement. In entering into this agreement, the parties did not rely on any belief of any fact represented by the other party hereto and had the opportunity to fully explore any and all facts which may or could bear on the

circumstances giving rise to this Agreement and have been on notice of all such facts. The parties hereby specifically and knowingly waive any and all claims they may have for fraud in the inducement of this Agreement recognizing that their interests in entering into it are adverse and opposing and that they have had a reasonable opportunity to conduct any and all prudent and complete due diligence in entering into same. The parties represent and warrant that they each did a thorough, independent investigation as to all facts, which might or could have borne on their decision to enter into this Agreement and were on notice of same. This Agreement supersedes and replaces all prior negotiations, representations, proposals, agreements and/or communications occurring prior to the execution of this Agreement. Each party acknowledges that he, she or it has not executed this Agreement in reliance on any collateral promise, representation or warranty, or in reliance on disclosure of facts or circumstances or in reliance in any belief as to any fact not expressly set forth herein.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands on this 28 day of September, 2011.

Burlingame Capital Partners II, L. P., for itself and as trustee for the Preferred Interests.

By: _____
Robert D. Judson, Jr.
Principal of the General Partner

By: _____
Janice H. Judson

By: _____
Robert D. Judson, Jr.

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action. My business address is 501 West Broadway, 15th Floor, San Diego, California 92101-3541.

On April 20, 2015, I served on interested parties in said action the within:

> **TRUSTEE'S SUPPLEMENTAL BRIEF RE APPLICATION FOR SECOND ORDER REQUIRING PRODUCTION OF DOCUMENTS AND APPEARANCE FOR EXAMINATION BY BURLINGAME CAPITAL PARTNERS II, L.P.**

> **DECLARATION OF CHARLES L. PERNICKA IN SUPPORT OF TRUSTEE'S SUPPLEMENTAL BRIEF RE APPLICATION FOR SECOND ORDER REQUIRING PRODUCTION OF DOCUMENTS AND APPEARANCE FOR EXAMINATION BY BURLINGAME CAPITAL PARTNERS II, L.P.**

☒ **BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF"):** the foregoing document(s) will be served by the court via NEF and hyperlink to the document. On March 9, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

- Gary B. Rudolph on behalf of Trustee James L. Kennedy: Rudolph@sullivanhill.com; hill@sullivanhill.com, millerick@sullivanhill.com, bkstaff@sullivanhill.com, vidovich@ecf.inforuptcy.com, Rudolph@ecf.inforuptcy.com

- James L. Kennedy: jim@jlkennedy.com, jkennedy@ecf.epiqsystems.com

- James W. Beshears on behalf of Debtor, Burlingame Capital Partners II, L.P., a Delaware Limited Partnership: jwblaw@sbcglobal.net

- United States Trustee: ustp.region15@usdoj.gov

- Jeffrey D. Cawdrey on behalf of Debtor and/or Debtor's Principals: jcawdrey@gordonrees.com, jmydlandevans@gordonrees.com, emos@gordonrees.com

☒ **BY PERSONAL SERVICE:** I placed a true copy in a sealed envelope addressed as indicated below on the above-mentioned date, and gave same to Nationwide Legal, whose business address is 110 West C Street, Suite 1211, San Diego, CA 92101, for personal delivery on April 21, 2015 at the offices of addressee:

**COURTESY COPY:**

John W. Howard
JW Howard Attorneys
225 Broadway, Suite 2220
San Diego, CA 92101
**Attorney for Debtor and/or Debtor's Principals**

1    I declare under penalty of perjury under the laws of the State of California that the
2    foregoing is true and correct.

3    Executed on April 20, 2015, at San Diego, California.

4

5    _____          _____
          Glenda Trickey
6        (Type or print name)                        (Signature)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28